UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
---------------------------

In the Matter of:                Chapter 11

MORGANSEN'S LTD.                 03-80994

        Debtor
---------------------------

Motion to Expedite for a Proposed Public Auction Sale

                    United States Bankruptcy Court
                    Central Islip, New York

                    October 1, 2003
                    10:30 a.m.

B E F O R E:

            HONORABLE STAN BERNSTEIN,
            Bankruptcy Judge

A P P E A R A N C E S:

MELTZER, LIPPE & GOLDSTEIN, LLP
        Attorneys for Trustee
190 Willis Avenue
Mineola, NY 11501
            BY: NEIL H. ACKERMAN, ESQ.
                CHARLES A. BILICH, ESQ.

WILLIAM F. BATES, ESQ.
        Attorney for Estate of Esther A. O'Keefe
120 Court Street, P.O. Box 1463
Riverhead, NY 11901
            BY: WILLIAM F. BATES, ESQ.

ALAN TODD COSTELL, ESQ.
        Attorney for Carey Turnbull
329 Middle Country Road
Smithtown, NY 11787
            BY: ALAN TODD COSTELL, ESQ.

DAVIDOW, DAVIDOW, SIEGEL & STERN, LLP.
        Attorneys for Evelyn A. Rupolo
One Suffolk Square, Suite 330
Islandia, NY 11749
            BY: WALLACE DAVIDOW, ESQ.

A P P E A R A N C E S (CONT.):

OFFICE OF THE UNITED STATES TRUSTEE
560 Federal Plaza
Central Islip, New York 11722
            BY: TERESE CAVANAGH, ESQ.

ALSO PRESENT:

Maur Dubin

Paul M. Faver

Barbara Goldberg

Marvin Goldberg

June Kessler

Jennifer R. Miller

Tasha Moody Piazzola

Phil Pape

Eileen Cronin, Court Reporter

## I N D E X

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE |
|-----------|--------|-------|----------|---------|-----------|
| Mr. Maltz | 180 | 197 | 214 | | |

1                        P R O C E E D I N G S

2                    THE COURT:    Please be seated.

3                    THE CLERK:   Matter on Morgansen's Ltd.

4                    THE COURT:    Can I have your appearances?

5                    MR. COSTELL:   For Carey Turnbull, Alan Todd

6       Costell, 329 Middle Country Road, Smithtown, New York 11787.

7                    THE COURT:  You can give your cards to Ms.

8       Cronin.  I just need to know your first and last name and

9       who you represent.  Your name is?  What happened to the last

10      person who ran right by me before I could do anything.

11                   MR. COSTELL:   My name is Alan Todd Costell.

12                   THE COURT:    Alan Todd Costell.

13                   MR. COSTELL:   C-O-S-T-E-L-L.

14                   THE COURT:    And you represent who?

15                   MR. COSTELL:   Carey Turnbull.

16                   THE COURT:    Is that the only person or do you

17      have others?

18                   MR. COSTELL:   That's all.

19                   THE COURT:    Okay.

20                   MR. BATES:    William F. Bates for the Estate of

21      Esther O'Keefe.

22                   THE COURT:    William Bates?

23                   MR. BATES:   Yes, sir.

24                   THE COURT:    The estate of Esther O'Keefe.   All

25      right.

1          MR. GOLDBERG:    Marvin Goldberg, your Honor.  I

2    represent myself and my wife Barbara Goldberg.

3          MR. FAVER:    Your Honor, my name is Paul Fava

4    here on behalf of myself.  F-A-V-E-R.

5          THE COURT:    All right.

6          MR. PAPE:    Your Honor, Phil Pape representing

7    myself.

8          THE COURT:    Your name?  You can pick up the

9    mike.

10         MR. PAPE:    Phil Pape, 101 Foster Crossing,

11   Southampton, New York.

12         THE COURT:    Spell your name please.

13         MR. PAPE:    P-A-P-E.  Like paper without the r.

14         MS. MOODY:    Good morning.  I am here to claim

15   something, and I am representing myself.  Tasha Moody.  M-O-

16   O-D-Y.    PIAZZOLA.

17         THE COURT:    Slowly please.  Last name -- M-O-

18   O-O-D-Y.

19         MS. MOODY:    Thank you.

20         MR. DAVIDOW:    I am Wallace Davidow.

21         THE COURT:    Wallace?

22         MR. DAVIDOW:    Wallace Davidow representing

23   Evelyn Rupolo.

24         THE COURT:    How do you spell her name please?

25         MR. DAVIDOW:    R-U-P-O-L-O.

1          THE COURT:     Okay.  Thank you.  Anybody else?

2          MS. KESSLER:     June Kessler, representing

3    myself.

4          THE COURT:     Your name is?

5          MS. KESSLER:     June.  J-U-N-E.  Kessler.  K-E-S-

6    S-L-E-R.

7          THE COURT:     K-N-E --

8          MS. KESSLER:     No. K-E-S-S-L-E-R.

9          THE COURT:     Okay.

10         MS. KESSLER:     Thank you.

11         MS. MILLER:     Jennifer R. Miller, representing

12   myself.

13         THE COURT:     And your last name is Miller.

14         MS. MILLER:    Yes, sir.

15         THE COURT:     Okay.

16         MR. ACKERMAN:     Neil Ackerman, Trustee and also

17   appearing for counsel for the Trustee at Meltzer, Lippe &

18   Goldstein.

19         THE COURT:     All right.  Is there someone from

20   your firm who is going to deal with the legal issues?

21         MR. ACKERMAN:     Yes.

22         THE COURT:     Your name?

23         MR. BILICH;   Charles A. Bilich.  B-I-L-I-C-H.

24         THE COURT:     Look.  I am going to tell all of

25   you one time.  The acoustics in this courthouse are very

1    poor.  It is a rather cavernous room.  It may be designed to

2    impress you.  It is not designed to facilitate

3    communications between litigants and their counsel and the

4    courthouse.  So you have to speak directly into the

5    microphone.  It doesn't pick up a very broad range.   You

6    move away from the microphone by more than a few inches, I

7    have difficulty hearing you even though you are just a few

8    yards in front of me, and we won't be able to get a recorded

9    tape of this.

10        We have these tape machines so that persons who

11   appear at these hearings and save themselves the expense of

12   ordering transcripts so they can listen to the tapes at

13   their own leisure, and if they want to transpose them, they

14   can do that.

15        You don't have to stand up at the podium to

16   address the Court.  If it is more comfortable for you to sit

17   down at the table, I don't treat it as an act of disrespect

18   by any means.  So you can use the table, spread out your

19   papers, and speak directly into the microphone.

20         The house rules are only one person at a time.

21         All right.  So I don't want a free for all here.

22   And I understand for some of you, this is a matter of

23   considerable anxiety if not anger.  I have to deal with the

24   facts on legal issues.  So I want there to be suitable

25   restraint addressing those instances.  I have not made up my

1    mind about anything, and I know the lard in this area even

2    with the revised uniform commercial codes still remains

3    somewhat opaque.

4        So Mr. Bilich, why don't you explain to me if you

5    would please and to the others assembled, what is the

6    position of the Trustee.  I am not interested in the

7    historical exercise.  I am interested in what is the status

8    of the UCC as amended and what was the effective date of

9    those provisions with respect to the issues before the

10   Court.

11       MR. BILICH:   Yes, your Honor.  The position of

12   the Trustee, your Honor, is that this case is squarely

13   covered by Section 2-326 of the Uniform Commercial Code

14   which became effective in the State of New York on July 1,

15   2001 in conjunction with the revision of Article IX that

16   became effective in New York State on that date, and it was

17   meant to conform that portion of Article IX so they would be

18   consistent.

19       THE COURT:   Were there any non-uniform

20   variations on the issues specifically before the Court

21   enacted by the New York State Legislature or did it adopt

22   the proposed revisions recommended by the Uniform Commercial

23   Code Law Revision Committee?

24       MR. BILICH:   Section 2-326 is the Uniform

25   provision.

1          THE COURT:      Okay.

2          MR. BILICH:     That section provides that -- first

3      of all it has a definition called -- defines a term called

4      sale or return where if a person delivers goods for the

5      purpose of resale, that is deemed to be a sale or a return,

6      and secondly, it provides a rule that goods being held on

7      sale or return are subject to the claims of creditors in the

8      possession -- creditors of the person holding the goods, and

9      the only other point which I want to make which I think is

10     very critical to this is that Section 2-326 ignores the

11     agreement between the consignor and the consignee.

12          The only requirement for being within its

13     coverage is that the goods must be delivered for resale, and

14     we think -- I think that the terms of the agreement between

15     the consignor and the consignee which obviously are not

16     available to the third party creditors whose rights this

17     action in part deals with are both logically and in terms of

18     construction of the statute, are largely irrelevant as long

19     as the purpose and the intent of the arrangement is a sale

20     or return.  That's the way we see it.  We see it; it's just

21     that simple.

22          THE COURT:     I don't see it that simple.  If we

23     go through the definitional sections and you tell me that it

24     squarely fits within 2-326. 1) Unless otherwise agreed if

25     delivered goods may be returned by the buyer even though

1          they conform to the contract, the transaction is B) a sale

2          or a return of the goods delivered primarily for resale.

3                   So I don't understand why you begin to say that

4          the parties agreement is irrelevant because under 2-326

5          there is a provision that basically permits the parties to

6          opt out based upon an agreement.  So it can't be the case

7          that the agreement between the parties is irrelevant, and I

8          do this in some kind of an objective basis, at least as I

9          read the statute on its face.

10                  MR. BILICH:   I grant you that there is a second

11         condition which you have identified to the operation of this

12         provision which is that the agreement of the parties, of the

13         consignor and the consignee, must be that the consignee can

14         return the goods at will.  I think that's really the

15         language that you are citing I believe.

16                  THE COURT:    I'm just picking up in your

17         statement that agreements between the parties are

18         irrelevant.

19                  MR. BILICH:   Well, I'm amending that.

20                  THE COURT:     Okay, fine.  And I am going to

21         Paragraph 3.  Two is irrelevant.  Paragraph 2 says good held

22         on approval.  We're not dealing with those.  It says goods

23         held on the sale or return to such claims while in the

24         buyer's possession and I have to start 2 from the beginning

25         because there is a reference.  Goods held on approval which

1    are defined in 1(a) to say that if the goods are delivered

2    primarily for use as opposed to resale.  Goods held on

3    approval are not subject to claims of the buyer's creditors

4    until acceptance.  Goods held on sale or return are subject

5    to such claims which would mean that the buyer's creditors

6    while in the buyer's possession.

7         So, you are relying upon 2-326; 2 in particular;

8    the second part of that.

9         MR. BILICH:    That is correct.

10        THE COURT:    And then it says any or returns

11   from the sale for any or return term of a contract for sale

12   is to be treated as a separate contract for sale in the

13   statute of frauds section of this article Section 2-201 and

14   it is contradicting the sale aspect of the contract within

15   the provisions of this article on parole or extrinsic

16   evidence.  No.  When I read that it is hardly self-

17   explicating, and I go flipping back through the other

18   sections to understand this.  If there is no written

19   contract between the parties, and it is simply an oral

20   agreement.  So walk me through the situation when there is

21   only an oral agreement.  Is the sale or return of the item

22   enforceable because it is not in writing?  Are there

23   exceptions under the statute of frauds?  Have you gone

24   through 2-201 to make sense of this Paragraph 3?

25        MR. BILICH:    I really haven't focused on 3.  We

1    didn't see any,

2              MR. ACKERMAN:    Your Honor, may I step in here?

3              THE COURT:    Yes.

4              MR. ACKERMAN:    With respect to that, what you

5    are pointing out, the official comment --

6              THE COURT:    You have to speak into the

7    microphone.

8              MR. ACKERMAN:    In respect to the comments that

9    you are pointing out, I think official comment three to the

10   new provisions on that same page is important.  You are

11   correct.  I do believe that the contract is important; and

12   as set forth specifically in official comment three,

13   starting on the fourth line, the oral return aspect of a

14   sales contract must be treated as a separate contract under

15   the statute of frauds section and is contradicting the sale

16   insofar as --

17             THE COURT:    It's just repeating the rule.  It

18   doesn't explain anything to me.

19             MR. ACKERMAN:    So I definitely agree, totally

20   that the agreement is compelling.

21             THE COURT:    Okay.  So the question is if I

22   have an oral agreement, and there is no writing, is it

23   unenforceable because it doesn't comply to the statute of

24   frauds; and if it is unenforceable, where does that leave

25   the buyer's creditors?

1          MR. ACKERMAN:    I believe we would then look at

2     the official comment 4 and the fourth official comment

3     states that certain true consignment transactions were dealt

4     with in former Sections 2-326 and 9-114.  These provisions

5     have been deleted and have been replaced by new provisions

6     in Article 9.  So basically, what this would be saying is at

7     the very minimum, a UCC should be filed.  And that's how

8     creditors of Morgansen's --

9          THE COURT:     That's the writing you think?

10         MR. ACKERMAN:    It could be --

11         THE COURT:     That's a perfection rule.

12         MR. ACKERMAN:    Well, I believe that UCC Article

13    9 provides that there must be a security agreement --

14         THE COURT:     It says I have to go  -- look.

15    This is always a question of chasing your tail.  I have to

16    go to Section 9-109 A4, 9-103 D and 9-319 for whatever

17    illumination those sections offer because these new sections

18    trump the old law, and I assume under the prior version

19    which included a different subsection 3, the rights at first

20    blush of persons delivering goods on sale or return vis-a-

21    vis the buyer's creditors are reduced in scope.  In other

22    words, as I look at this, someone selling on sale or return

23    -- someone delivering goods on sale or return to a consignee

24    or a party holding these goods for resale were have been

25    able to take these goods out of the category of property of

1    estate and the Trustee couldn't realize upon these goods.

2    So is the move, if I understand it correctly in favor of the

3    creditors under the revised code; i.e. the creditors of the

4    buyer.  And if you want to as the consignor or the person

5    selling through a resale agent, is it your obligation to

6    make those a public filing; and if you don't do it, you're

7    stuck.

8         MR. ACKERMAN:   I have always felt so, sir, and I

9    have always provided for security interest.  However there

10   is a strange twist here.  And that would be compelling in

11   respect of any oral agreement as opposed to a written

12   agreement.  The strange twist is that Article 9 of the UCC

13   has an interesting new provision which is not referred to in

14   the official comment 2-326.  And may I invite your attention

15   to Section 9-102 of the UCC.

16        Sir, I have another copy of it.

17        THE COURT:   I have 9-102 right here.  I have

18   the New York version.

19        MR. ACKERMAN:   This might be easier to review if

20   you would like.  May I hand it to your law clerk.

21        THE COURT:   I have it.  Can't I read this one?

22   Is your version better than mine?

23        MR. ACKERMAN:   No.  Not in any way, shape, or

24   form.

25        THE COURT:   This is the New York statute.

1    It's annotated.  Thank you for your help.

2                MR. ACKERMAN:   Judge, I apologize.

3                THE COURT:    Okay.  So I am in 9-102 and what

4    subsection?

5                MR. ACKERMAN:   There are several different

6    sections which deal with consignment in 9-102 which carries

7    directions and definitions for Article 9.  The first one is

8    A 19.

9                THE COURT:    A 19.  Okay.  Mr. Ackerman, I

10   began my legal career teaching the UCC, and it was such a

11   mind bending exercise, that I decided to drop it in favor of

12   something simpler called bankruptcy law.

13               MR. ACKERMAN:   Which led you right back to the

14   conundrum of dealing with the UCC.

15               THE COURT:    And bankruptcy law got so

16   complicated, that I was tempted to do environmental law.

17   That had to be easier.  I have some difficulties here.  I'm

18   in A 20?

19               MR. ACKERMAN:   A 19, A 20, A 21, A 22.

20               THE COURT:    Subsections 19 through 22, right?

21               MR. ACKERMAN:   Yes.

22               THE COURT:    So you are calling my attention to

23   consignee means of merchant to which goods are delivered in

24   a consignment.  So then I have to decide what's a merchant.

25   Then under 20 consignment means a transaction regardless of

1        its form in which a person delivers goods to a merchant for

2        the purpose of resale.

3                    MR. ACKERMAN:    Purpose of sale.

4                    THE COURT:    Purpose of sale.  And A the

5        merchant, so I need to define that term deals in goods of

6        that kind under a name other than the name of the person

7        making delivery.  So clearly Morgansen's is an entity other

8        than operating under that name other than the name of the

9        persons making the delivery of the goods.  Two is not an

10       auctioneer and here we begin to have a problem.

11                   MR. ACKERMAN:    Yes.  Now from what we know

12       about 70% of Morgansen's good -- Let me step back, Judge.  I

13       apologize.  Morgansen's did not sell only at auction.

14       Indeed it held --

15                   THE COURT:    I understand that.

16                   MR. ACKERMAN:    Indeed it held a few auctions.

17                   THE COURT:    Okay, but we have a fact question

18       here.

19                   MR. ACKERMAN:    Yes.

20                   THE COURT:    And I know Morgansen's did have

21       certain auctions and it was the subject of considerable

22       commentary on the record in connection with Chapter 11, and

23       I know that she was counting upon the success of those

24       auctions to continue to provide sufficient funds--namely,

25       her percentage of the sales to continue her operations.  And

1    we had a terribly rainy spring and summer.  We didn't know

2    what was the occupancy level of persons taking their

3    vacations on the East End and what affect that would have.

4    We didn't know where the market was and whether or not

5    persons from Wall Street and other financial intermediaries

6    and/or Hollywood stars would be traipsing out to the East

7    End particularly because of security concerns with

8    international and perhaps domestic flights.  So there were a

9    number of rather considerable variables that we couldn't

10   quantify at the beginning of the case.  I know there were at

11   least two auctions that were conducted.  But I also know

12   that Mrs. Brunesco said that she had a base of customers who

13   were interior decorators or persons working with interior

14   decorators who were some of her principal customers.  And

15   those would be private sales and not auctions.

16            MR. ACKERMAN:    Additionally, the store was open.

17            THE COURT:    But you know, we didn't develop

18   any law in the case.  I am simply recalling the various

19   statements and testimony made during numerous hearing.  So

20   let's assume that a merchant, and I believe she is a

21   merchant under the definition.  She surely held herself out

22   as a merchant.  Where is the definition of merchant.  It is

23   not under 54.  It's not where it should be.

24            MR. Bilich:    It's probable under Article 1 or

25   Article 2 definitions.  It's probably under the definitions

1       for Article 1 or Article 2.

2               THE COURT:      We'll hold off that to the side.

3       I don't think there is any dispute that she was a merchant,

4       but we will double check on that.  If a merchant engages in

5       auctions as part of her normal business activity, how does

6       it affect its construction.  Are there any cases that say if

7       your gross sales for a year are based upon auctions and

8       private sales, is it a situation in which a majority of

9       revenues produced by auctions make you an auctioneer.  If

10      auctions are 10% of your business, does that affect you?  Is

11      there a quantitative measure?  Is it an either or situation?

12      Once you engage in any auction, you're tossed out of this

13      section?  Because this section is not self-defining on that

14      issue.

15              MR. ACKERMAN:    There has not been one case that

16      construed new Article 9-102 A 20.

17              THE COURT:      But weren't there prior cases in

18      which the word auctioneer was used.  Couldn't we go back to

19      the prior section and rely upon.  If there is a law defining

20      who is an auctioneer under the predecessor sections, and I

21      assume that the concept of auction hasn't changed from the

22      pre-99 versions to the 99 amendments.  So it's not that we

23      are without possibilities of finding an answer.

24              MR. ACKERMAN:    You are correct, Judge.  They

25      were dealt with under old Section 2-326 (3).

1           THE COURT:      That was the section that was
2     dropped.

3           MR. ACKERMAN:    That was the section that was
4     dropped, and there the cases -- there were many cases -- it
5     became a question of fact.

6           THE COURT:      Right, I understand that.

7           MR. ACKERMAN:    Some courts were saying 85% of
8     the public knowing you are an auctioneer is not good enough.
9     It was all over the place.

10          THE COURT:      And who had to know that you were
11    an auctioneer.  Wasn't it the merchant's creditors.  It
12    wasn't the consignor's creditors, or the sale or return
13    people.  The test was what did the -- in this case debtor's
14    creditors know.  Right?

15          MR. ACKERMAN:    Yes.  The debtor's creditors and
16    the public.

17          THE COURT:      Okay, and we know based upon the
18    activities in this case, who are some of the principal
19    creditors in the Chapter 11 most particularly the landlord,
20    and I am sure the landlord had a very good understanding of
21    the nature of Ms. Brunesco's business; and if he knew that
22    she engaged in auctions and you're the representative of the
23    creditors of this estate, then how does that play out if her
24    most substantial unsecured creditor was her landlord?

25          MR. ACKERMAN:    Judge, there are a lot of other

1       creditors including and this is quite interesting, the New

2       York State --

3                   THE COURT:    There is a lot of insider debt,

4       loans from her father or other members of the family.

5                   MR. ACKERMAN:    Oh, I'm not going to count that

6       sir.

7                   THE COURT:    So excluding insider debt.

8                   MR. ACKERMAN:    -- New York State Department of

9       Taxation and Finance which filed a warrant for sales taxes.

10                  THE COURT:    Okay.

11                  MR. ACKERMAN:    Now that would not be the

12      liability of the auctioneer.  If it was an auction sale, it

13      would be the liability of the principal.  But these were

14      undisclosed principals.  In fact, this was a

15      wholesale/retail operation which also did some sales.

16                  THE COURT:    Unlike the landlord, you surely

17      couldn't attribute actual knowledge to the sale of her

18      operations.  They would simply issue warrants on whatever

19      theory.  They didn't go out and check her business.  They

20      didn't go review her books and records.  Right?

21                  MR. ACKERMAN:    I would presume New York State

22      Department of Taxation and Finance did either check returns

23      or check something; and in fact, there was an objection

24      filed by them simply saying we are a secured creditor, and

25      we want it to be known that we are secured for sales taxes.

1          THE COURT:     Secured creditor of Morgansen's.

2          MR. ACKERMAN:    Of Morgansen's.    The Department

3     of Treasury of the Internal Revenue Service likewise.   New

4     York City Department of Finance --

5          THE COURT:     Is there any provision outside of

6     the main C Code that establishes the rights between the

7     taxing authorities and persons who deliver goods on sale or

8     return or is all the law to be found under the UCC.

9          MR. ACKERMAN:    It's all under the UCC, Judge.

10          THE COURT:     Okay.

11          MR. ACKERMAN:    If this was just an auctioneer;

12     let's suppose we are talking Martin Fine & Co., David Maltz

13     & Co., Inc.

14          THE COURT:     Call themselves as auctioneers.

15          MR. ACKERMAN:    It's the only thing they do.

16     Like they sell for Neil Ackerman, Trustee of Morgansen's.

17     That's a whole different situation.   This was Morgansen's

18     which was a store that was open five days a week during the

19     summer -- 5 to 7 days a week during the summer; 4 days a

20     week.

21          FEMALE VOICE:    I object.

22          THE COURT:     Excuse me.   Listen.   I told you.

23     I am not going to have these interruptions.   You will have

24     an opportunity to speak, but I am going to turn this into a

25     free-for-all.   Just be careful.   And if you persist, I will

1    have you removed.  That's why that gentleman is in the back

2    row, because some of you have been more than a little testy.

3    Both the comments in the papers and in what I understand to

4    be actions taken against the Trustee.  You will have your

5    opportunity to explain your position.  I am just trying to

6    understand the Trustee's point, because he is the moving

7    party.

8                    Go ahead, Mr. Ackerman.

9                    MR. ACKERMAN:   This was an entity that bought

10   goods on its own account, sold goods on its own account.

11                   THE COURT:    You mean it had an inventory.

12                   MR. ACKERMAN:  Yes.

13                   THE COURT:    That was part of its goods.

14                   MR. ACKERMAN:   Yes.  Always did consignment

15   agreements as far as we know.  That was how I was able to

16   build a list of consignors to give notice to.

17                   THE COURT:    The only reason you got that list

18   was because I came down with both feet on the debtor's

19   counsel.

20                   MR. ACKERMAN:   No, he didn't give it to me.

21                   THE COURT:    He was directed to amend his

22   schedules.  I'm just telling you what happened here.  I have

23   a rather distinct recollection of this.  When debtor's

24   counsel appeared here, I said how come you haven't listed

25   any of the consignors as creditors, whatever their rights

1    might be.  He said, oh, I didn't realize that.  I was just

2    dealing with the trade creditors and the landlord and the

3    taxing authorities.  I said, well, you have to describe all

4    property held by the debtor and since you have already told

5    me that you view some of these as consignments, then they

6    have rights, and you better list them.  So he then amended

7    the schedules, presuming consultation with Ms. Brunesco and

8    generated based upon the best information she had a list of

9    persons who had delivered goods to her --

10         MR. ACKERMAN:   Yes, Judge.  Unfortunately, I

11    apologize.

12         THE COURT:    -- Now it may be an incomplete

13    list, but there surely was a list because I was not going to

14    permit this case to go forward in Chapter 11 unless those

15    parties were given an opportunity to participate in the case

16    by being added to the schedules, even if they were disputed

17    claims, and they would receive notices of all matters

18    requiring notices to the universal creditors.

19         MR. ACKERMAN:   I know about what you directed

20    him to do, and I saw the amended schedules.  I looked them

21    up, and they were 1½ pages.  When I first saw the very first

22    proposed consignment agreement, I went -- I was like oh my

23    God, oh my God.  I have to give notice to everybody.  And I

24    looked it up, and I called up Mr. Weiss who had been the

25    attorney during the 11, and I said where is the list of

1    consignors.  He said the Judge directed me to file them.
2    It's two pages.
3         So I directed by accountant to go through all
4    books and records.  We took all phone calls that came in.
5    There was a sign placed on the door of Morgansen's which
6    told people they call the auctioneer.  The auctioneer, David
7    Maltz & Co. was directed to notify all people of me, and I
8    would then speak with them directly.  We complied a list
9    through phone calls, looking through books and records, et
10   cetera.
11        That list turned out to be 12 to 13 pages long.
12   I am going to be making application in order to amend the
13   court's docket and in fact, Judge, we still get phone calls
14   every day.  We are hoping the publication notice that we are
15   asking for will route out more.
16        THE COURT:    Well, I appreciate your effort.  I
17   am discouraged when I hear that Mr. Weiss did not do his job
18   or Ms. Brunesco didn't give him all of the information that
19   she had and should have given him because my point on this
20   is that everyone who has an interest in this estate or
21   claims to have property that is not property of the estate
22   should be given notice and an opportunity to appear.
23        MR. ACKERMAN:    I absolutely feel that.  That's
24   why I would not submit the application until I had the best
25   complete list of consignors that I could imagine.

1          THE COURT:    When you go through this list, how

2    many people are we talking about?  In aggregate numbers.

3    Are we talking 50 persons, 100 persons, 200 persons?

4          MR. ACKERMAN:    One second, Judge.  I apologize.

5    The list was attached to the Affidavit of Service.  It goes

6    on.  It might be 200-300 people, Judge.  It goes on for

7    about -- I'm holding in front of you a stack about 1/8 inch

8    of paper.

9          THE COURT:    Mr. Ackerman, before we go too

10    far.

11          MR. ACKERMAN:    Yes, Judge.

12          THE COURT:    Someone has naively moved for a

13    class representative.  I do think for those of you who are

14    here today, there should be some kind of arrangement in

15    which we treat you as a committee of persons asserting

16    certain rights of return and goods that you caused to be

17    delivered to Morgansen's, and I think that committee should

18    give consideration to retaining counsel so that we don't

19    have a number of persons who are pro se, and are walking

20    into a legal land mine because I have to tell you that this

21    area is very difficult.  It has burdened us all for many,

22    many years.  I have been practicing bankruptcy and

23    commercial law for close to 30 years, and unfortunately, I

24    was the UCC person in my law firm.  So I had to deal with

25    this in many contested matters over many years with disputes

1    between secured creditors, banks, and others and debtors,

2    and claimants.

3            And it seems to me first of all, Mr. Ackerman

4    shouldn't have to deal with 200 to 300 people if you are all

5    in the same boat.  You may not all be in the same boat.  You

6    may have different kinds of agreements.  Some may be in

7    writing.  Some may not.  Some may be subject to other

8    conditions, but it seems to me that rather than to burden

9    each of you with having to come to court, because I know

10   that you have businesses and other activities that you have

11   to attend to, it probably makes sense to pool your resources

12   in some way, and retain counsel, and I am not pushing anyone

13   here, but to retain counsel who is capable of addressing

14   these issues on an expedited basis in making some kind of

15   determination of what's the appropriate way to proceed.

16           I have to tell you that the customary way in the

17   courthouse in bankruptcy cases is to authorize the sale of

18   the goods, make sure they are adequately advertised with

19   notice to all creditors, and public notices to the world of

20   persons who tend to buy these kinds of goods, and then there

21   is a period of time for examination and then some kind of

22   proceeding where the court determines any objections to the

23   proceeding.  And then what we do, we take the proceeds, have

24   them held in escrow, pending further determinations.  It is

25   quite unlikely that my initial move would be to start

1    directing the Trustee to return goods.

2              I am open to argument about that, but I do think

3    that for most of you, you did this in order to generate

4    proceeds.  You wanted to have them sold.  And if we can

5    develop a mechanism that maximizes the sales proceeds, that

6    may be the most economical way of doing it and then we can

7    deal with your individual claims under the facts of your

8    particular agreements.  The Trustee has some insurance.

9              Is that correct Mr. Ackerman?  Do you have

10   insurance on these goods?

11             MR. ACKERMAN:   Yes, we actually got it.  It took

12   an amazing amount of effort.  It is in place now, Judge.

13             THE COURT:    What are the policy limits?

14             MR. ACKERMAN:   One second, Judge.  I apologize.

15   We have liability of $2 million aggregate and $1 million per

16   occurrence.  We have a deductible of $5,000.  We are insured

17   for $500,000 on personal property.  That is multi-peril

18   against all things including theft.  In order to get the

19   theft insurance, we had to turn on the alarm system last

20   Friday.

21             THE COURT:    Well, surely, I don't have to tell

22   the persons who are here that any self-help effort on your

23   part to recover goods that now remain in the custody of the

24   Court pending further legal determinations, will be dealt

25   with very harshly because if we have to hire investigators

1    to chase who it is, anyone who converts goods of the estate
2    subject to a determination whose rights they are will end up
3    being reported to the United States Attorney's Office,
4    because you live in fear with the federal administration of
5    an insolvent estate.  So, however, hot you may be under your
6    collar, I have to protect everyone's respective rights in an
7    order of priority.  If anyone tries to break in, they will
8    be dealt with to the fullest extent of the law.

9           This isn't a threat.  That's exactly what is
10   going to happen.  Now, I don't know any of your.  I assume
11   that you would not resort to self-help no matter how
12   strongly you believe your claims to be.  We will deal with
13   them on an expedited basis in an orderly manner.  But it is
14   important that these assets be insured.  You are probably in
15   a better position now than you were under Ms. Brunesco's
16   management; however, ironic that might seem to you.

17          MR. ACKERMAN:   Judge, in fact, Ms. Brunesco
18   didn't tell you.  The insurance was cancelled effective I
19   believe June 9.  We didn't know that; and when we found
20   that, that was when I started calling up for insurance on an
21   expedited basis.  It had not been insured for some three
22   months.

23          THE COURT:    And some of you may have
24   individual claims against her.  I am not deciding that now.
25   All I'm dealing with is the estate claims.  You may have

1    state law claims that could be asserted against her

2    individually.  Whether it's collectable, is another story.

3                    MR. ACKERMAN:   Judge, may I add in that vein

4    that there are --

5                    THE COURT:    Let's go.  Now that the goods are

6    insured, you have reasonable policy limits, that you have

7    secured the premises, even though it is in a fairly remote

8    location, let's get back to the issue of auctioneer.

9                    So you say that's fact.  Who's got the burden of

10   proof whether she is an auctioneer or she isn't an

11   auctioneer.

12                   MR. ACKERMAN: Well, the situation, Judge, is

13   this.  If it is an auctioneer, then it is governed by

14   Article 9 -- pardon me, if it is not an auctioneer, then it

15   is governed by Article 9. Show me UCC.

16                   THE COURT:    Wait a minute.  If he is an

17   auctioneer, it is governed by what?

18                   MR. ACKERMAN:   If she is an auctioneer, we

19   believe, it is governed just be 2-326.

20                   THE COURT:    Okay.

21                   MR. ACKERMAN:   If she is --

22                   THE COURT:    Which I thought takes these

23   matters out of 2-326.

24                   MR. ACKERMAN:    The only reason why I believe is

25   that you were talking about the oral agreements.

1          THE COURT:    Look, when I deal with the
2     statute, I go to 2-326, then I have to go jumping into the
3     other provisions we've been discussing.  I thought that if
4     these goods are delivered to an auctioneer, they fall
5     outside of the scope of 2-326 as an exception.
6          MR. ACKERMAN:    I think he would fall outside of
7     the scope of Article 9, but it would be under Article 2-326.
8
9          THE COURT:    Well, you'll walk me through this.
10    All right.  Go ahead.
11         MR. ACKERMAN:    I think that she is not an
12    auctioneer, Judge, and I also feel that this section is also
13    horrible.  I can't even believe if you --
14         THE COURT:    What's your argument that she is
15    not an auctioneer?
16         MR. ACKERMAN:    Because there was a wholesale and
17    retail operation pending.  Because the sales tax was the
18    responsibility of Morgansen's and not of the consignors.
19         THE COURT:    That may be the position asserted
20    by the State.  The State may be wrong.
21         MR. ACKERMAN:    No consignor --
22         THE COURT:    Just because the State files a
23    warrant to collect sales tax, it doesn't decide the legal
24    question of whether the sales tax is the responsibility of
25    Morgansen's or of the party delivering the goods for resale.

1

2          MR. ACKERMAN:    I don't think consignors did pay

3     sales tax, Judge, but let's move on.  You're right.

4               THE COURT:     What's that?

5          MR. ACKERMAN:    I don't think they did pay sales

6     taxes, but you're correct, let's move on.  There was no

7     disclosed principals.  The goods were all co-mingled

8     together.  They were not segregated.  Like this is a sale of

9     the estate of Morgansen's, and you can't have anything else

10    in that sale except for the estate of Morgansen's.

11               THE COURT:     I represented one of the largest

12    fine guild jewelers in the United States operated under the

13    name of Schrieve, Kremper and Lowe in Boston, Schrieve & Co.

14    in San Francisco, and a number of different names in

15    different places around the country.  And there was a

16    section in the store, and we talked about these as the

17    ladies on the Hill, and we could not mess with the ladies on

18    the Hill.  This was Beacon Hill.

19               Because this company had been operating for over

20    100 years those were estate sales, and they were separately

21    demarcated and put in a different part of the store so that

22    when I came in, I could have bought a diamond ring for my

23    girlfriend and I wouldn't know whether they were consigned

24    or not.

25               I could also go to the estate section and buy

1    some bowl or china or brooches or other articles that the
2    ladies on the Hill liked to wear or have in their
3    possession.  And when their trust funds began to run out,
4    they had to start liquidating their estates.

5         There was also included in that, actual estates
6    where the persons entered into arrangements with Schrieve
7    were fiduciaries of probated estates.  So it was either the
8    little ladies on the Hill or the estates.  And they were
9    separately demarcated because the inventory was very
10   different.

11        Now, you are telling me if I were to walk into
12   Morgansen's as a potential customer, purchaser, I would look
13   at a display case that would have inventory that she had
14   purchased.  There would also be those good that you believed
15   were on sale or return, and they wouldn't be separately
16   distinguished particularly if she sold antiques and other
17   objects and they weren't new items.  In fact, she had new
18   items, old items, and everything in between.

19        MR. ACKERMAN:   And everything was all together
20   in the store.  We have the auctioneer here you actually was
21   at the premises and who secured the premises and who has
22   gone to the premises and let people inspect the property.
23   And he will tell you what he told me.  Everything was all
24   together.

25        THE COURT:    That's an evidentiary matter.  So

1          it's not just about my perceptions or recollections or

2          yours.  If this becomes a threshold issue, then we would

3          have to have an evidentiary hearing in which Mr. Maltz is

4          the person who would be called.  He'll testify, and he will

5          be subject to cross examination.  I think that's best done

6          through some representative, so there aren't 20 people

7          jumping up and asking Mr. Maltz questions with respect to

8          oh, did you see my thing.

9                    MR. ACKERMAN:    There were other things.  By the

10          way, that was exactly what was going on.  I think that's my

11          thing.  I don't know.  But there were other things.

12                    THE COURT:    And then there were presumably

13          sales of goods on sale or return where the proceeds weren't

14          remitted.

15                    MR. ACKERMAN:    Precisely.  In fact that was one

16          objection; and there were many, many people who called me

17          about that.

18                    THE COURT:    Okay.  So if there were goods that

19          were converted or there were proceeds that were converted

20          and weren't properly accounted for that then gives rise to a

21          claim against the estate.

22                    MR. ACKERMAN:    Correct.

23                    THE COURT:    And those would be unsecured

24          claims would they not be?

25                    MR. ACKERMAN:    Yes.

1          THE COURT:     And someone might have a claim and
2    the only question is if they are valid and subsisting lien
3    claims in favor of the estate, and those liens are not
4    defeasible, then obviously the Trustee will look into that.
5          MR. ACKERMAN:    Yes.  I will also say one thing,
6    Judge --.
7          THE COURT:     And under those kinds of
8    circumstances if these goods were sold and the proceeds
9    would have to first cover the cost of sale administration
10   and be paid to secured creditors, and then the balance would
11   be distributed to the holders of allowed unsecured claims.
12   Correct?
13         MR. ACKERMAN:     Yes.  All in accordance with law
14   under your approval, Judge, there has to be a notice of
15   hearing.
16         THE COURT:      All right.  Okay.
17         MR. ACKERMAN:    I want to point out that there
18   are several people here who I don't recall the name.  Give
19   me one second, Judge.  I just want to say this.  Mr.
20   Goldberg and other people -- Mr. Goldberg is here I believe,
21   but other people have called me.  There are definitely
22   questions about monies and properties which are missing.
23   There are other things that I didn't want to put on the
24   record right now.  We are tracking cash; and if we find any
25   evidence of a bankruptcy crime whatsoever, we shall be

1    reporting that.  We may make appropriate motions before the

2    Court.  We shall be reporting that to criminal authorities,

3    and we may make motions that other locations are property of

4    the estate.

5                    THE COURT:    All right.  I want you to

6    understand some of you, that Mr. Ackerman acts in a

7    fiduciary capacity subject to very tight standards.  He has

8    been at this for a very long time.  He is one of most

9    experienced Trustees.  He is also one of our best commercial

10   lawyers, and it is his obligation to protect to the fullest

11   extent possible the unsecured creditors.  Secured creditors

12   can generally take care of themselves.  He doesn't need to

13   help the State of New York.  They have enough remedies in

14   place, and he may determine that some of these liens could

15   be avoided or reduced.  Under those kinds of circumstances,

16   it is fully in your best interests to report to him any

17   information you have that may lead to a criminal

18   investigation.  He is not your enemy.  He is independent.

19   He represents basically the class of creditors who hold

20   allowed unsecured claims, and his statutory goal is to

21   cooperate with the creditors take information from them, try

22   to assist them in a collective capacity, and to try to

23   maximize the proceeds.

24                    His compensation as Trustee is a function of the

25   distribution he makes to the creditors.  So if he doesn't

1    make any distributions, he doesn't get any commissions.

2          So, it is obviously to your interest to cooperate

3    with him.  These are difficult factual issues to sort out,

4    particularly in the absence of full records.

5          Because the other problem is that the more he has

6    to spend investigating these claims or actions, the higher

7    the administrative expenses are.  The more litigation, the

8    more legal fees are going to be incurred by the Trustee.  So

9    it is always desirable to try to resolve these matters short

10   of full blown litigation because that's expensive for the

11   estate.  It's a burden on the unsecured creditors of allowed

12   claims, and it is a very substantial burden on individuals.

13         We are not dealing with large corporations here

14   who are creditors of the estate.  We are dealing with

15   individuals who may have family heirlooms, they may be

16   investors in certain art objects, the may be in the business

17   of their own character, but we are not dealing with national

18   or regional creditors.  There is no one creditor here who is

19   unsecured and is the principal source of supply to this

20   business.  Many of you are local residents.

21         All right.  Go ahead.

22         MR. ACKERMAN:    Indeed, Judge, a lot of the

23   creditors have been incredibly helpful in that way.

24         THE COURT:    All right.  Okay.

25         MR. ACKERMAN:    That's the way we found out about

1    other locations.

2             THE COURT:    When you say other locations, you

3    mean some of the inventory may have been diverted?

4             MR. ACKERMAN:    I don't want to say for the

5    record, Ms. Brunesco might have -- I don't think she's here,

6    but let's just say I'm scheduling another examination

7    because of some things creditors have told me and shown me.

8             THE COURT:    Okay.

9             MR. ACKERMAN:    There was someone who pointed out

10   a very curious question to me.  Why is it called

11   Morgansen's?  Well there is a reason why we think now.

12            THE COURT:    All right.  Going on.

13            MR. ACKERMAN:    What we believe is the case is as

14   follows.

15            THE COURT:    What section are we in.

16            MR. ACKERMAN:    We were looking over 9-102 (A)

17   (20).

18            THE COURT:    All right.  A merchant deals in

19   goods of that kind under a name other than a name of the

20   person making delivery is not an auctioneer and 3 is not

21   generally known by its creditors to be substantially engaged

22   in the selling of goods of others.  That's again a fact

23   dispute, correct?

24            MR. ACKERMAN:    But I think that probably

25   Verizon and other trade utilities --

1          THE COURT:   What's that?

2          MR. ACKERMAN:   Verizon, excuse me, any gas

3    creditors, all of these utilities which have turned off

4    services and all of that never knew.

5          THE COURT:   They never knew that she was

6    selling the goods of others?

7          MR. ACKERMAN:   Yes, Judge, and indeed here is

8    another interesting question.  According to Ms. Brunesco,

9    now, the SBA is a creditor of the debtor.  A huge amount of

10   debt.

11         THE COURT:   Never listed before?

12         MR. ACKERMAN:   Never listed before. $250,000.

13   Now, I have my suspicions about this, and we are

14   communicating with the SBA, but they have no idea that this

15   is an auctioneer.  The reason why I have my suspicions --

16         THE COURT:   Well, you did a lien search

17   against Morgansen's.  Did you come across other filings in

18   favor of the SBA?

19         MR. ACKERMAN:   Nothing, and I have never heard

20   of the SBA ever lending money to a company without taking a

21   security interest.  That is why we are in communications

22   with them.

23         THE COURT:   All right.

24         MR. ACKERMAN:   But it was shocking to hear, oh,

25   I forgot.  There's a $250,000 secured claim.

1          THE COURT:     Okay.  All right.   Which

2     presumably she personally guaranteed.

3          MR. ACKERMAN:     Yes.

4          THE COURT:     All right.  So you'll look into

5     that.  So that takes us through 20.  We have identified some

6     of these issues.  And the other thing is what does it mean

7     to be not generally known?  Not generally known to the

8     majority of creditors?

9          MR. ACKERMAN:     Under 2-326 (3), the old one,

10    which has been removed, there were cases which were saying

11    that if 85% knew, that wasn't good enough.

12         THE COURT:     So I have to construe the words

13    generally known and not generally known.

14         MR. ACKERMAN:     It's kind of like section 303,

15    Judge, I believe with respective not generally paying their

16    debts as they become due, one of your standards for an

17    involuntary filing.  It is always a question about what if

18    you are paying all of your creditors except for one large

19    one or what if you are paying the large one and not the rest

20    of them, which is small.

21         THE COURT:     All right.  So I can rely upon

22    another provision of the Bankruptcy Code that tracks this

23    for analogous case law.

24         MR. ACKERMAN:     And I think another provision of

25    the Code which is incredibly relevant here is Section 544

1      which gives me the right of a hypothetical lien creditor.

2      If I would have walked into that place, I would never have

3      known.  And If I had gotten a lien against Morgansen's, I

4      would never have known,

5                  THE COURT:     For a hypothetical lien creditor,

6      you don't walk in.  You don't know anything.

7                  MR. ACKERMAN:    I just get a lien.  You're right.

8      Sorry, Judge.

9                  THE COURT:     All right, Okay.  So, go on.

10                 MR. ACKERMAN:    All right.  9-102 (a)(20) would

11     say either

12                 THE COURT:     Good morning Mr. Bilich.  You

13     should never let your partner get up.  Is he doing all

14     right?

15                 MR. BILICH:    There's no stopping him.

16                 THE COURT:     Go ahead.

17                 MR. ACKERMAN:    Let's suppose it's not an

18     auctioneer.  We would go then Judge if I may invite your

19     attention to 9-103 (d).

20                 THE COURT:     B as in boy?

21                 MR. ACKERMAN:     D as in David.  I apologize.

22                 THE COURT:     9-103.  Okay.

23                 MR. ACKERMAN:    And that says that security

24     interest of a consignor in goods that are subject of a

25     consignment is a purchased money security interest --

1          THE COURT:    Wait a minute.  Consignor's

2    inventory purchase. The security interest of a consignor in

3    goods that are subject of a consignment is a purchased money

4    security interest in inventory.

5          MR. ACKERMAN:    Now, how do we perfect a PMSI?

6    If I may invite your attention then Judge to 9-324.

7          THE COURT:    9 what?

8          MR. ACKERMAN:    I apologize.  9-324.

9          THE COURT:    Okay.  This is the priority rules

10    on purchasing a securities interest.

11          MR. ACKERMAN:    Yes, Judge.  9-324 subsection a

12    of that provision sets forth that the purchased money

13    security interest must be perfected within 20 days of

14    delivery.

15          THE COURT:    I thought there were purchased

16    money security interests in consumer goods that didn't

17    require a public filing.

18          MR. ACKERMAN:    That would be like a refrigerator

19    sold by Sears to an individual.  This is -- I don't think it

20    would provide where it pertained items given to us or a

21    store which was selling jewelry, antiques, things of that

22    nature.  How in the world would a third party know.

23          THE COURT:    One of the stumbling blocks in

24    this when I began to review this was what is a consumer good

25    because if it's a consumer good, it gets treated

1    differently.  Then you have to go to the definition of what

2    is a consumer good.  If I have a painting by some lesser

3    known artist that an art appraiser would say was worth

4    $5,000, is that a consumer good?  Is it something that I

5    would use in my household by putting in on the wall or

6    hanging things does not constitute use.

7           MR. ACKERMAN:    I think there Judge that we would

8    look.

9           MR. BILICH:    I apologize.  We just established

10   that this consignor's interest isn't an interest in

11   inventory.

12          THE COURT:    You have to decide what inventory

13   is, and there is a category of inventory under consumer

14   goods.

15          MR. BILICH:    I think in the co-inventory and

16   goods are different terms.

17          THE COURT:    Wait.  There is a category of

18   goods.  Then there are sub-categories under goods.  Right?

19   And the sub-category under goods is consumer goods.  That's

20   just one of them.

21          MR. BILICH:    Please go back to the definition we

22   were looking at 9-102 20.  The consignment definition in

23   Article 9 specifically excludes consumer goods from the

24   definition of a consignment transaction.

25          THE COURT:    I understand that.  So we need to

1    know what consumer goods to determine whether they should or

2    shouldn't be excluded. All I have is a category. I don't

3    know what it substantiates said variable.

4           MR. BILICH: But if they are consumer goods, the

5    consequence is that Article 9 doesn't apply to our

6    situation.

7           THE COURT: I understand that, but it seems to

8    me that at first blush some of these items may be treated as

9    consumer goods.

10          MR. ACKERMAN: What I was thinking he was

11    saying. I apologize Judge, I didn't speak into the

12    microphone.

13          THE COURT: What's the definition of consumer

14    goods?

15          MR. ACKERMAN: Before I point --

16          THE COURT: Look, answer my question. Then we'll

17    go to yours.

18          MR. ACKERMAN: Done. Sorry. Let's go to

19    Section 9-102 (23) and (24).

20          THE COURT: 9-102 (23) says consumer goods

21    means goods that are used apart from use primarily for

22    personal, family or household purposes. So if I look at this

23    category of goods that were on the shelves in Morgansen's,

24    why could I not conclude that most of those items would be

25    treated as consumer goods. They are going to be used in

1    households.  If she is selling in private sales goods to

2    interior decorate, then that's just homeowners on the East

3    End redecorating their homes and that includes certain art

4    objects that are going to be put on the wall or china or

5    other goods that would be put in display racks in homes.

6    What do they call them?  There's a word for them.

7              MR. ACKERMAN:    Etageres.

8              THE COURT:     What's that?

9              MR. ACKERMAN:    Etagere.

10             MALE VOICE:   Vitrine.

11             THE COURT:    What's that?

12             MALE VOICE:    Vitrine.  It's kind of a showcase.

13             THE COURT:     How do you spell it?

14             MALE VOICE:    Vitrine.

15             MR. ACKERMAN:     Vitrine.

16             THE COURT:     What I'm thinking about is you go

17   into someone's living room and they have this wall-sized

18   unit that has lighting and they are basically display

19   cabinets for valuable objects.  It could be a collection of

20   eggs, whatever they call those things.  It could be a

21   collection of porcelain.  It could be a collection of

22   perfume bottles, and they often have locks to them.  You

23   switch on the lights, and you display it to your guests some

24   of your priceless possessions.  So if I have one of these

25   things that is 8 feet tall, 16 feet wide and has about six

1    shelves on it all built with a display, what is the thing

2    that holds these items called?  Is it an etagere or is it

3    something else.  You might call it a china closet, but it

4    holds more than china.   Someone of the floor says that it

5    is a vitrine.  Look at what we are going to learn here.

6    Okay.

7            But the question is are those things on display

8    in a household consumer goods?

9            MR. ACKERMAN:   That's the interesting part,

10   Judge.

11           THE COURT:    But this is not new news.

12           MR. ACKERMAN:   No I'm saying this.  If -- when

13   they went to Morgansen's, either you say it was either a

14   consignment; ergo, it is governed by 2-326 or you say

15   Morgansen's was buying it, in which case it is not a

16   consumer good.  It has to be for resale Judge.  It was given

17   to Morgansen's as a consignment.

18           THE COURT:    So you're telling me I have to

19   look at the perspective of Morgansen's.  I'm not going to

20   look at the item itself.

21           MALE VOICE:   Judge, can you repeat when he said,

22   please?

23           MR. ACKERMAN:    I apologize.  What I believe is

24   the transaction -- if you are a creditor, you see goods

25   there, and when we are defining this, if a consignor urges

1    that he was selling it to the public, then it was a

2    consignment, and it is governed by 2-326.  If he was selling

3    it to Morgansen's notwithstanding that it was called

4    consignment --

5              THE COURT:     I think you are evading the

6    question.   No, no, it's not selling to Morgansen's.  It's

7    on a sell or return basis.  The understanding is that

8    Morgansen's is basically a broker for a fee.  And what they

9    are selling is items that will end up in people's homes.

10    Maybe some of them will end up in businesses, in the

11    lobbies, in the entryways; but for the most part, if the

12    ultimate purchasers are going to be persons who would hold

13    them in their homes for personal use or display, you're

14    telling me that I don't look at the end result.  I simply

15    have to look at this as between the person who brought it

16    there on a sell or return, called a consignor, and

17    Morgansen's, and I don't look at who the ultimate purchaser

18    is.

19              MR. ACKERMAN:   That is exactly what I believe,

20    Judge, what 2-326 (2) teaches us.  That's why --

21              THE COURT:     I thought it taught us that if it

22    is a consumer good, you take it out of that statute.

23              MR. ACKERMAN:   I don't believe so, Judge.  If I

24    may, I invite your attention to 2-326 (2).

25              THE COURT:  It just says who are the creditors.

1   It doesn't tell you --

2       MR. ACKERMAN: It says they are subject to the

3 claims of the creditors while in the buyer's possession.

4       THE COURT: Yes.

5       MR. ACKERMAN: While in Morgansen's possession;

6 that's exactly the lesson. That's why 2-326 governs.

7       THE COURT: Okay, but you know it seems kind

8 of intuitive, and here are persons who basically turned over

9 and delivered goods for resale and they are going to get the

10 proceeds; and if he doesn't sell it within a certain agreed

11 period of time, they have the right to take it back. And

12 under those circumstances, if it is going to be held for

13 resale to consumers, then I don't understand why the things

14 on the shelves don't maintain their status as consumer

15 goods.

16       MR. ACKERMAN: It might not be sold to

17 consumers, as you stated. Ms. Brunesco was testifying that

18 she had a wide variety of merchants that would buy from her

19 and they would resell it to other entities.

20       THE COURT: Okay, but what you're telling me

21 is I have to look at her business function. I don't look at

22 the object itself.

23       MR. ACKERMAN: We look at that and we look at

24 what the creditor would be thinking.

25       THE COURT: What?

1       MR. ACKERMAN:   We look at what a creditor would
2   know; a hypothetical creditor.
3       THE COURT:      Okay.  Put me back to Schrieve,
4   Krump, and Lowe.  I am in the estate section of the store.
5   I look at something, and I want to buy it.  I want to use it
6   on special occasions; when my Great-Aunt Tillie comes over.
7   I want to show that I reached a certain level of
8   respectability.  So I pull out my china.  I have a big
9   Armoire that we use for storing our china from my wife's
10  great grandmother; and every time we move, I imagine to
11  break more of it.  We haven't used it 6 ½ years since we've
12  been here, but it's there.  It's of great sentimental value.
13  It's in my living room.  If I said, I need liquidity to pay
14  my taxes and I then bring them to someone who deals in goods
15  of this kind under his or her own trade name, and I have
16  expecting to be paid, and I don't really care where it goes,
17  whether it goes to another broker, another dealer, an
18  interior decorator.  It gets put up on the wall in some
19  restaurant like the Three Village Inn.  I just want the
20  money.  But I know ultimately that it is going to end up
21  somewhere; and it may be in someone's home or it may be in
22  someone's business.
23      So you're telling me I don't look at the actual
24  outcomes.  I don't look at who the customers are.  In the
25  end the customers determine whether they are consumer goods.

1     They don't have any use.  They have no use other than to be
2     used as decorative objectives and a great majority of these
3     things are going to be in people's homes.

4               If that's the case, why aren't they consumer
5     goods.

6               MR. BILICH:    I think there is a misconception
7     here in one respect.

8               THE COURT:    Clear it up.

9               MR. BILICH:    First of all, 2-326 section that
10    we think governs this doesn't distinguish between consumer
11    goods and non-consumer goods, and so I would submit that the
12    issue that we are talking about to the extent that 2-326
13    governs --

14              THE COURT:    The problem is we can't bracket
15    everything under 2-326.  2-326 has to be read in a wholistic
16    fashion in connection with other definitional sections and
17    other sections of the code.

18              MR. BILICH:    Let me make one other point.

19              THE COURT:    I don't just read 2-326 on its own
20    bottom and ignore all the other provisions.

21              MR. BILICH:    Let me make one other point which
22    may or may not be clear.   The definition that we have been
23    looking at in 9-102 (20) the definition of consignment.  The
24    purpose of that definition serves is to draw a distinction
25    between two types of consignments.  One type of consignment

1    if it is within the definition, it's governed by the rules

2    of Article 9; and to the extent that you have a consignment

3    that is not governed by Article 9 because the consignee is

4    an auctioneer, because the consignee is known to deal in the

5    goods of others because the goods involved are consumer

6    goods to the extent that you have a consignment within the

7    carve-outs from Article 9.  The only consequence to that is

8    that Article 9 does not govern the issue that we are talking

9    about, and you have to look at some other law to govern that

10   situation.

11              THE COURT:     You mean it falls outside of the

12   code.

13              MR. BILICH:    No outside of Article 9.

14              THE COURT:     If it is outside of Article 9, is

15   it under Article 2?

16              MR. BILICH:   I believe so.

17              MR. FAVER:    Your Honor?

18              THE COURT:     You will have plenty of

19   opportunity to explain your position.

20              MR. FAVER:    The answer to your question in the

21   code Judge.

22              THE COURT:     Thank you.

23              Go ahead Mr. Bilich.

24              MR. BILICH:    So, all I want to point out is

25   that the definition of consignment --

1          THE COURT:     Counselor, every question I have

2     before me is in the Code under the Bankruptcy Code, the UCC.

3     The problem is just because it is there, it doesn't exactly

4     explain itself.  And if it has terms of reference, we have

5     to chase other sections.  I don't think there is any case

6     under the UCC where the answer doesn't require you to look

7     at least eight to ten definitional provisions and other

8     sections.  So you have to continue to string these things

9     together in some coherent whole and it is a art form of

10     analysis.  This was supposed to regularize or normalize

11     business transactions so we didn't have disputes over legal

12     issues, and the UCC has failed in that regard, and it is now

13     so complicated that we are forever litigating these matters.

14     There are no clear rules in the UCC in transactions of this

15     character.  These transactions are in the margins of the

16     law, and that's our problem, because they can be

17     recharacterized several different ways.

18          Okay Mr. Bilich, you are going forward.  You're

19     telling me if they are consumer goods, they'll fall outside

20     the scope of Article 9, so we're not dealing with purchased

21     money security interest and whether they are perfected or

22     unperfected.  Correct?

23          MR. BILICH:    Right.  And then you have to look

24     at some other law other than Article 9; and the last point I

25     want to make --

1                THE COURT:      But there are two alternatives.

2       One is that I have to go to common law or applicable non-UCC

3       law, the law of bailments, the law of sales, common law

4       stuff that isn't codified, because it really does not have a

5       commercial application or I have to go to 2-326.

6                So, there are two options.  If it's out of 9.

7       Then it's either in 2 or out of 2; and if it is out of 2 and

8       out of 9, it is nowhere under the UCC.  So I have to look to

9       state law principles.  Correct?

10               MR. BILICH:     Yes.

11               THE COURT:      Generally referred to as common

12      law.   But there could be specific statutes.

13               MR. BILICH: Or statutory law.

14               THE COURT:      There could be case law or

15      particular provisions or special provisions of the state law

16      in the State of New York.

17               MR. BILICH:     Or statutory law; other statutory

18      law.

19               THE COURT:      I understand, but you are telling

20      me that you believe that if they are consumer goods.  Your

21      position is it can't be consumer goods because of the

22      arguments made by Mr. Ackerman?

23               MR. BILICH:     My position is that if they are

24      consumer goods, Article 9 does not apply.

25               THE COURT:      I got that part.

1          MR. BILICH:   I believe Article 2 applies which

2     does not distinguish between consumer goods and non-consumer

3     goods.

4          THE COURT:   Yes.  Then why would I be going to

5     9-102?

6          MR. BILICH:   9-102 (20) defines which types of

7     consignments are governed by Article 9.

8          THE COURT:   So you're telling me I can't use

9     9-102 (20) to determine the scope and the applications of 2-

10    326?

11         MR. BILICH:   That is correct.

12         THE COURT:   So that definition is only good

13    for Article 9.  You can't use it to construe an apply it to

14    2-326.  Is that your point?

15         MR. BILICH:   Yes.

16         THE COURT:   I finally got it.  Thank you.

17         MR. ACKERMAN:   And in that vein, Judge, there

18    were cases --

19         THE COURT:   Oh, it's tag team time.

20         MR. ACKERMAN:   I'm sorry.  In that vein, Judge,

21    there were cases decided in the application and notice which

22    we should precisely talk about that.  If I may invite your

23    attention to Page 4 of the notice.  I can find it in the

24    application.

25         THE COURT:   This is the first time I have seen

1      a notice to creditors that constituted a brief.

2                  MR. ACKERMAN:    I know.  I didn't know what else

3      to do here Judge.  I wanted everybody to have their best

4      understanding.

5                  THE COURT:    I don't think they have the same

6      fascination that you do.  You seemed to get a real kick out

7      of writing this.  So on Page 4, you are reciting which

8      cases?

9                  MR. ACKERMAN:    It would be in the third full

10     paragraph, Judge, and they are re: Corvette Collection of

11     Boston, Inc. 294 BR 409.

12                 THE COURT:    That's the District of

13     Massachusetts?

14                 MR. ACKERMAN: That's the Southern District of

15     Florida.

16                 THE COURT:    And who decided that.

17                 MR. ACKERMAN:    I believe, Judge Paske, Judge.

18                 CLERK:    He's in the Middle District.  Judge

19     Paske.

20                 MR. ACKERMAN:    Then I am not sure.  I apologize,

21     Judge.

22                 THE COURT:    So that is the cite.  That's a

23     fairly recent case?

24                 MR. ACKERMAN:    Yes, it is 2003.

25                 THE COURT:    Go ahead.

1          MR. ACKERMAN:   And the quote from that is

2     pursuant to Section 544 (a) of the Bankruptcy Code all goods

3     held by the debtor --

4          THE COURT:   What?

5          MR. ACKERMAN: All goods held by the debtor on the

6     sale or return basis under UCC 2-326 becomes assets of the

7     bankruptcy estate.

8          That's the only, only, only case I found on 2-326

9     as amended--the only cases.

10          THE COURT:   Well they can become assets of the

11     estate.  The question is are they subject to third party

12     claims?  A property that is mortgaged can become property of

13     the estate.  That doesn't vesciate the lien of the

14     mortgagee.  And your point here is that this isn't about

15     liens, it's about ownership.

16          MR. ACKERMAN:   I believe first it is about

17     ownership.

18          THE COURT:   Do you understand the concept of

19     ostensible ownership?

20          MR. ACKERMAN:   Yes.

21          THE COURT:   Okay.  What does that mean?

22          MR. ACKERMAN:   I think what you are talking

23     about is how it is viewed by third parties and whether other

24     parties would look at it, how someone is holding it; whether

25     they hold legal title as opposed to equitable title.

1          THE COURT:    So, you are suggesting that in

2     this case, Ms. Morgansen isn't one who is the ostensible

3     owner; she is the actual owner?

4          MR. ACKERMAN:    Morgansen's Inc. is the legal

5     owner of this property or the bankruptcy estate of

6     Morgansen's Inc. I should say.

7          THE COURT:    Is the actual owner?

8          MR. ACKERMAN:    Yes.  Subject to third party

9     claims as they can prove they have filed and they have

10    perfected, subject to the voidance provisions of the

11    Bankruptcy Code.

12         THE COURT:    As to the persons who delivered

13    these goods for resale for the right of return, you are

14    telling me that once they turn over these goods to a

15    merchant, if that merchant conducts business, then the

16    insolvency risk is going to be borne by the persons who

17    delivered the goods because they can't exercise their right

18    of return once it comes into the bankruptcy estate.  Is that

19    your point?

20         MR. ACKERMAN:    I would say that except in the

21    case of a discrete auctioneer, Judge, that only, only sells.

22         THE COURT:    I'm talking about a merchant not

23    an auctioneer.

24         MR. ACKERMAN:    A merchant that is selling

25    unsegregated goods when the goods are unidentified, yes.

1          THE COURT:    Okay.  So it's the person that

2    delivers on sale or return who must be on notice, must make

3    sure that the companies they're dealing with continues to

4    meet their on-going expenses and doesn't head for

5    bankruptcy.

6          MR. ACKERMAN:    Yes, and Judge I would add this.

7    If there were UCC's on file, I would urge you to recognize

8    the UCC's.  I invited in my notice that people file any

9    UCC's because the searches I do are sometimes wrong.  And as

10   I made note to chamber, I would have definitely argued that

11   anyone with a UCC had a security interest.

12         THE COURT:    All right.

13         MR. ACKERMAN:    Another section I would invite

14   your attention --

15         THE COURT:    I'm a little concerned about some

16   of the commentary seems to draw a distinction with respect

17   to diamonds and paintings.

18         MR. ACKERMAN:    Yes.

19         THE COURT:    Now I assume that if I had

20   disposable wealth and I wanted to stay out of stocks and

21   bonds and real estate investment trusts based upon some

22   misconception, that I would invest in industrial grade or

23   better grade diamonds, and I might have a bag of these in my

24   safety deposit box.  I could have a collection of gold

25   Kugerands or I could have a collection of other metallic

1    substances when melted down would enhance certain value.  If

2    I thought the price would continue to go up or the price of

3    silver was going to continue to go up, or the price of

4    diamonds that can be cut into stones for domestic purposes

5    for diamond rings, pendants, and things of that nature, if

6    that is how I wanted to hold my wealth, would that give rise

7    to certain distinction.

8            MR. ACKERMAN:   I don't know that distinction,

9    Judge, but I do know this --

10           THE COURT:    Well, what's the difference

11   between having value or wealth in diamonds as opposed to

12   value or wealth in very old, well maintained china?

13           MR. ACKERMAN:   Judge, if I believed this was a

14   jewelry store where everything was put together and not

15   segregated as you represented one entity that has segregated

16   goods, there would be no -- this issue wouldn't even exist.

17   It would just be, of course, as the property of the estate.

18   If they were not segregated and no one could tell -- if the

19   creditors could not tell whose jewelry was whose --

20           THE COURT:    What are the major disputes in New

21   York.  It's well-known to every bank's practitioner.  It is

22   that the diamond industry doesn't operate on memoranda.  In

23   the case in which I represent Schrieve, the creditor's

24   committee was made up of diamond merchants, and they never

25   put anything in writing because that's not the way the

1          industry operates.  So the answer to them was well, that's

2          maybe the way you operate, but you are still bound by the

3          same law; and even though there are millions of dollars of

4          diamonds that are being traded and held under various

5          arrangements, you are still bound by the terms of the law.

6          And this always created consternation because these people

7          said wait a minute, we have been dealing with these families

8          for generation.  We are all part of the same religious and

9          social community, and you can't impose alien law as it were

10         on us, and we would say, sorry.  That's not the way it plays

11         out.  Have you ever had cases involving diamond merchants as

12         a Trustee?

13                   MR. ACKERMAN:    Yes.

14                   THE COURT:    And the diamond merchant says well

15         those are my diamonds, and you say, sorry.

16                   MR. ACKERMAN:    Yes.

17                   THE COURT:    And you have litigated those kind

18         of issues to judgment?

19                   MR. ACKERMAN:    There were people who came to

20         court to argue.  I was Trustee in Marty Jewelry Corporation

21         and its many offspring because they would file and they

22         would refile and refile, and people would come in and argue

23         that the jewelry belonged to them, and they could not prove

24         that it was segregated and the answer was to sell it.  They

25         have a claim.

1          THE COURT:     But these resulted in reported

2    decisions?

3          MR. ACKERMAN:    I don't know of any reported

4    decisions in the cases.   There wasn't an issue.

5          THE COURT:     Well I just know because of the

6    extent and magnitude of the diamond industry and the way

7    they practice business that there have been a number of

8    instances in which the Bankruptcy Court is swept into that

9    vortex, and I would have assumed that because this is a

10   situation that so frequently occurs in New York that there

11   would be a reported decision.

12         MR. ACKERMAN:    I know there is one expressed

13   provision in New York law about a special type of object;

14   that is, art drawn by the original artist, and that is

15   protected; however, none of the art here was original.

16   That's why I made that clear in this notice.   If it was

17   drawn by the original artist, then please tell us.   I don't

18   know.

19         THE COURT:     All right.   Okay.   So this is your

20   essential position.

21         MR. ACKERMAN:    Your Honor, I do want to put on

22   the record if there is art and they can show that they were

23   the original artists, then I would say that it would be

24   excluded.   I did not know.

25         THE COURT:     That would be under New York law.

1

2                    MR. ACKERMAN:   Yes, Judge.

3                    THE COURT:      What else do you have to say.

4                    MR. ACKERMAN:   I would invite the Court's

5          attention to one other provision 2-403.  Interesting goods

6          to others can convey good title.  That is the whole essence.

7                    THE COURT:      That's where you go to a jewelry

8          repair shop that also sells jewelry.  You go to bring your

9          watch to a trusted jewelry repair man and he also sells

10         watches of the same character right out of the same display

11         tables.

12                   MR. ACKERMAN:   I think what it says is that what

13         was the power of the transferor.

14                   THE COURT:      Any entrusting or possession of

15         goods to a merchant who deals in goods of that kind gives

16         him power to transfer all rights of the entrustor to a buyer

17         in the ordinary course of business.

18                   MR. ACKERMAN:    Now we look at 11 USC 544.

19                   THE COURT:      And then it defines a entrusting,

20         right?

21                   MR. ACKERMAN:    Correct.

22                   THE COURT:     So where does 2-403 take me.  Is

23         it your position that some of these persons entrusted their

24         goods.

25                   MR. ACKERMAN:   Well, I'm saying that a lot of

1    people are arguing that it shouldn't be governed by 2-326.

2    They're saying we really entrusted the goods.  It's an

3    agent/principal relationship or something of that nature.

4    But New York UCC governs that.  New York UCC and the

5    Bankruptcy Code together would govern that.  You can convey

6    good title.  Morgansen's can convey good title and under 11

7    USC 544, a hypothetical judicial lien creditor, the Trustee

8    acquires the rights -- excuse me, of a hypothetical judicial

9    lien creditor, et cetera, et cetera, and would be such

10   people.

11          THE COURT:     Would what?

12          MR. ACKERMAN:   Would prevail over the buyers of

13   those persons would prevail over --

14          THE COURT:     So these are the customers of

15   Morgansen's.  We are talking about the suppliers.

16          MR. ACKERMAN:   What I am just simply saying as

17   to those people arguing it is -- even though the agreement

18   was called a consignment agreement, every single one, they

19   are saying forget the name of the agreement, we entrusted

20   the goods.

21          THE COURT:     But we are not talking about the

22   customer.  We are talking about persons who delivered goods.

23   We are not talking about the power of Morgansen's to convey.

24   We are talking about what rights any of these persons who

25   deliver these goods on a sale or return basis have to

1    recover the goods against the Trustee.

2            MR. ACKERMAN:   Well, I think under 544 (a),

3    while the goods are in Morgansen's possession, a

4    hypothetical judicial creditor could have grabbed those

5    goods.

6            THE COURT:     But it's not an entrusting

7    situation.

8            MR. ACKERMAN:   I don't think it is.  Every

9    agreement says consignment agreement.  How can you not say

10   that it is 2-326?

11           THE COURT:     Okay.  So that's your position

12   effectively?

13           MR. ACKERMAN:   Yes, Judge.

14           THE COURT:     And what is it that you are asking

15   for the Court to authorize a sale.  We are now in October.

16   You're talking about seasonality.  I know it took us a while

17   to tee this up for a hearing, and we didn't convert this

18   case to Chapter 7 until the summer, late summer.  So, is

19   timing critical for goods that are not perishable?

20           MR. ACKERMAN:   Yes, Judge.  Timing is critical.

21   The end of the Hampton season is coming.

22           THE COURT:     How long do you think that season

23   lasts.

24           MR. ACKERMAN:   At the most, as far as I

25   understand for another 20 days.  I'm looking at the

1       auctioneer.  By the end of October, Judge.

2                    THE COURT:      How are we going to get all of

3       this done, cut through all of this stuff and authorize an

4       auction to be held by the end of October.  Is that

5       sufficient time to properly publish this, to dredge up

6       business?  I mean it's awfully miserable out this week.  It

7       would have been nice if we had the continued weather, and we

8       had a nice Indian Summer, but it looks like we have lost the

9       Indian Summer this week.

10                   Maybe the last two weeks in October are going to

11      be glorious, and the trees will have turned, and everyone

12      will be going out to the North Fork or to the south Fork to

13      get their last breath of fresh air, and it will be a festive

14      thing and maybe there are other activities that are

15      scheduled for October that would draw tourists, but Ms.

16      Morgansen's testimony on several occasions was that the

17      majority of her business was conducted over the telephone

18      with interior decorators and other persons of that sort.

19                   While there were people who would traipse through

20      the store, a substantial part of her business was conducted

21      over the phone or in connection with on-site sales by way of

22      auction.

23                   MR. ACKERMAN:    One of the aspects of relief that

24      we are asking for Judge is authorization to conduct -- to

25      publish the Notice of the Sale in various entities and

1    expend up to the sum of $7,500.  We would advertise in the

2    <u>New York Times</u> definitely, I think in <u>Newsday</u>, and certainly

3    in the local newspaper.  We are also going to put it on the

4    internet.

5              THE COURT:     Look, if I want to sell certain

6    items, obviously of value, I am not sure I want to incur the

7    expense of a <u>New York Times</u> ad.  There must be some

8    opportunity in connection with trade shows, in connection

9    with other highly marketed events.  I don't know why it has

10   to be out on that part of the Island.  If I had valuable

11   goods of this sort, maybe I would want to open up a booth in

12   Manhasset during the Christmas sale.  Why wouldn't I want to

13   do this in connection with some place of business where

14   there is going to be an awful lot of traffic of persons who

15   live a hell of a lot closer to that location than they do

16   out on the East End.

17             MR. ACKERMAN:   What I've been told and I'm

18   trying to get the auctioneer in here is that it would cost a

19   significant amount to move these items in the sum of maybe

20   $20,000 to $50,000.

21             THE COURT:     Well if you could maximize sales,

22   that's one of the costs you have to take into consideration

23   and requires the Trustee's business judgment in consultation

24   with an auctioneer.  But if people aren't traipsing out to

25   the location where these goods are held, and the weather is

1     adverse, it seems to me that it might be more sensible to

2     sell it in Nassau County or in Manhattan during some

3     discrete period of time to bring in more traffic, if that is

4     the way this stuff gets sold. If the principal customers are

5     interior decorators who attend these auction sales or estate

6     sales or anything else of that sort, there may be other

7     shows that they attend, at the pre-Christmas period of time

8     to start stocking up their shelves.

9            MR. MALTZ:   Good morning, Judge, David Maltz,

10    the auctioneer.  We thought about moving the items.   The

11    cost associated with doing that would be so high, we would

12    have to worry about breakage, location, and I feel if we get

13    an auction in before the end of this months, we still have

14    the season out there that we can get it done as long as it

15    is properly advertised and marketed.

16           THE COURT:     You're the only one with a tan Mr.

17    Maltz.  I don't know if it is local or you go to the tanning

18    salon, or you go to Florida.

19            MR. MALTZ:   I work outside a lot Judge.

20           THE COURT:     Okay, I understand that.

21            MR. MALTZ:   I like planting flowers with Mr.

22    Stern.

23           THE COURT:     Okay, so in any event --

24            MR. MALTZ:   I do have pictures of the premises.

25    I don't know if the Court has seen any of them, and I would

1          be happy to pass them up to you if you have any interest.

2                    THE COURT:     I'm not going to be making a

3          decision about where this stuff should be sold.  That is up

4          to the Trustee in consultation with his experts.  And I just

5          asked this more than out of mild curiosity, because the goal

6          of Mr. Ackerman is to maximize the proceeds; and the more

7          proceeds there are, perhaps the easier it is to deal with

8          some of these persons in court today.  Because if you are

9          putting real money on the table, and they are going to get a

10         decent distribution, they may determine that it is better to

11         take those proceeds with the sale that you are proposing to

12         hold brings in substantial revenues.  But I don't know what

13         experience you had in auctioning goods of this character.

14                   MR. MALTZ:   We have had experience selling

15         similar items, and I discussed it at length with Mr.

16         Ackerman the costs associated with relocating these goods

17         either into Nassau County or even into Manhattan.

18                   THE COURT:     Well, this was a very small store.

19         Didn't she have a maximum of 4,000 sq. ft. of store space

20         and 4,000 ft. of storage.

21                   MR. MALTZ:   I would have to guess that there is

22         probably over 600 items in the store.  There is a huge

23         amount of items.  Unfortunately, one of the things that

24         makes it difficult for us, and I discussed it with Mr.

25         Ackerman, we have to do a two day auction because there are

1  rooms just piled floor to ceiling with goods, where it is
2  more like a warehouse.

3  THE COURT:    I understand.

4  MR. MALTZ:    The place is packed.

5  THE COURT:    And you couldn't move this out
6  with one semi trailer?  How many cubic feet would this
7  occupy?

8  MR. ACKERMAN:    Judge, What I think you are
9  saying is absolutely correct.  When I heard Mr. Maltz
10  telling me it would cost about $20,000 to $40,000, I said
11  okay, let's not move it, but what you're saying is if we are
12  talking about increasing the price from 250 to 500, then
13  it's a worthwhile -- it's a possibility.

14  THE COURT:    Well, I'm trying to understand why
15  it would cost $20,000 to move 600 items, and I don't know
16  you can't just back it into one truck.  Obviously, you would
17  need -- you might need some special packaging material.  You
18  would have to have a crew that is far more adept at moving
19  things from one place to another than I.

20  MR. MALTZ:    You would probably need 2 to 3 40
21  foot trailers.  You would need a crew of how many men to
22  properly wrap and pack.  You have chandeliers.  You have
23  pianos.   You have large objects.  You have fragile,
24  breakable items.  The way it is set up out there, and like I
25  told Mr. Ackerman, if we can get an auction in this season,

1    by the end of October, we should be fine.  The Fall is a

2    very large season out there; and if a sale is properly

3    advertised and marketed, I anticipate no fewer than 100

4    people attending the sale.  We're concerned where we are

5    going to park them.

6              THE COURT:    You're going to hire valets?  Are

7    there any public parking lots or garages?

8              MR. MALTZ:   There is a golf driving range next

9    door.  We are going to speak to them, and there is an Elks

10   club across the street.  So we are going to see if we can

11   utilize one or both of those locations.

12             THE COURT:    Can't Mr. Ackerman exploit his

13   membership in the Elks?

14             MR. MALTZ:   When I spoke to the principal of the

15   debtor, she said that -- I asked her what she used to do

16   when she ran auctions.  She said they had a valet service,

17   and they would take the cars around the block to residential

18   areas which I don't think would really work for our

19   situation and what we have to do.

20             THE COURT:    You can hire a bus.  But is 100

21   persons a lot turnout for inventory of this value?

22             MR. MALTZ:    Yes.

23             THE COURT:    And how many buyers do you think

24   you are going to have out of the 100?  20?

25             MR. MALTZ:   How many buyers do I think I have?

1    I think I will have 100 buyers.  We'll have end users as

2    well as dealers, galleries.

3         THE COURT:    Do we know based on the records of

4    the estate, do you know how many persons attended any of the

5    auctions conducted this past summer by Ms. Brunesco?

6         MALE VOICE:    I was there.

7         THE COURT:    How many people?

8         MALE VOICE:    Eight, maybe ten.

9         MR. MALTZ:    A sale advertised by the way she did

10   business, that's why we are all in Bankruptcy Court in a

11   properly advertised marketed bankruptcy sale.  I don't see

12   why we wouldn't have close to 100 people out there if not

13   more.

14        THE COURT:    Do you have any evidence based

15   upon your past experience of what values can be realized in

16   a bankruptcy sponsored auction?  Are these going to be

17   distressed prices?

18        MR. MALTZ:    It will be reasonable, wholesale

19   prices with similar items like they sell for.  We actually

20   found one list of items that she purchased at another

21   auction, that she brought into her store.  Her prices are

22   insane for lack of any other word.  I mean we have been

23   checking prices of what similar items have sold for compared

24   to the list price on her items there, they are anywhere five

25   to seven times too high.  The items will sell for what they

1    are worth.  The sale has already been advertised on our

2    website without a date to be determined subject to Court

3    approval.

4            THE COURT:    Your representations to the Court

5    because you are not testifying is that you have done these

6    things before of goods of similar quality, of similar scope,

7    and that you believe based upon your network because you

8    have been in this auction business for many, many years, you

9    are probably the principal auctioneer for most of the

10   Trustees in the Eastern District of New York; and you

11   believe based upon your experience, you are going to be able

12   to generate a substantial yield, and you think

13   notwithstanding the limitations in parking, notwithstanding

14   the distances from the location of the store to the major

15   population areas, if I want to sell to this market, I would

16   take certain items that I would think would be attractive,

17   and I would have a sale in Manhasset or Locust Valley or in

18   Great Neck or in the Five Towns, something of that sort.

19           MR. MALTZ:    Judge, in all candor, I have a

20   $15,000 sq. ft. warehouse in Plainview readily available

21   which would be much more convenient for me and my staff to

22   run an auction from there, but I do not feel that it would

23   be cost efficient for this estate to go through the costs of

24   transporting these items there.  I don't feel that we would

25   realize that much more, and regardless of how well items are

1    packed, when you are moving that quantity, you will have

2    damage and you will have breakage.

3         THE COURT:   Is it possible to have locations

4    simultaneously at two different locations for those items

5    that may command a lot from market and where the

6    transportation and handling costs are lower.

7         MR. MALTZ:   Well --

8         THE COURT:   Why would I go to buy a piano on

9    the East End.  I presume I could go to Steinway dealer or

10   somebody else of that sort.  I was quite struck when I went

11   to Fortunoff's --

12        MR. MALTZ:   Judge it's not like we have --

13        THE COURT:   And there is a Steinway dealer,

14   and I took a look at the piano and I am kicking myself all

15   around the floor, because I sold this marvelous grand that I

16   had when I had to skinny down and come to this remote

17   location from a marvelous suburban area on the coast.  So I

18   sold my Steinway that I bought myself as a birthday present

19   ten years before, and I took a real hit.  I looked at the

20   prices of these things in the Steinway dealership.  Maybe

21   those prices are five to seven times what they should be,

22   but I doubt it.  So, there I was in Manhasset and

23   surrounding areas.  That was Westbury.  But I assume if I

24   went upscale, I'd go to Manhasset.

25        MR. MALTZ:   Judge, there is probably more money

1      out there than anywhere else on this Island right now, and

2      the buyers will come.  As far as pianos, we only have one of

3      them.  What we could do, if certain items do not bring a

4      number that we feel is a reasonable number, we go through

5      the sale.  Mr. Ackerman approves the items that he likes.

6      The ones he doesn't, we then move those items, but then our

7      costs associated with moving, would be considerably less

8      because we would be moving only a handful of items.

9      THE COURT:    Did you ever set up an auction so

10     that persons who claim these good have an opportunity to

11     make a bid for them, and the proceeds are held pending

12     further determination.

13     MR. MALTZ:    All the time.  In this case, one of

14     my thoughts was after we identify them by lot numbers, to

15     have these folks come in, let them identify it.  We will be

16     able to establish which number is theirs.  We will know

17     exactly what the sale proceeds are from their item.  They

18     will also have an opportunity to come to the auction and bid

19     on it.  If the item doesn't bring as much money as they feel

20     it is worth, it might be more cost efficient for them just

21     to buy it back and wait to get their money back later on if

22     their claim is approved.

23     THE COURT:    From their perspective, that means

24     they bought it twice.

25     MR. MALTZ:    That's correct.

1          THE COURT:     And what do you think the range of

2     sale prices will be?

3          MR. MALTZ:    We have items that will bring

4     $100.00.  We have items that will bring thousands of

5     dollars.

6          THE COURT:     But of the 600 items using that as

7     a ballpark figure, how many of them will sell for less than

8     $2,000 per item?

9          MR. MALTZ:    I haven't gone through the store

10    that well to answer that question.  But overall, you should

11    have in excess of $100,000 there.  Again, like I stated

12    earlier, you have rooms that are just loaded floor to

13    ceiling.  I have no idea what's in those rooms until my

14    people get in to start lotting and cataloging and pulling it

15    out.

16          THE COURT:     The question is are you going to

17    have enough display space.  If it is all packed in rooms

18    that make it very difficult to walk your way through, then

19    how are you going to be able to display the goods?

20          MR. MALTZ:    We have two solutions to that

21    problem, which I am going to discuss with Mr. Ackerman after

22    this hearing.  One is to run two separate auctions two weeks

23    apart, where we leave that stuff in the room, sell the stuff

24    that is exposed now, and then move that down.  The second is

25    to take everything out and may be rent the Elks Club across

1   the street or rent a tent and conduct the auction in there,

2   have an inspection the day before, or the the morning of,

3   take digital pictures of the items, so we can show it prior

4   to sale.  Whichever is more cost efficient and Mr. Ackerman

5   decides that we should go forward, is the way we will go it.

6   But we have addressed all of these issues.

7           THE COURT:    But your strong preference based

8   upon realizing the maximum amount taking into consideration

9   all of the alternatives, is to do it in place.

10          MR. MALTZ:    Without a doubt.

11          THE COURT:    Maybe we'll poll some of the

12  brethren here and the sisters where they think it should be

13  sold.  All right.

14          Now a number of you -- look it is very difficult

15  for you to go through this.  All of you should have gotten

16  notice of the legal arguments.  For those of you who

17  represent yourselves and are not lawyers, I'm sure it is

18  very difficult to listen to this and try to penetrate it

19  because it turns on fairly subtle distinctions and you have

20  to put together all kinds of code sections in some coherent

21  way.  And unfortunately, there are even disputes among the

22  reporters about how these sections should be construed.  I

23  see in some of the commentaries, my former colleague, Steven

24  Harris, who was one of the co-reporters, takes some view and

25  other writers who are very sophisticated teachers of the

1          Uniform Commercial Code, White and Summers, take a view very

2          different from the position taken by Professor Harris, who

3          was one of the principal reports and the one who drafted the

4          notes.  So even under this text where it was supposed to be

5          substantially improved and clarified, the law professors

6          can't even agree what these sentences mean, or what these

7          comments mean.  I assume these are not just academic

8          disputes.  They are real issues about how this law should be

9          applied in the 49 districts in which it may have been

10         enacted.  Louisiana always goes its own way.

11                   Who is going to address some of the legal

12         arguments made by the combination of Misters Ackerman and

13         Bilich?  You are?

14                   Who claims to be the original artist.  Let's get

15         you out of here.  Any of you claim to be the original artist

16         who created these art objects and can demonstrate through

17         some verifiable means that you are the artist whose goods

18         will be excepted from the sale.

19                   MS. PIAZZOLA:    Judge, I represent my father.

20         My name is Tasha Moody-Piazzola, and we put the artwork

21         there as decoration, and they were to sell it.

22                   THE COURT:    Okay, but your father was the

23         artist?

24                   MS. PIAZZOLA:    Yes.

25                   THE COURT:    And he can prove that?

1          MS. PIAZZOLA:   Yes.  It's patented.

2          THE COURT:     Patented?

3          MS. PIAZZOLA:   Yes.

4          THE COURT:     Artwork is patented?

5          MS. PIAZZOLA:   Yes, it is.

6          THE COURT:     I thought patents were for designs

7     that are unique.

8          MS. PIAZZOLA:   Some sculptures are unique art

9     pieces that are designs and patterns, and they are patented

10    with the US Patent Corporation or whoever it is, because I

11    have all of his --

12         THE COURT:     And you have the documentation to

13    establish that?

14         MS. PIAZZOLA:   I can get it.  I didn't know

15    that I needed it because I am representing my father.

16         THE COURT:     Generally, persons represent

17    themselves.

18         MS. PIAZZOLA:   Well, I didn't want to put him

19    through this whole scene, because he is a sick elderly man

20    and I was just trying to maintain some business.

21         THE COURT:     I appreciate that, but how many

22    items are you talking about, and what is the value you

23    attribute to these items?

24         MS. PIAZZOLA:   We have two items there.  They

25    were claimed to be $25,000 for one, and the other one was

1    $1,000 for Morgansen's Auction House, which always referred

2    as Morgansen's Auction House, but anyway --

3            THE COURT:    Look, I am perfectly happy for you

4    to make legal arguments, but the question I raised because

5    Mr. Ackerman was quite direct.  If these are works that

6    qualify as works of artists and should be excepted from the

7    scope from the property of the estate, and you can

8    demonstrate that, you will save yourself a lot of cost and

9    bother.  You just have to be able to demonstrate to Mr.

10   Ackerman that you qualify under that limited exception.  And

11   if your father qualifies under that and you have the

12   documentation and you can point out the objects, we don't

13   have to litigate about it.

14           But if Mr. Ackerman is not satisfied with the

15   documentation, and you can't prove that your father was the

16   artist, we can deal with that perhaps on a separate

17   occasion.  Our goal here is to limit the range of

18   controversy.  So if you can demonstrate that those are

19   artistic works traceable to the artist, and your father is

20   the artist, you can work something out with Mr. Ackerman.

21   All right.

22           MS. PIAZZOLA:    Thank you, Judge.

23           THE COURT:    But you use two different names.

24           MS. PIAZZOLA:    My married name is Moody, and my

25   father's name which is my name now, I'm divorced, is

1           Piazzola.  The work is Piazzola.

2                     THE COURT:     Spell out your father's name.

3                     MS. PIAZZOLA:   It's like Mike Piazza.  P-I-A-Z-

4           Z-O-L-A.

5                     THE COURT:     And his first name is?

6                     MS. PIAZZOLA:    Francesco.

7                     THE COURT:     F-R-A-N-C-E-S-C-O.  Okay.  And

8           you are a resident of the Eastern District of New York.

9                     MS. PIAZZOLA:   Actually, no.  We are located in

10          Queens.

11                    THE COURT:     Queens is in the Eastern District

12          of New York.

13                    MS. PIAZZOLA:   Oh, okay.

14                    THE COURT:     The Eastern District of New York

15          for bankruptcy purposes includes Staten Island, Brooklyn,

16          Queens, Nassau and Suffolk.

17                    MS. PIAZZOLA:  Oh, okay.  Thank you.

18                    THE COURT:     Welcome to the Eastern District.

19                    MS. PIAZZOLA:   It's so beautiful here.

20                    THE COURT:     A little remote though.  You have

21          to like cows.  Yes.

22                    MR. ACKERMAN:   I have given her my business

23          card.  I have asked her to fax the patents to me, and we are

24          going to immediately get that to Mr. Maltz to see if the

25          items are there.

1               THE COURT:     Okay.  Have you seen them there,

2     Ms. Piazzola?

3               MS. PIAZZOLA:    Yes, I have.

4               THE COURT:     All right.  Any further persons in

5     this category?  All right.

6               MR. FAVER:    I'm sorry your Honor.  My name is

7     Paul Faver.

8               THE COURT:     Paul what?

9               MR. FAVER:    Faver.  F-A-V-E-R, if I may approach

10    the lectern, your Honor.

11              THE COURT:     Yes.  You can sit and talk from

12    there.  Whatever is more convenient for you.

13              MR. FAVER:    Well the other side stood up here.

14              THE COURT:     We don't stand on ceremony on such

15    minor matters.  It's just so you can be heard.

16              MR. FAVER:    Judge, again, my name is Paul Faver.

17    I find a lot of discussion today rather intellectually

18    intriguing.

19              THE COURT:     But it doesn't put the dollars in

20    your pocket.  I understand that.

21              MR. FAVER:    I'm sorry, your Honor.

22              THE COURT:     It doesn't get dollars in your

23    pocket.

24              MR. FAVER:    But the reality is that I actually

25    want to engage in that intellectual discussion.  I agree in

```
1        large part with your former colleague, Steven Harris.  I

2        assume the technical interpretations of the Code.

3                    THE COURT:    You are here on your own.

4                    MR. FAVER:    Yes, sir.  I no longer practice

5        law.

6                    THE COURT:    Yes, sir.

7                    MR. FAVER:    I no longer practice law.  I'm here

8        to represent myself.

9                    THE COURT:    You were once admitted?

10                   MR. FAVER:   Yes, your Honor.

11                   THE COURT:    What are the items that you are

12       claiming to be yours.

13                   MR. FAVER:   Mine Judge is the Chanukah Menorah.

14                   THE COURT:    What's that?

15                   MR. FAVER:   The Chanukah Menorah.  It's a bronze

16       sculpture.

17                   THE COURT:    And the Menorah is --

18                   MR. FAVER:   For the record, I intend once -- if

19       I secure for the return of it to contribute it and donate it

20       to the 92$^{nd}$ Street Y; so it means more to me than the

21       proceeds itself.

22                   THE COURT:    That's not going to influence me.

23       You can engage in whatever charitable activities.

24                   MR. FAVER:   But there was a discussion earlier

25       as to what proceeds and alike.
```

1            THE COURT:     There are some traditions that say

2    that charitable gifts are the ones that are not disclosed.

3            MR. FAVER:    There are tenants to that effect.

4            THE COURT:     So you have a Menorah, and what's

5    the market value attributed to the Menorah?

6            MR. FAVER:    $4,500.  It's a bronze sculpture.

7    And although I would obviously love to address a lot of the

8    practical issues about the sale and alike and the other

9    things, I think the legal issues you raised are rather

10   interesting, and some of the answers that were debated

11   rather extensively are simpler than what they may appear.

12   Although this whole area seems complicated, I think if we

13   take a step back from it, Judge, and walk through it step by

14   step, code by code, I think we will figure out the answers

15   to the questions here despite how convoluted and complex

16   they may otherwise seem.

17           Your question about consignment goods, Judge, was

18   clearly answered in the code itself under 102 20(c).  There

19   was a lot of discussion about consumer good and when it is a

20   consumer good when a purchaser takes it from Morgansen's and

21   brings it home or if it is an Armoire that has been in the

22   family for a long time, and really all of that is rather

23   interesting, the code specifically says exactly when it is

24   we look to determine whether an item is actually a consumer

25   good for purposes of whether it is consignment under Article

1       9.

2                   THE COURT:     Go slow Mr. Faver.  I don't talk

3       or think as fast as you do.

4                   MR. FAVER:    When I clerked for a Judge in the

5       South --

6                   THE COURT:   What's that?

7                   MR. FAVER:    When I clerked for a Judge who was

8       in the South, I thought I talked slowly, Judge.

9                   THE COURT:    1-02.

10                  MR. FAVER:    I heard reference to Judge Paske

11      brought back fond memories actually.

12                  THE COURT:     A lot of people didn't have fond

13      memories.

14                  MR. FAVER:    I know that.  I was never on that

15      side of the bench.

16                  THE COURT:     You said 1-02?

17                  MR. FAVER:    102 20 (c).  Here it says --

18                  THE COURT:     Counsel, I am trying to find the

19      section.  You said it's under 1-02?

20                  MR. FAVER:    102.  It's the definitional section.

21      9-102.

22                  THE COURT:     Yes.

23                  MR. FAVER:    20 (c).  This is the definition that

24      we were discussing about what constitutes a consignment for

25      purposes of Article 9.

1          THE COURT:     Okay.

2          MR. FAVER:   If you recall, we had extensive

3    discussion earlier about whether it is a consumer good and

4    therefore exempt, and if the consumer purchased it from

5    Morgansen's and took it home and used it for personal use,

6    is that a consumer's good.  But it is rather clear right

7    here where it says the goods are not consumer goods

8    immediately before delivery.  So the issue is whether the

9    consignors, the people here, whether it was a consumer good

10   to us at that time, just like your armoire from your

11   grandmother was a consumer good for you at that time.

12   That's the defining moment in time.

13         THE COURT:     The armoire is from Arizona,

14   rather inexpensive because it was large.  It was the plates

15   from the great-grandmother.  But that's not relevant to the

16   record.  All right.  So you're telling me I should look at

17   9-102 20 (c).  Okay.  And you are telling me the point of

18   reference is not the point of reference from Morgansen's

19   perspective, but the status of these goods in the hands of

20   the person who delivered them.

21         MR. FAVER:   Which would be the consignors in

22   this case.  For purposes of determining Judge that this is

23   albeit a consignment in a general way, is not a consignment

24   as the counsel for the Bankruptcy Trustee conceded for

25   purposes of Article 9 which is the purpose behind this

1    change in 102 20 (c) or 20 generally.

2                THE COURT:    How do you demonstrate that your

3    Menorah is a consumer good?

4                MR. FAVER:   Well, then we go back down to the

5    code Judge, consumer goods means goods that are user bought

6    for use primarily for personal, family, or household

7    purposes; and clearly when it was in my possession before

8    delivery, it was clearly used for those purposes.

9                THE COURT:    I would have to check out if there

10   was any melted wax.

11               MR. FAVER:   I cleaned it, your Honor.

12               THE COURT:    You cleaned it up.  So you are

13   going to show me pictures of the candlelight?

14               MR. FAVER:   There is a picture as Exhibit A

15   without the candles but I suppose --

16               THE COURT:    Okay.  How old is this?

17               MR. FAVER:   It was purchased in 1999.

18               THE COURT:    What's the date of manufacture?

19               MR. FAVER:   I'm sorry, your Honor.

20               THE COURT:    Do you know the date of

21   manufacture?

22               MR. FAVER:   Not long before it.  It was one of

23   the earliest in the edition.

24               THE COURT:    It's a contemporary item.  Okay.

25   I have the picture.

1          MR. FAVER:   I think for purposes of legal
2    analysis, we can start where you were earlier in terms of
3    whether it was a consumer good and if it is a consumer good,
4    then it is therefore no longer consigned for purposes of
5    Article 9.  Although you can look to the other question
6    rather extensively, and that is of an auctioneer.

7          THE COURT:     Wait.  Before you go there, Mr.
8    Bilich said if it falls outside of Article 9, we agree there
9    were two routes out.

10          MR. FAVER:   That's correct.

11          THE COURT:     It's either out of the code or
12    under 326.  So let's assume you are right and it is not
13    consigned for purposes of Article 9.  We don't have all of
14    the perfection rules.  The question is now how do you escape
15    the reach of 326.

16          MR. FAVER:   Your Honor, I again just go to the
17    code itself, although I would like to point out the earlier
18    amended version, but your former colleague, Steven Harris
19    had it right.  Morgansen's is not a buyer.  If we go to the
20    statute 326 which is a sole and exclusive basis for the
21    Bankruptcy Trustee's position, it talks solely and
22    exclusively in terms of a buyer.  And again, if we simply
23    just look at the code and look at the section that defines
24    buyer, which is 2-103 1(a) --

25          THE COURT:   Wait a minute.  Slowly.  2- --

1        MR. FAVER:    I'm sorry, Judge. 2-103 1(a).  I
2    think I have been in the northeast too long perhaps, talking
3    a little too rapidly.

4        THE COURT:    You should recognize that I'm from
5    the northeast but more northeast where we talk slower.
6    Okay.  If I go to 2-103 1(a), that is going to tell me?

7        MR. FAVER:    Let's make sure I understand it and
8    perhaps that we all understand correctly that UCC 2-326
9    talks explicitly and exclusively about a buyer and the
10    buyer's creditors.  I think we can all agree on the plain
11    meaning of the language used in the statute.  And once we do
12    that, then we go to the definitional section of the statute
13    that defines buyer.  And that section, your Honor --

14        THE COURT:    Hold on, counsel.  It's like Alice
15    in Wonderland, chasing the rabbit.  2-103 1 (a).

16        MR. FAVER:    It's the first definition.

17        THE COURT:    All right.  It means a person who
18    buys or contracts to buy goods.

19        MR. FAVER:    Yes, your Honor, and in this case
20    Morgansen's neither bought nor contracted to buy my Chanukah
21    Menorah.  The consignment agreement makes it absolutely
22    clear that there was no purchase by Morgansen's of my
23    Menorah; and therefore, they are not a buyer for purposes of
24    Section 326.  Therefore, 326 is inapplicable to this set of
25    circumstances.  Now, although it is simple I think and

1          straight forward by reading the statute itself and going to

2          the definitional section as your Honor has on so many other

3          appropriate occasions, we can also look at the amended

4          version of 2001.  In that, if you look at my papers, I

5          stated in its entirety in footnote three in the title of

6          that statute, your Honor, I think really speaks volumes.

7          This is the former statute.

8                    THE COURT:    Why am I looking at the former

9          statute?

10                   MR. FAVER:  Because that, your Honor, before it

11         was amended was titled Sale on Approval and Sale or Return

12         and I quote "consignment sales" and rights of creditors.

13         You see when the Legislature amended the statute your Honor,

14         they specifically and intentionally omitted consignment

15         sales from this statute.  Ironically, just as I pounded home

16         a minute ago that the language was buyer, buyer, buyer, when

17         you look at the former sub-section 3 which was the section

18         that was equally omitted that dealt with consignments, it

19         discusses slowly and exclusively in terms of the person not

20         the buyer Judge.

21                   THE COURT:    I don't know where this goes.  I

22         think this still evades the question, because if someone is

23         reselling goods on a sale or return basis, there is no

24         exclusion under the definition of buyer or person in that

25         category so it may well be that a person excepts delivery of

1     goods on a sale or return can be determined for bankruptcy

2     purposes as well as state law purposes to be a buyer.  I

3     don't think this definition takes you home, but you have to

4     consider it.

5          MR. FAVER:   But I noticed in your use --

6          THE COURT:     But a consignment, whatever you

7     want to call it, sale or return, there was a reason for

8     dropping sub-section 3 because it confused the hell out of

9     everybody.  And we had to go back to the drawing board to

10    try to clarify it and apparently there was some question

11    about whether it was adequately clarified so maybe we give

12    praise to my former colleague, Steve Harris, and then fault

13    him for not having drafted this as well as he can.  And his

14    defense would be I had to listen to all kinds of lawyers who

15    represented different interests.  So the language got

16    watered down or got confused, because it is a negotiated

17    process.  And the draft that I submitted which was pristine

18    and clear was destroyed by all of these years and years and

19    years of going back and forth with the commentators.  But

20    apart from that imaginary conversation, because I have had

21    that conversation with him, but not when I was on the Court.

22

23          MR. FAVER:   Mr. Harris' thoughts on that are

24    specifically quoted in White and Summer where Mr. Harris has

25    taken the position that I have asserted in advance here

1    Judge that it is not a buyer.

2            THE COURT:    And Mr. Harris, as you pointed,

3    has severely discounted buyer in White and Summer.  It's a

4    nice argument.  We don't buy it.

5            MR. FAVER:   And even if we would go to the White

6    and Summer direction, we still prevail, and here's why,

7    Judge because White and Summer --

8            THE COURT:    Okay, but you know White and

9    Summer aren't courts.  They are just treatises, and I have

10   to make a decision based upon language preferably as

11   construed by the Courts and I give some weight but not very

12   much to academic commentary.

13           MR. FAVER:   Well, let's give it some weight

14   because White and Summer said exactly what you said at the

15   beginning of this hearing, your Honor, and that is, there is

16   an agreement.  There is an agreement between the parties and

17   despite counsel from the Bankruptcy's initial view that

18   there was no such agreement to be otherwise considered,

19   White and Summer said there is.  And what we do, is we look

20   at that agreement to determine whether or not potentially

21   they are a buyer for purposes of 326.  So in other words, if

22   the written agreement specifically talks in terms of a

23   consignment and that the consignee is acting as the agent of

24   the consignor, which it does your Honor.  That is Exhibit B

25   in my papers, then White and Summer also agree with me that

1          326 is inapplicable.

2                    THE COURT:     But, you are not capturing the

3          point that was made by the Trustee.  It doesn't matter what

4          you write.  Because these agreements are not going to be

5          publically available.  So you may enter into an agreement

6          and call a horse or a cop, that doesn't bind the universe

7          because you've entered into what the philosophers call a

8          private language and the meaning of words is only in their

9          use and the public.

10                   We can't be bound by private agreements in which

11         you define things in unique ways, and what Mr. Ackerman's

12         point was is that from the standpoint of a hypothetical lien

13         creditor of the Trustee as avoidance powers.  He does take

14         subject to your private agreements in which you define

15         things in a way that's maybe advantageous to you or even

16         advantageous to Morgansen's.  He is looking for some

17         objective rule and I think that part of the difficulty is

18         that we sometimes seem to be under objective rules, we seem

19         sometimes to be under agreements, and I have to sort that

20         thing through.

21                   I don't reject your agreement out of hand, but it

22         is not persuasive.  I have to look at it and then I have to

23         determine what the substance of that agreement is, not its

24         form.

25                   MR. FAVER:     In substance of that agreement, your

1    Honor, specifically says that they were acting as an agent

2    and not a buyer, which then determines as we have discussed

3    already whether 326 applies.  And really what happens

4    privately or publically may be of less consequence than what

5    the Legislature did when the made this amendment in 2001.

6          You see what they did, Judge, and when you think

7    through it, just as White and Summers explains in their

8    treatise, is that they removed consignments like what we're

9    discussing here, where people put their personal belongings

10   in the hands of an auctioneer or consignment store just as

11   we did.  They exclude it from Article 9 and say, hey, guys,

12   you don't have to deal with those sophisticated UCC

13   financing statement rules; and by the way, you are not going

14   to have to worry either about being subordinated to the

15   rights of the consignee because they are not a buyer.

16   So the Legislature was protecting the person.

17         You talked about the estate sale earlier.  The

18   ladies of Beacon Hill, I believe.

19         THE COURT:    Yes, the ladies on the Hill.

20         MR. FAVER:   And it was the ladies of Beacon Hill

21   and people which perhaps is the most vivid picture we have;

22   maybe elderly people putting this goods on consignment with

23   the neighborhood consignment store because they need money

24   to cover their rent and alike.  Although that may be the

25   vivid picture, the intentions equally apply here.

1            THE COURT:      No, no, no.  Well I drive through

2       certain communities, and I see a consignment store.  They

3       are often called thrift stores, and they sell used clothing,

4       what the UCC does is taking that out of the box.  That's a

5       very specialized industry, not of great commercial

6       significance, so people deliver those goods on some

7       consignment.  The store is marked as consignment.  There is

8       no original inventory there.  Everyone knows what you are

9       doing, when you walk in there.  Then you have entrusted

10      situation in which your watch for repair, and the jeweler

11      puts it in his display case, and he sells it.  So we have a

12      classic entrusted situation that has been well defined

13      institutionally and through practices.

14            And then the code draws a distinction, a rather

15      unclear distinction, between consumer consignments and

16      commercial consignments.  And those terms are reflected in

17      the White and Summers commentary.

18            So the question is for purposes of this estate,

19      one way of asking the question may be are these consumer

20      consignments or commercial consignments.  And if they are

21      commercial consignments, they are bound by these provisions.

22      If they are consumer consignments, we have to look much more

23      closely.  So I need to know from the Trustee's standpoint is

24      it fair to draw this distinction, Mr. Ackerman?  Can I ask

25      questions about whether these are commercial consignments or

1     consumer consignments?

2               MR. ACKERMAN:   Judge, I don't believe so.

3               THE COURT:    You don't believe I should draw

4     that distinction?

5               MR. ACKERMAN:   I think that basically White and

6     Summers is just one thing but in fact they would say what

7     the creditors are looking at.  2-326 --

8               THE COURT:    Well you say look at the

9     creditors.  Mr. Faver is saying look at the person's use of

10    those goods before they were delivered to Morgansen's.  So

11    we have two perhaps incompatible views, and the question is

12    which perspective controls.

13             MR. ACKERMAN:   There are two ramifications --

14             THE COURT:    Mr. Faver said irrespective of the

15    person in this case he uses the Menorah in his home and he

16    wants to sell it for whatever reason.  He got a more

17    expensive Menorah, or he stopped lighting candles or

18    converted or whatever.  We don't need to get into that.  So

19    he puts this up for sale for resale through Morgansen's.

20    Maybe he had a prior relationship with that company.  Maybe

21    they disposed of other items for his benefit.  But he says

22    look at this situation when it was in my hand before I

23    turned it over, and that ought to be controlled.

24             You say no.  We are in a bankruptcy court.  We

25    are only dealing with debtor/creditor relationships, and

1          even though outside of bankruptcy there might be a different

2          kind of arrangement or understanding, I should look

3          exclusively from the standpoint of Morgansen's creditors.

4                    MR. ACKERMAN:   I would say there are two --

5                    THE COURT:    I can't possibly reconcile these

6          two positions.

7                    MR. ACKERMAN:   Well, I think we can.  The

8          ramifications -- there are two ramifications to this

9          argument.  The first one is basically this.  UCC 2-326 does

10         not exist.  When it says --

11                   THE COURT:   UCC 2-326 does not exist?

12                   MR. ACKERMAN:   That is what he is saying that

13         this section of the UCC -- not that it doesn't apply, it

14         doesn't exist.  He is saying where it says if delivered

15         goods are delivered primarily for resale, that doesn't

16         matter.  That was a mistake that they put that in the UCC.

17                   THE COURT:    He says you have to read the text

18         as an integrated whole, and I have to make sense of

19         provisions and see them at their face to go into different

20         directions.  I can't say I am going to ignore the

21         definitions of the definitional section.  I assume those

22         definitions are applied across the board under all of the

23         articles.

24                   MR. ACKERMAN:   I think there is a second

25         ramification though, Judge.

1            THE COURT:    Yes.

2            MR. ACKERMAN:   And that is in every single

3   bankruptcy case that involves a business from now on, we can

4   have people coming in and saying they are holding my

5   consigned goods.  I can't prove it.  Maybe I even have a

6   consignment agreement.  It's my property.  Creditors would

7   take security interests.  They would maybe take a security

8   interest in all inventory and collateral.  It doesn't

9   matter.  Nobody in the public is protected.  It doesn't

10  matter if --

11           THE COURT:    Wait a minute.  It's between a

12  landlord or the gas company, why should their rights be

13  greater than the person's who delivered the goods.

14           MR. ACKERMAN:   They're not.  They are the same.

15           THE COURT:    What do you mean they are the

16  same.

17           MR. ACKERMAN:   They are both unsecured

18  creditors.

19           THE COURT:    I see.

20           MR. ACKERMAN:    Mr. Bilich, you wanted to add

21  something.

22           MR. BILICH:   I just want to make a couple of

23  points --

24           THE COURT:    Make it quick.

25           MR. BILICH:    -- a couple of points which are

1    really repeated from before.

2              THE COURT:    Don't repeat it.  I remembered it

3    the first time.

4              MR. BILICH:    The definition in Article 9 that we

5    are looking at is limited to Article 9.  I don't believe it

6    has any application to Article 2.

7              THE COURT:    You're telling me that there is a

8    more specific rule that governs transactions under 9; and

9    when you have a more specific definition, that controls over

10   the general definition.

11             MR. BILICH:    Not only that, but if you look at

12   the definition -- if you look at 9-102, it's lead in says in

13   this Article, the following terms mean the following in this

14   Article.  So I don't believe that the Article 9 definition

15   has any force in interpreting Article 2.  Article 2 talks

16   about goods.

17             THE COURT:    I understand what they are talking

18   about.  I am not sure that argument is persuasive.

19             MR. BILICH:    Neil's point, which I would like

20   to try and articulate a little better.

21             THE COURT:    Well we're not going to be

22   resorting to first names.

23             MR. FAVER:    I'm getting double teamed Judge.

24             THE COURT:    Mr. Faver, you can be triple

25   teamed.  I'm sure you would hold your ground.

1          MR. BILICH:   He can handle it.  I think if 2-326

2     does not apply to Morgansen's, does not apply to this fact

3     situation, we can't figure out what it would apply to.  So I

4     think the argument proves too much.

5          THE COURT:    Well we could have a statutory

6     provision that is meaningless.  It could be.  Back to the

7     drafting table.  Okay.  I got your point.

8          Mr. Faver anything else?

9          MR. BILICH:    One further point.  I do believe

10    that Morgansen's is a buyer and the reasoning for that is if

11    the customer that comes into Morgansen's and buys this

12    Menorah, he gets an invoice or a bill of sale from

13    Morgansen's.  He deals with Morgansen's.  He's in privity

14    with Morgansen's.  He doesn't know any other seller.  If he

15    has any remedy against any defect, it's against Morgansen's.

16    From that I conclude that he has bought from Morgansen's

17    which means that the reality of this transaction is that

18    Morgansen's has bought from the consignor --

19         THE COURT:    I'm going to tell you that there

20    is a certain mysticism that goes on here, and it is a

21    tradition that doesn't follow from Menorahs.  This good can

22    be in one category from the time it is delivered to the time

23    it is about to be resold.  At the very time that it is to be

24    resold, its legal character can shift.  So until it is sold,

25    it may occupy one status, and Mr. Faver may be right.

1          After it is resold, at the time it is being

2      resold, it may be the case that from your perspective as

3      soon as she negotiates a sale that would be enforceable, she

4      then buys the good from Mr. Faver and then becomes a trustee

5      with respect to the proceeds.  So it could be a case that

6      while it is on the store shelves and it hasn't been sold,

7      she hasn't become a buyer of it yet.  She only buys at the

8      point of sale -- resale.

9          MR. BILICH:   That definition of buyer -- the

10     definition of buyer in the code is one that buys or

11     contracts to buy and I view this as Morgansen's contracted

12     to buy the Menorah subject to a condition that it is able to

13     sell it.

14         THE COURT:      And why isn't that a contract

15     subject to a condition subsequent that I -- hold on -- that

16     I become a buyer only when I have a resale customer.  And at

17     that point in time I now become the buyer.

18         MR. BILICH:   You're right.  But there are two

19     elements to the definition of buyer.  One is an actual

20     buyer, and one who has a contract to buy; and what I am

21     asserting is that Morgansen's when it signs this consignment

22     agreement has a contract to buy subject to a condition that

23     it is able to sell it.

24         THE COURT:      Well, that's the question when

25     does she become a buyer: at the date of delivery or the date

1     of resale, and I am not sure that it is answered by the

2     code.

3              MR. FAVER:   That's a trust question, your Honor.

4     It goes to equitable versus legal title.

5              THE COURT:    UCC is supposed to set up rules of

6     law.

7              MR. FAVER:   I want to go back to the UCC.

8              THE COURT:    Make it quick, because there are

9     other people who want to address the Court.

10              MR. FAVER:   Your last point about how you

11     reconciled the generally known versus the consumer good is

12     rather easy, Judge, because under 9-102 20 all of those

13     conditions must be met.  There is a conjunction at the end.

14     And.  So it has to be not a consumer good for example,

15     immediately before delivery.  It has to be generally known

16     by the creditors to be in the business of selling goods of

17     others.

18              And Judge, I want to make this distinction,

19     because the generally known language we've confused today

20     with the auctioneer language.  It is not whether someone is

21     generally known as an auctioneer, Judge, the issue is

22     whether the entity is an auctioneer; not whether it is

23     generally known as it would be in the very next provision as

24     to whether it is generally known to be in the business of

25     selling goods to others.

1          And with all of that said, Judge, it comes rather

2     clear that Morgansen's was an auctioneer using the numbers

3     that were spouted out to us earlier today.

4          Do you realize that 600-700 items, there are 300

5     consigned orders, but that only assumes that each consignor

6     has one good.  In other words, the majority of these goods

7     were those put on consignment for auction, not the ones that

8     we're told were bought and sold by the entity by

9     Morgansen's.  So it is important just to make sure we're

10    paying attention as well to the numbers that are being

11    rattled off here and the consequence and the legal issues.

12          THE COURT:     Well, I don't know if your

13    agreement can be characterized as an auction agreement.  If

14    a majority of these people put these up for auction, then

15    you are dealing with an auctioneer.  And the question is

16    whether or not you gave that discretion in terms of

17    disposition to Morgansen's and they could sell it by auction

18    with or without reserve or they could sell it to a private

19    customer and whether you basically licensed Morgansen's to

20    do whatever they please, and then you get into a question is

21    it a bailment, which takes us other places.

22          MR. FAVER:   The 9-102 real simply just says is

23    not an auctioneer and here we are dealing with an

24    auctioneer.  It's a factual question, yes, but it is a

25    rather easily resolved factual question.  When you look at

1          the sign in the front, when you look at the business card,

2          when you look at the consignment agreement, when you hear

3          about the auctions that are being conducted when you go to

4          their website about auctions that have been conducted, not

5          just in their title but in the way they operated their

6          business.  They are an auctioneer, and under the statute

7          under 102 (c) 20, once they are an Auctioneer, they are no

8          longer under Article 9.

9              Here's the analysis in a nutshell.  You're ready.

10         We've got 102 20, if it is not Article 9, then there is no

11         UCC required; and then just as you have said on a number of

12         occasions earlier when talking with the counsel for the

13         bankruptcy, Judge, the question comes down to whether 2-326

14         applies or we go to the common law.  So once Article 9 is

15         inapplicable, as I think it clearly is because either it is

16         an auctioneer generally known as or the consumer goods that

17         we discussed ad nauseam, then we go to whether it is 326 in

18         which case you can take either Professor Harris' view, which

19         I do, which you look at the term buyer, that's the term used

20         in the statute, passed by the Legislature.  The Legislature

21         in a definitional section also gave us a definition of

22         buyer, and it is inapplicable, or you can look at it like

23         White and Summer does and says let's look at the agreement

24         and see whether or not the entity was in fact a buyer or in

25         fact was a bailee in terms of consignment.

1          And in here this company, Morgansen's was nothing

2    ever more than a bailee in terms of our consigned goods.

3    And as a consequence, 2-326 is inapplicable.  We go to the

4    common law.  The common law says very clearly that under

5    these circumstances our interests prevail, that they were

6    being held in trust as our agent.

7          THE COURT:    You don't need to keep repeating

8    it.  I've got the summary.

9          MR. FAVER:    Thank you, your Honor.

10          THE COURT:    And what is it that you are doing

11    for a living these days?

12          MR. FAVER:    I develop real estate.

13          THE COURT:    I figured.  You are building low

14    cost, affordable housing.

15          MR. FAVER:    Actually, it's part of what I do.

16          THE COURT:    How much of a part that you do?

17    10%, 20%, 30%.  What is it?

18          MR. FAVER:    There's a definitional term under

19    the code.  But you can see, I miss some parts of the

20    practice of law and that was the intellectual discussion we

21    had here Judge.

22          THE COURT:    I understand that, and then I want

23    to know what Yeshiva you attended.  Thank you.

24          MR. FAVER:    Thank you, your Honor.

25          THE COURT:    Who else wants to address the

1    Court who is appearing not pro se but a lawyer in active

2    practice.

3         MR. COSTELL:    Alan Costell, your Honor, for

4    Carey Turnbull, and I have submitted objections and --

5         THE COURT:    Did you submit a brief on it?

6         MR. COSTELL:    No, I did not.    My objections

7    contain some law, and I will address --

8         THE COURT:    Look since you had a limited time

9    to respond, I just want to make sure that you are prepared

10   to stand on your papers or your asking for a very limited

11   period of time to supplement your papers to address these

12   legal issues.

13        MR. COSTELL:    At this time, I don't think we

14   would like to supplement.    Basically, the legal position

15   that is set forth in my papers --

16        THE COURT:    Okay, so I should rely on your

17   papers, right?

18        MR. COSTELL:    Yes, you can.    I just want to

19   highlight them in that in the worse case scenario, my client

20   has a PMSI, which is unperfected, and I don't believe that

21   the law states, although the Trustee has unequivocally taken

22   the position that the Trustee is a secured creditor that has

23   any superior rights to the --

24        THE COURT:    He says he is a hypothetical lien

25   creditor, by operation of law, and if the PMSI is

1    unperfected --

2              MR. COSTELL:   That's against all other

3    creditors.

4              THE COURT:    No.  Yes, that's against all other

5    creditors, and he's going to come in here and say if you are

6    unperfected, you're subordinate to my interest.

7              MR. COSTELL:   And I don't think that is clear

8    because at best, he is just another creditor.

9              THE COURT:    Not just another creditor.  For

10   certain purposes; for hypothetical lien creditor.  It's as

11   if he had a judgment lien and under state law, if he has a

12   judgment lien and you are unperfected, you lose to him.  You

13   take a junior priority.

14             MR. COSTELL:   In effect, he is asking for a

15   declaratory judgment as to ownership of the property.  I

16   think he needs to begin an adversary proceeding.  My papers

17   set forth our position.  The other argument or matters that

18   I would like to raise are that Mr. Ackerman is in possession

19   of the agreement between Morgansen's and my client, which

20   clearly sets forth a reserve and a non-reserve on every

21   item.  Clearly as to my client, Morgansen's was an

22   auctioneer

23             THE COURT:    Okay.  What's the value of the

24   items of your client?

25             MR. COSTELL:   We are not sure -- we have not

1       been able to get in to see what items are present and not

2       present, but the approximate value is between $20,000 and

3       $25,000.

4                       THE COURT:      How many items does not consist

5       of?

6                       MR. COSTELL:    That consists of -- well not

7       knowing which were precisely sold, there are three

8       significant items of more than $5,000 each.

9                       THE COURT:      What are they?

10                      MR. COSTELL:    There are a couple of items that

11      are worth approximately $5,000 each.

12                      THE COURT:      What are they?

13                      MR. COSTELL:    One is a table and chair set, and

14      the other is an antique stove.

15                      THE COURT:      Now, I take it Mr. Ackerman

16      because of the condition of the premises, Mr. Maltz was not

17      able to do a detailed inventory of every item.

18                      MR. ACKERMAN:   Not of every single item, Judge,

19      but he did review and did allow an inspection.

20                      THE COURT:      Is there anyway of identifying Mr.

21      Costell's client's items: table and chair and the stove?

22                      MR. ACKERMAN:   Judge, without him going there to

23      identify them, there is a table and chair -- there are many

24      tables and chairs there.  There are one or two old stoves

25      there.  If they are his or not, we did have an inspection, I

1       believe last Friday morning for whoever could make it to

2       identify their items.  I have no problem letting him in to

3       verify if his items are there or not.

4               THE COURT:    Mr. Ackerman, we have been at this

5       for a bit.  You know I can go on until 9:00 this evening but

6       that's not going to happen.  So, for the benefit of my

7       staff, we are going to have to take a break.  Persons may

8       leave the court house or go down to the cafeteria.  I don't

9       know if the persons here want to collaborate.  It is not Mr.

10      Ackerman's intention to engage in divide and conquer

11      strategies, but I do think to the extent that some of you

12      have common interests, you might want to talk among

13      yourselves if you haven't already and try to determine if

14      some of you can join in kind of a united front.

15              MR. ACKERMAN:    Judge --

16              THE COURT:    I'm not requiring you to form a

17      committee.  I am not imposing it as a requirement to

18      participate here, but I do think it is in your collective

19      interests to spread your risks involved.

20              MR. FAVER:    Judge, I did in my papers request a

21      designation of a committee given the circumstances, there

22      are approximately 300 consignors.  Given the commonality of

23      the legal issues, perhaps --

24              THE COURT:    The question is can you have --

25      let's assume that we are going to treat these as creditors,

1    because that's the way you are viewing them Mr. Ackerman,

2    and the question is does the Court have an authority in a

3    Chapter 7 to appoint a committee.

4              MR. ACKERMAN:   I believe you do.  I don't know

5    what a committee would do, but I believe it is under Section

6    705.  Yes, 705.  Actually, it says may elect a committee.

7              THE COURT:    I'm going to 705.

8              MR. ACKERMAN:   You're going to hate me.  It is

9    also 105 (a).

10             THE COURT:    Oh, look at this.  Section 707,

11   look what the top case on the page is in the 2003 pamphlet

12   edition.  I'll let you look at it.

13             705 Creditor's Committee.  Let the meeting under

14   Section 341, Creditors that may vote for Trustee under

15   Section 702 of this title, may elect a committee of not

16   fewer than three and not more than eleven creditors, each of

17   whom holds an allowable unsecured claim of a kind until time

18   of distribution under Section 726 (a) 2 of this title.  A

19   committee elected under this sub-section (a) of this section

20   may consult with the Trustee of the United States Trustee

21   connected with the administration of the estate, make

22   recommendations to the Trustee or the United States Trustee

23   respecting the performance of the Trustee's duties and

24   submit to the Court of the United States Trustee any

25   question affecting the administration of the estate.

1          I assume this may be denominated an official

2     committee?

3               MR. ACKERMAN:    I believe so Judge.

4               THE COURT:    Okay.  When was the 341 meeting

5     held?

6               MR. ACKERMAN:    It was held on September 29;

7     September 27th or September 29; however it is rescheduled

8     for October 9 at 2:30.  Mrs. Brunesco is trying to get out

9     of coming, but I am --

10              THE COURT:    Who?

11              MR. ACKERMAN:    Mrs. Brunesco who is the

12    purported principal of the company is trying to get out of

13    coming, but I am insisting that she come.  I just want

14    people to know about that.

15              MR. FAVER:    Your Honor, given what you just read

16    there, there may be a more practical resolution to this

17    whole problem.

18              THE COURT:    Just hold on.  Let me find the

19    numbers.  Cool your jets.  I think this refers to an

20    official committee, and I think that is the most convenient

21    time to do it at a meeting of the creditors, and it doesn't

22    say at the initial date of creditors which we have other

23    purposes under the Bankruptcy Code, and we not talking here

24    about creditors voting for a Trustee.

25              Part of the problem is that most of you are

1      taking the position that you are not a creditor, you are an

2      owner except to the extent that you have claims of

3      conversion.  But nothing precludes you from forming

4      informally your own committee and appearing collectively

5      through representatives, so I think it is not radical

6      extension and it is really a question of economizing, and I

7      am not triggering class certification rules.  If some of you

8      want to participate together and you want to retain counsel,

9      that is something -- that is a private agreement that you

10     can make.  You don't have to do it today.

11             You ought to have a sign up list, and you

12     exchange addresses and telephone numbers and things of that

13     sort, but I think it might be helpful for some of you to do

14     that during a lunch hour so you can decide whether it makes

15     sense for you to go it alone on a pro se basis, whether you

16     want to retain counsel after this hearing with respect to

17     your particular claim, but there is a timing issue here.

18             Because the Trustee wants to get a move on to

19     capture the season, and some of you should address whether

20     or not there is a season through the end of October, whether

21     you think it should be sold in place or at another place

22     without conceding the validity of your objections.  I just

23     want you to give us some input.

24             MR. GOLDBERG:    May we be heard on the issue of

25     fraud?

1          THE COURT:     No.  Any -- that's not the issue

2     before the Court.  If you think you have been defrauded by

3     Ms. Brunesco or by Morgansen's, that's information you

4     should share with the Trustee.  You have direct cause of

5     action in state court against Ms. Brunesco.  If she used the

6     corporation and she is the officer or director and

7     shareholder and committed fraud, you may have a claim

8     against her directly.  It has nothing to do with the

9     bankruptcy estate.  I am not making that determination, but

10    it is not the US Trustee's position to pursue individual

11    claims of fraud on behalf of persons who appraised the

12    estate.  That is not his job.  If you give him information

13    that he believes should be reported to the criminal

14    authorities, that's another matter, but this is not a court

15    for individual creditors against a corporation can assert

16    fraud claim.  You can assert a claim for damages arising

17    from fraud, and if it doesn't draw an objection from the

18    Trustee or any other creditors, you basically have

19    quantified your claim and you participate on a pro rata

20    distribution with other creditors in your class.

21          MR. GOLDBERG:    Your honor, the mere fact that

22    two or three -- Marvin Goldberg appearing on my own.  The

23    mere fact that 200 or 300 people as the Trustee mentioned

24    were not notified were named in the petition in and of

25    itself should be a red light that something underhanded was

1    going on in this situation.

2            THE COURT:    Mr. Goldberg I don't have to

3    speculate about that.  I tried to address it.  Mr. Ackerman

4    pursued it much more vigilantly than Mr. Weiss who was

5    representing Ms. Brunesco and the corporation.  But I don't

6    think a failure to list all of the persons is tantamount to

7    fraud.  That's an item that you can make against her.

8            MR. GOLDBERG:    Your Honor, Ms. Brunesco

9    appeared at our house on two occasions.  First occasion she

10   looked to see what property we had available, and on the

11   second occasion, she had brought a truck and she removed a

12   certain number of items and brought them to her facility.

13   At no time was it our intention that title to these goods

14   were to be turned over to her.  In fact, I don't believe it

15   was her intention to accept title to these goods.  By virtue

16   of her own consignment agreement, the first --

17           THE COURT:    Mr. Goldberg, look.

18           MR. GOLDBERG:    May I just state this.  Paragraph

19   1 of her consignment agreement states you, consignor, hereby

20   consigns to Morgansen's the property annexed and described

21   and further referred to in this agreement as the property or

22   lots which Morgansen's as the exclusive agent for consignor.

23   She talks about herself as being an exclusive agent.  She

24   doesn't claim to have ownership or title to this property,

25   and I believe if you had all of these consignors, so called,

1    testify under oath, not one of them will agree that they had

2    an intention of turning over the title of their property to

3    this lady or this corporation.

4              THE COURT:     Thank you Mr. Goldberg.

5              MR. GOLDBERG:    You're welcome.

6              THE COURT:     But this does not deal with the

7    issue raised by the Trustee.

8              MR. GOLDBERG:    Well we object to the sale.

9              THE COURT:     I understand your objection.

10             MR. FAVER:    Judge, after lunch, will you give me

11   a brief moment to address some the practical issues that may

12   easily resolve this without the Court's intervention.

13             THE COURT:     You may be able to, but you are

14   not going to be acting as an attorney for a committee.

15             MR. FAVER:    That's understandable your Honor.

16             THE COURT:     You can speak on behalf of

17   yourself.  You can't undertake to represent anyone on legal

18   issues

19             MR. FAVER:     I have no intention to either.  I

20   plan to propose some things to the Court that may resolve

21   this more practically and easily for everybody.

22             THE COURT:     Anything that makes sense, Mr.

23   Faver, we all are interested in a practical solution.  I am

24   not trying to preclude Mr. Goldberg from asserting his

25   claims in an appropriate forum, but now is not the day to do

1      it.

2                  MR. FAVER:    I completely agree.

3                  THE COURT:     And if he has claims against Mr.

4      Brunesco, he can pursue those.  If he has claims against the

5      estate, he can file a proof of claim.  He doesn't have to

6      litigate it and bring a complaint.  He has the right to file

7      a claim and state the basis of his claim for damages.

8                  MR. GOLDBERG:    Your Honor, if there's

9      bankruptcy fraud here, isn't it in your jurisdiction to --

10                  THE COURT:     If there are criminal activities -

11     - If you signed a consignment agreement and the goods were

12     caused to be delivered, I don't understand how you treat

13     that as fraud.  You entered into a voluntary agreement where

14     you turned over possession of these goods.  The issue of

15     title is a very different issue.  She didn't come and steal

16     this stuff from you.  She put it in her store.  It was there

17     for exposure for a resale.  I don't understand at first

18     blush how you can claim you were defrauded at the inception

19     of this transaction, and Mr. Goldberg I am not ruling on it

20     today.

21                  MR. GOLDBERG:    May I just say something.  When

22     we visited the premises, a good portion of our property was

23     not there.  It was missing.  We can only assume that they

24     were offered for sale and sold, and we never saw one nickel

25     out of the proceeds.

1          THE COURT:     That's your claim for damages.  If

2     your goods are not there, you are not being dealt with in

3     this auction sale.  You may have a claim for the recovery of

4     your proceeds.  It has nothing to do with what is going to

5     be sold, when, and under what kinds of condition.

6          MR. GOLDBERG:   Well, there are 200 other people

7     that have to be heard on the issue.

8          THE COURT:     Why don't you let them represent

9     themselves.  You are not the class agent here.  If you

10    believe that your goods were sold, and you authorized her to

11    sell it, but she didn't remit the proceeds which she agreed

12    to, then you have a claim against the estate, and you might

13    have a claims against her individually, but she is not the

14    debtor in this case.

15         MR. GOLDBERG:   But she is a creditor as far as

16    $240,000 that she claims that gave to the estate out of her

17    own pocket. I would like to know if the goods that were sold

18    and the proceeds found their way into her personal assets

19    and now she is claiming she is a creditor of the estate.

20         THE COURT:     You can bring objections to her

21    claims.  I suspect that the Trustee will under some

22    circumstances treat her claims differently and at a lower

23    priority.  If she engaged in practices that were severely

24    detrimental to creditors, then she runs the risks of having

25    her claims equitably subordinated as a remedy.  So that

1    means, that she won't participate in any distributions but

2    that's --

3              MR. GOLDBERG:    Your Honor --

4              THE COURT:    Mr. Goldberg stop interrupting me.

5    I have already declared a recess.  I understand that you are

6    passionate about this.  You have made your presence known in

7    this estate.  We have heard you loud and clear through all

8    of the signals you are sending out.  You will have an

9    opportunity to deal with the Trustee on that matter, but the

10   question for today is if there are goods on the floor that

11   remain unsold, how should those be dealt with.  And if your

12   stuff was sold, and you didn't get the proceeds, it has

13   nothing to do with the auction.

14             MR. GOLDBERG:    Some of the goods were sold and

15   some of the goods we claim title to.  We claim they are

16   still our goods, and they should not be sold; therefore, we

17   object to the sale.

18             THE COURT:    Okay.

19             MR. GOLDBERG:    Thank you, your Honor.

20             THE COURT:    We'll be back here at 1:45 p.m.

21             MR. ACKERMAN:    Quarter to, Judge?

22             THE COURT:    You can do it in a half an hour?

23             MR. ACKERMAN:    No problem, Judge, I just wanted

24   to make sure.

25             THE COURT:    I'll see you at 1:45 p.m.

1              (Whereupon, a recess was taken.)

2              THE CLERK:    The matter continues on Morgansen's

3    Ltd.

4              MR. COSTELL:   May I proceed, your Honor.

5              THE COURT:    Yes.

6              MR. COSTELL:   Your Honor, there are a number of

7    items that I would like to get to before I give up my turn

8    at the lectern.  One is again on a practical matter, your

9    Honor to consider, which is there seems to be so much lack

10   of clarity in the provisions as amended and the

11   implementation under the Bankruptcy Code, my question for

12   the Trustee would be why sell the consigned goods of those

13   who have made objections here today or prior to today.  What

14   is the need for a sale and an auction in a general sense,

15   which I don't think has been established, and even if it is

16   established that a sale must take place, why sell those

17   consigned goods or those goods that are debated as to their

18   ownership, of those people who made objections.

19              If the Court determines that there should be

20   sale, I still would object why a sale would be held now.  In

21   other words, if the Court -- I guess I am asking the Court

22   as a matter of relief to ask the Trustee to make a list of

23   those goods that are consigned by the parties who made

24   objections and to omit those from any order for sale or

25   auction.

1          In addition going over whether a sale should be

2     held in general at the present time, I think there is a

3     consensus having been at the lunchroom and speaking to

4     people that the season is now over.  The season is over at

5     Labor Day and that it's been missed, and any attempt to rush

6     a sale now would be counterproductive.  Certainly, a sale at

7     the location at this time would also be counterproductive

8     because many of these items that are on the premises have

9     been there for a long time.  Some for a year; some for a

10    number of years.  As one party put it everyone in

11    Southampton has seen these goods.  They are not going to

12    sell.

13              THE COURT:     What, everyone --

14              MR. COSTELL:   Everyone in Southampton has

15    already seen these goods.  They are not going to sell.

16              THE COURT:     The question is whether they were

17    realistically priced.

18              MR. COSTELL:   That is another --

19              THE COURT:     I'm sure some of you have had the

20    experience of driving around town seeing a house being

21    advertised for sale, that you would like to buy and the

22    buyer is asking for a price that is way above market.  So

23    you say, okay, I'll just keep driving by and when the season

24    ends, and the buyer has to get serious, then I'll make a

25    bid.  I'm not going to be bound by what he says.  Yes.  I

1    have driven by and I've seen it. It's a nice house, but

2    he's asking for the moon, and I don't want to get into a

3    bidding contest.

4          MR. COSTELL:    I understand and I can't negate

5    that argument, your Honor, but I think the converse also

6    holds true that the parties are concerned that at this time

7    and at this place, that whatever first person walks up and

8    offers you said asking for the moon; how about asking for

9    the sewer that they are going to get sewer prices instead of

10   reasonable fair market value prices.

11         THE COURT:    The Trustee conducts every auction

12   under reserve. The Trustee is not going to sell these at

13   distressed prices, but the Trustee is not an operating

14   Trustee, and these are on leased premises, and the landlord

15   wants to be able to reclaim those premises so he is going to

16   be charging occupancy charges to the Trustee. The Trustee

17   will have to continue to maintain insurance coverage. It is

18   not cost free.

19         It may well be the case that the stuff should be

20   brought to Plainview or some substantial part of it. But

21   just because someone files an objection, doesn't necessarily

22   mean that I should pull that item from the sale.

23         I don't know whether the purported owner is going

24   to pay for storage. I am not going to let the owners take

25   it back into their own homes, and who is going to bear the

1     freight.  Are the owners going to pay for it pending some

2     outcome?

3                What kind of liability does the Trustee incur to

4     those who want to pull their goods from the sale.

5                If you think I am going to let everyone object

6     take the stuff away and then try to continue to assert

7     jurisdiction when it is in 50 different places, and the

8     Trustee then has to go sue one of these "owners" to recover

9     the goods, that's not practical.

10               MR. COSTELL: I wasn't suggesting that it be

11    distributed to the parties, your Honor, but I was saying

12    that it does need to be sold now and as part of my argument

13    in talking about what the Trustee's responsibilities are,

14    the point of fact is if these parties win on the argument

15    that these goods were not subject to the Bankruptcy Estate,

16    it's irreparable harm to them that they will not be able to

17    receive these goods back, and they may get--and I hesitate

18    to say what the actual --

19               THE COURT:   They will have an opportunity to

20    counter any bid.  We've already talked about that.

21               First of all, it is not clear that the Trustee is

22    going to sell every item if it doesn't bring a sufficient

23    price.  Those are mixed legal and business judgments.  The

24    Court has to defer to the Trustee on consultation with an

25    experienced auctioneer.

1          You are dealing with a very experienced Trustee,

2    whose liquidated estates over many years, of all kinds of

3    varieties, and it is not this Court's function to second

4    guess the Trustee unless he goes way outside of the

5    boundaries.

6          Secondly, The Trustee has certain holding costs.

7    The Trustee's obligation is to liquidate these assets and

8    make a distribution.  And if we are going to sell it under

9    commercial and reasonable terms, through a much more

10   aggressively advertised sale, there is a tendency of

11   bankruptcy sales to bring in all kinds of folks; and

12   sometimes, they get into bidding contests.  I have seen them

13   here.  I've been to auctions.  I've been caught up in the

14   fervor, and I've paid more for things than I should have

15   paid for them.  I want to win the game.

16         So, there are a number of considerations.  There

17   are practical ones.  And if after some determination, and we

18   can try to do it in some expedited basis, the Trustee will

19   have those funds.  They will be in government insured

20   accounts and they can be returned to the owners.

21         So you have a number of opportunities to protect

22   your rights.  If you think that these goods might be sold at

23   a distressed price, and you can't convince the auctioneer of

24   what the floor should be, then I guess you can protect

25   yourself by making a payment to the estate for the right to

1    recover.  You'll have the good back.  You will still have

2    the value there.  You will have paid for this.  If you

3    prevail on the legal issue, you will settle, and you will

4    get your money back.  That seems to be the easiest thing to

5    do.  But I can't -- I don't think it is fair under these

6    circumstances that the Trustee makes a prima facie case that

7    these are goods of the property of the estate.  To hold

8    these goods hostage in a liquidating situation until we

9    determine all of these matters.

10           I assume you want to have an adequate opportunity

11   to assert your rights, but the bankruptcy mode very often is

12   the one I told you before.  We transfer liens to proceeds

13   and then we fight over whether there is a bonafide claim of

14   ownership; and that's the most expeditious way.  Is is the

15   best in all conceivable worlds.  No.  But we can't let the

16   goods be held hostage.  You have to deal with it within

17   those constraints, and then we will be able to bring this

18   matter.  We will have an evidentiary hearing.  Each of you

19   will be treated separately with respect to your separate

20   facts; and if you want to resort to some alternative dispute

21   resolution mechanism, the Trustee may agree to that making

22   him submit these to a mediator, someone who has experience

23   in consignments, both a bankruptcy lawyer who has a decent

24   sense of auction sales and collectibles in this character.

25           I am sure there are persons who can help in this

1     situation.  A number of persons other than Mr. Maltz who

2     specialize in dealing with antique good and others.  So

3     there may be an opportunity to put together a panel so you

4     can arbitrate these things and mediate them with people who

5     know what they are talking about.

6               I'd appoint Ms. Cavanaugh to it, but she is the

7     Assistant U.S. Trustee.  I assume she is not here to see the

8     sale with the artwork, although it would draw a big crowd.

9               I appreciate your argument, but I am trying to

10    work this thing through.  The notion that you people can opt

11    out simply because you filed an objection; some of it not

12    accompanied by any law is not going to fly.

13               MR. COSTELL:  Your Honor, let me move on to my

14    next argument which is that even if -- and assuming that the

15    sale is necessary for all the reasons you cited, that the

16    Trustee has admitted and presumably in his capacity as

17    fiduciary has identified the items that are inventoried to

18    the business as opposed to consigned goods or property

19    bailed or otherwise given to the company.

20               Maybe as a backup argument, I would say that why

21    is it that the inventoried goods, the good actually owned or

22    allegedly owned by Morgansen's couldn't be sold to meet

23    these obligations to allow the parties time to make their

24    legal arguments.

25               THE COURT:  I don't know how much confidence the

1          Trustee has in what's inventoried and what's consignment.

2          He has been trying to give you people the benefit of notice

3          so that if there are no records at the company, you can

4          submit copies of your records to determine which category it

5          falls under.  But I don't know what the breakdown is in

6          terms of value and amount of this so-called inventory.

7                    MR. COSTELL:   Well, whose burden is it to

8          establish that?  Is it merely the Trustee's --

9                    THE COURT:    I'm not dealing with burdens at

10         the moment.  If there is an inventory, clearly identified as

11         an inventory, that doesn't have any agreements attached to

12         it in written form called consignments or whatever else it

13         is, and the Trustee thinks that makes sense to sell that

14         inventory, he can do that.  He doesn't need your permission.

15                   MR. COSTELL:    I agree.  My question --

16                   THE COURT:    I don't know what the value is.

17         If the total amount of goods we're talking about has some

18         ballpark figure of $250 unless it's enhanced, and the

19         inventory should be $1,000, it may not make sense to have an

20         auction sale unless it is enhanced.  The inventory should be

21         $1,000.  It may not make sense to have an auction sale.  It

22         may make more sense to have a private sale on an above bid

23         basis.  Because the costs of holding an auction will

24         substantially erode the recovery.  But those are judgments

25         the Trustee makes; not the Court.

1        Have you identified a separate inventory, Mr.

2    Ackerman?

3        MR. ACKERMAN:   We can't in fact when people were

4    going there to inspect what I was advised was that people

5    were saying I think that might be mine.  I think I am not

6    really sure.  We also have had many instances where people

7    have stated they believed their goods were sold and Ms.

8    Brunesco absconded with the money.  We are trying to track

9    monies, and we will be pursuing that with vigorous --

10        THE COURT:     But tracking the money for goods

11    that aren't there has nothing to do with an auction sale.

12    It's just about establishing claims.  People file claims.

13    They file claims for damages.  You have to document your

14    claims with documentation; specifically identifying the

15    items, if these goods are in effect refundable and you

16    really can't define the characteristics, and you can't

17    establish what it was that you delivered to Morgansen's

18    other than by some generic description.  We'll deal with it.

19    They will be treated as co-mingled goods.  I just don't

20    know.  I am not going to guess what this stuff looks like or

21    how much is there or where it is, or whether it is stacked

22    in piles or on the tables.  What has been exposed for sale

23    for a year at an unrealistic asking price.

24        The Trustee can't bear this burden of going

25    through this elaborate rationale; and unfortunately, that's

1    one of the risks you incur when dealing with someone who

2    might become insolvent.  I can't recreate the universe as it

3    was before on the assumption that Morgansen's was always

4    going to be successful.  She was insolvent for more than one

5    year.  In fact, she was insolvent throughout this entire

6    operation.  Yet, the goods remained there, and you didn't

7    make any efforts to have them returned if you could identify

8    them on the floor.  So to some extent, you may be escoufed

9    from raising certain items.  If you had a right to demand a

10   return and you made that demand and the goods were still

11   there, and are still there now, maybe that puts it in a

12   different situation, but you are going to have to document

13   that you made a timely demand for return.

14            MR. COSTELL:   Under what theory your Honor?

15   What are we talking about?

16            THE COURT:    Whatever theory you want to

17   advance.  But you have to show an active demand for return

18   under your agreements.  You can't simply assume that you

19   have the right to a return without any further proof.

20            MR. COSTELL:   Well, the only impediment to that

21   your Honor is the fact that the bankruptcy interceded.  We

22   weren't in bankruptcy, we wouldn't be having these issues.

23            THE COURT:    Well, I could change that.

24            MR. COSTELL:   It's sort of the mythological or

25   mystic argument that we were talking before what makes a

1    buyer, when is a buyer a buyer.  I don't want to belabor the

2    points that I obviously take your Honor has obviously made a

3    decision on.

4          THE COURT:     I haven't made any decision.

5    Look, until the fat man sits down, it's still open, okay.

6    Just like the baseball.  When the fat lady stops singing,

7    it's over.  I haven't stopped singing.

8          MR. COSTELL:   I don't want to repeat argument

9    that have previously made, but let me ask you whether there

10   is any open discussion with regard to who has the burden of

11   proof establishing whether the debtor is an auctioneer.

12         THE COURT:     Counsel, I may have mislead you to

13   think this is a debating society or a moot court.  It is

14   not.  Maybe you are not used to the way I have to try to get

15   at the truth or the law.  There's a certain amount of

16   dialogue and exchange, and then I think about the arguments

17   that were made, and then I decide.

18         I don't come in here with my mind made up.

19   That's why we have hearings on notice.  Any discussion who

20   want to have, you can have with the Trustee and the

21   Trustee's counsel.  I don't preclude that from happening.

22         So, I am not going to answer questions.  It's not

23   my duty to tell you what I think the law is.

24         MR. COSTELL:    I agree your Honor.  Let me close

25   just by saying that I think there are questions about the

1    procedure that people have raised that have not been

2    resolved.  One is the short notice that were given to many

3    people, the lack of notice given to many others, and that

4    the timeliness of the sale is an issue that many objectors

5    have raised.

6              The other issue is the --

7              THE COURT:     I haven't heard anyone tell me or

8    recommend and it's not to me, it's to the Trustee and the

9    auctioneer, what would be a more appropriate route.  The

10   only thing you say is give me back my stuff.  That's doesn't

11   deal with a mode of disposition in which maybe parties will

12   come to conclude that if a sale is conducted in other terms

13   that no one has proposed to the Trustee, it may yield higher

14   benefits to anybody or to everybody and then you have to

15   work through the costs, a costs benefit analysis.  These

16   sales are not -- I can't suspend the operation in time.  I

17   can't suspend the approval costs, so I have to make a

18   decision within real time.

19             And if you have a better way of disposing of this

20   inventory for want of a better term, to maximize the

21   proceeds, after you have that discussion based on whatever

22   expertise you have with Mr. Ackerman and Mr. Maltz.  They

23   are all ears.  They simply put up a proposed based upon

24   their judgment.  They are experienced, and they have asked

25   me to approve it.

1          Unfortunately, because there are holding costs,

2     notice of these things tend to be expedited.

3          How much notice did you give them Mr. Ackerman?

4          MR. ACKERMAN:    Judge, ordinarily I would give 2

5     to 3 days.  Here, I gave 12 days and only after I filed a

6     list of all consignors.

7          THE COURT:    Twelve days.

8          MR. DUBIN:    May I say, your Honor, the day of

9     inspection was the first day --

10         THE COURT:    No, I am not recognizing you yet.

11    We are going to do this in order.  You will have a chance to

12    address the Court.  Okay.

13         What's the provision under 363B?  Isn't it 20

14    days notice?

15         MR. ACKERMAN:    It is usually 20 days under

16    Bankruptcy Rule 2002; however, it can be shortened.  I also

17    spoke with many people on the phone.

18         THE COURT:    When did you first become the

19    Trustee, Mr. Ackerman?

20         MR. ACKERMAN:    I believe on August 26th.  We

21    submitted the application I believe it was filed on

22    September 16th.  During that period, I probably spoke to

23    about 100 people, I think.

24         THE COURT:    Next.

25         MR. DUBIN:    Your Honor, I sent a great deal --

```
1        My name is Dubin, —A-U-R.  D-U-B-I-N.
2                  THE COURT:    You have to speak louder.    Your
3        name?
4                  MR. DUBIN:   Maur.
5                  THE COURT:    M-A-U-R.
6                  MR. DUBIN:    Dubin.  D-U-B-I-N.
7                  THE COURT:    D-U-B-I-N?
8                  MR. DUBIN:   Right.
9                  THE COURT:    All right Mr. Dubin.
10                 MR. DUBIN:   I have assigned a great deal of
11       things to Mr. Morgansen's.
12                 THE COURT:    We need to know the items you
13       claim to own.
14                 MR. DUBIN:   I have a list.  I went out to the
15       gallery the day they said that we should come, and I
16       identified each item that was mine.  I showed them the
17       invoice where they were listed, and he put a tag on all of
18       those items that were mine.  I did think it was not very
19       thoughtful of the Trustee to plan that visit on the first
20       day of the Jewish holiday when they know perfectly well that
21       most of the dealers that would be interested would be Jewish
22       and would not come.
23                 THE COURT:    I can't assume that.
24                 MR. DUBIN:   What?
25                 THE COURT:    I can't assume that the buyers are
```

1    going to be Jewish or the consignors.

2                    THE COURT:    In the furniture business in New

3    York.  Are you blind?

4                    THE COURT:    What?

5                    MR. DUBIN:   Furniture dealers in New York not

6    Jewish.

7                    THE COURT:    Do you want me to decide -- are

8    you going to ask me to make a determination of their

9    ethnicity just by looking at them?  Don't even go there.

10                   MR. DUBIN:    Sotheby's wouldn't have a sale that

11   day.

12                   THE COURT:    Fine.  So if you couldn't make it

13   that day, you were able to make it, notwithstanding your

14   religious practices, I assumed the Trustee was simply trying

15   to get people access to the premises as quickly as he could.

16   So he picked a day.

17                   MR. DUBIN:    When the fewest people would come.

18                   THE COURT:    So he picked a day that he thought

19   would be available to folks.  He wasn't making some

20   discriminatory statement with respect to the Jewish calendar

21   or the Islamic calendar or the Confucian calendar, or any

22   other calendar.

23                   MR. DUBIN:    There were 30 days prior and 30 days

24   after when they could have had that exhibition.

25                   THE COURT:    Thank you, Mr. Dubin.

1          MR. ACKERMAN:   Judge, I didn't know who they

2     were, and also they could inspect at anytime after the sale.

3          THE COURT:     What was the day that you held the

4     place open for inspection?

5          MR. ACKERMAN:   There were two days, Judge.  Last

6     Wednesday and last Friday, and I am Jewish.

7          THE COURT:     Maybe you don't observe enough.

8          MR. ACKERMAN:   I do observe.

9          THE COURT:     Last Wednesday was a Jewish

10    holiday?

11         MR. ACKERMAN:   No, Friday night, Judge.

12         THE COURT:     So Mr. Dubin has marked his stuff,

13    and you've looked at his list.

14         MR. ACKERMAN:   I never saw him.  He didn't file

15    an objection that I know of.

16         MR. DUBIN:   What are you talking about?  I got a

17    notice that there was going to be an auctioneer, and I

18    should come out to the premises and identify which

19    merchandise was mine, which I did.  He put tags on all of

20    the things which were mine.  And the next thing I know they

21    want to sell my things to pay his other obligations.  I

22    don't understand.

23         THE COURT:     That's not the point.  The point

24    is whether you've made an objection, and we didn't receive

25    anything.

1          MR. DUBIN:  We mailed it to the Court and we

2     called the girl, and said that it probably would not be here

3     by today, because we mailed it on Monday.

4          THE COURT:    You mailed it on Monday.  Do you

5     have a copy of what was mailed?

6          MR. DUBIN:    I think so.

7          THE COURT:    Then show it to the Trustee so he

8     can make a determination of what your position is.

9          MR. ACKERMAN:    Judge, what he is showing me is

10    a copy of my notice together with a copy of a proof of claim

11    which he has filed with the Court together with a list which

12    he circled items.  No UCC's.  No anything apart of that.

13         May I keep a copy?  I don't know your name.  Can

14    I write your name down.

15         MR. DUBIN:    Yes.

16         THE COURT:    Mr. Dubin, just out of curiosity,

17    what was the Jewish holiday on Wednesday?

18         MR. DUBIN:    Rosh Hashana.

19         THE COURT:    What?

20         MR. DUBIN:    It was not on Wednesday.  I was not

21    told we could exhibit on Wednesday.  We were told Friday.

22    We were told the exhibit was on Friday from 10 to 12.  I had

23    to leave Manhattan at six in the morning to get there.  I

24    heard nothing about Wednesday.  No one mentioned Wednesday

25    to me.  I don't think -- I don't know who was involved.

1          THE COURT:    But you got the inspection date in

2     your notice.

3          MR. ACKERMAN:    No, Judge.

4          THE COURT:    Okay.

5          MR. ACKERMAN:    We didn't feel anyone was going

6     to ask for an inspection prior to the hearing.  We thought

7     there would be an inspection after the hearing, if it was

8     approved.  That's when it usually is.  I never had an

9     inspection before a hearing before.

10          THE COURT:    But you did make arrangements for

11    people to get access before the hearing?

12          MR. ACKERMAN:    Yes.  Two different days.

13          THE COURT:    That wasn't publically announced,

14    right?

15          MR. ACKERMAN:    It was set forth in the notice

16    that there could be inspection upon notification of Mr.

17    Maltz.  Frankly it was a mistake about before the hearing.

18    When they made phone calls and pointed in out, I said to Mr.

19    Maltz you must make it available.

20          THE COURT:    All right.  Anything further, Mr.

21    Dubin?

22          MR. DUBIN:    I guess not.

23          THE COURT:    Thank you.  Hand up what you have,

24    and we will make copies of it so I can have a copy, and

25    we'll have it filed downstairs.  Okay?  Hand it up.  Mr.

1    Dubin, hand it up.  Bring it here, so I can make a copy of

2    it.  We will return it to you immediately.  Thank you.

3                 Next.

4                 MR. DAVIDOW:  My name is Wallace Davidow.  My

5    client received the notice on the 25th of September, this

6    last Thursday.  I haven't had enough time to do the proper

7    research, and I would like ten days to hand it additional

8    papers and a brief.

9                 THE COURT:    And what items does your client

10   claim?

11                MR. DAVIDOW:  My client has a list of items

12   which is attached to the Objection.  There is a total of 60

13   items.  They have a value of about $15,000 to $20,000.

14                THE COURT:    Okay.  Do you have that list?

15                MR. DAVIDOW:  It was submitted.

16                THE COURT:    Mr. Maltz or Mr. Ackerman, did you

17   review the list?

18                MR. ACKERMAN:  Who is your client sir?

19                MR. DAVIDOW:  Evelyn Rupolo.

20                MR. ACKERMAN:  Yes.  I definitely knew about

21   Evelyn Rupolo.  She was the one who objected on the basis

22   that it was unconstitutional.

23                MR. DAVIDOW:  That's one of your objections.

24                THE COURT:    And what's her other objection?

25                MR. DAVIDOW:  Well according to the New York

1   annotations on that section of the law 2-326, it says that
2   the person making the delivery is protected where there is
3   adequate notoriety, where the person in possession is
4   generally known by his creditors to be substantially engaged
5   in selling the goods of others.  Now, we know that
6   everybody, everybody around Southampton knows that
7   Morgansen's is in the business of selling the property of
8   others.  And the creditors know that too.
9           THE COURT:    I don't know why you assume that.
10  How would LIPA or Verizon or any other utility company know.
11  They just read the meters.  They don't look inside the doors
12  to see what business is being conducted.
13          MR. DAVIDOW:    There is a very big sign on the
14  premises that says auctioneer.  Everybody knows that.
15  That's how all of these people got there.  They saw the say
16  that says auctions.  So they bought their stuff there.
17  However, if your Honor questions the facts about that, I
18  would ask for a hearing on the subject.
19          THE COURT:    I thought we are going to have a
20  hearing.  I thought this was the hearing.  But, you will
21  have an opportunity to submit a Memorandum of Law.  Try to
22  keep your constitutional arguments to the end.
23          MR. DAVIDOW:    Well, I think that a due process
24  does require a hearing.
25          THE COURT:    We are going to moot that out Mr.

1    Davidow.  You will have a hearing after you submit your

2    papers and after we have had a chance to review them.  But

3    we are talking about litigation costs that will

4    substantially erode the value of these items, and that is

5    something you have to talk to your client about.

6         MR. DAVIDOW:   Your Honor, these items are not

7    going to bring very much on October 31st.  I live in the

8    Hamptons.  I live in Amagansett.  As a matter of fact,

9    before I lived in the house that I am in on the beach in

10   Amagansett, I used to rent it, and the season happens to be

11   from Memorial Day to Labor Day.  After Labor Day, all the

12   New Yorkers go home and they send their kids to school, and

13   there is nobody left to buy this stuff.

14        THE COURT:    Thank you.  Anything else?

15        MR. DAVIDOW:   That's about all.  I'll submit a

16   brief.  I have ten days for that, your Honor?

17        THE COURT:    Yes.

18        MR. DAVIDOW:   Also, I would like my client to

19   have an opportunity to go to the premises and inspect the

20   premises to see if her stuff is there.

21        THE COURT:    Work that out with Mr. Ackerman.

22        MR. DAVIDOW:   I can work that out with Mr.

23   Ackerman?

24        THE COURT:    Yes.

25        MR. DAVIDOW:    All right.  Thank you.

1          MR. ACKERMAN:    Judge, I just want to say two

2     things.  If you wish, the official comment note that was

3     quoted was the old official comment.

4          THE COURT:    I already got that.

5          MR. ACKERMAN:    And the second thing is we have

6     after Notice of Hearing where there has been notice of

7     hearing is construed in 1 or 2 (1) of the Code.

8          THE COURT:    I know what that is.  I'm going to

9     give me a chance of submitting a brief.  Okay, because these

10    are issues that appear to be fairly novel.  That doesn't

11    deal with how we are going to deal with the inventory.

12    That's part of the problem.

13          Yes, ma'am.

14          MS. KESSLER:    June Kessler.

15          THE COURT:    Yes.

16          MS. KESSLER:  On behalf of myself --

17          THE COURT:    K-E-S-S-L-E-R?

18          MS. KESSLER:    Right.

19          THE COURT:    Go ahead Ms. Kessler.

20          MS. KESSLER:    I have a question for the

21    Trustee.  Have you gained access to the City vault?

22          MR. ACKERMAN:    We have found out about the City

23    vault.  Maybe you were the one who told us about it.  And we

24    are trying to get in there.  There is apparently some other

25    premises and there is a warehouse.  I don't want to say more

1    on the record.

2            MS. KESSLER:   I just feel that it is premature

3    to order an auction of merchandise, when the full value of

4    the estate or the items that are attachable to the creditors

5    are not even discovered at this time.

6            MR. ACKERMAN:    Judge, I would require an

7    adversary proceeding.  I think I'm probably going to do a

8    Writ -- if everything is what I think it is, and I'm doing

9    an investigation because of creditor who like her who have

10   told me.

11           MS. KESSLER:   I've been told that at the time

12   one particular diamond that has not been returned to me was

13   in the City.  It was in the City in the vault.

14           THE COURT:    What kind of items do you have Ms.

15   Kessler?

16           MS. KESSLER:   I have a little bit of a confusing

17   story.  I will try to explain.  I have one GIA certified

18   1.33 carat diamond with an insert attached.

19           THE COURT:    A diamond ring.

20           MS. KESSLER:   I was paid a check for this item

21   and an emerald ring that was sold on an auction supposedly

22   through a lot sale where they were both sold together, and I

23   was given a check for -- hold on, I have the receipt.  I

24   think it is $5,185.  And then the check was returned, and

25   then it was replaced with several checks.  I deposited one

1     for $750.  I have all the receipts that I can give you.  One

2     for $750 that was stopped payment on.  This has been going

3     on for about two years.

4            THE COURT:    Ms. Kessler, look I appreciate

5     that you believe that you have been miserably and unfairly

6     treated

7            MS. KESSLER:  Oh, if you can just let me explain

8     the story, then you'll understand where I am coming from.  I

9     will make it fast.  Basically I got bad checks, and then she

10    told me that the party had not accepted the purchase and she

11    was going to return the items.  I have been asking for them

12    to be returned since.  I had spoken to Felicia at the

13    beginning of September.  She advised me that she would get

14    my goods for me; the emerald ring and the diamond ring.  And

15    then I got a letter about a Chapter 7.  I have never been

16    given notification of a Chapter 11, and she was in

17    possession of the emerald, which I saw this summer in her

18    auction place, and in September when I saw her, she said she

19    was going to give it back.  She now has told me yesterday on

20    the phone, that the emerald ring was sold on August 1st and

21    that the diamond ring is in the possession of someone, I

22    think a designer or somebody like that.

23           THE COURT:    What?

24           MS. KESSLER:   I think a designer or somebody

25    like that who she gave the goods to who was going to find

1    approving buyers.

2              THE COURT:     To find a who?

3              MS. KESSLER:    Approving buyers.

4              THE COURT:     Approving buyers?

5              MS. KESSLER:    People who are interested in

6    buying it.

7              MR. ACKERMAN:    What designer did she have it was

8    in the possession of?

9              MS. KESSLER:    She won't tell me the name.  She

10   won't tell me the name who she sold the emerald to on August

11   1st.  She did not tell me September 1 when I saw her

12   physically and said I want to pick up my stuff.  She did say

13   that she had a good month in August and that she didn't know

14   how she would keep her doors open.  Here she is and told me

15   that the diamond ring was in the possession of someone that

16   she gave several other items to that is refusing to return

17   it and that the police told her that it was a civil matter

18   and that a criminal matter.

19             I'm just opposing the auction sale because of the

20   disposition of my property is a little bit confusing at this

21   time.  I have been told many things.  I also feel, if I may,

22   that it would maximize the return to me as a creditor, just

23   to get my merchandise back and not to have it sold at

24   auction since it is worth more to me than it is worth

25   selling.

1          I also feel that in my interpretation of the UCC

2     law, Section 2-326 that my goods are always offered in the

3     two years that I have dealt with Felicia on a sale or

4     approval basis.  She had never sold my goods on a retail

5     basis.  The only time she sold my goods in a retail case was

6     through Angelo's which would still be as an agent.  Just as

7     I give my house to an agent to sell, I don't give them the

8     ownership of my house.  I didn't ever sell an item to

9     Felicia.  She also took my item and then negotiated.

10         Okay.  Let me just finish please.  Since I have

11    sat here for six hours listening to everybody.  The UCC

12    clearly states that if an item is sold for approval, as

13    Felicia was never a buyer to me.  She was merely transacting

14    sales to buyers for me, the seller, that they are not

15    subject to Bankruptcy Court and they cannot be attached by

16    creditors.  It clearly states this in the UCC Code.

17         You also state -- the Trustee states on Page 3

18    that the goods held on sale or return are subject to the

19    claim while in the buyer's possession.  Felicia was never a

20    buyer in all of the dealings that I have had with her.  She

21    was consistently pursuing diamond dealers, private accounts,

22    selling stores, doing auctions.  The UCC also states that an

23    auctioneer that there is no sale until the gavel hits the

24    ground and the approving buyer accepts the piece.  I don't

25    know the applicable law, but I believe that when you make a

1    sale to a buyer, that there is some sort of contract of

2    sale.  There is some sort of payment upon receipt.  These

3    were never my dealings with Morgansen's.  They always acted

4    as an agent to sell my merchandise to other buyers.  So in

5    my mind they were never a buyer as the Court has discussed

6    today.

7           THE COURT:     You have a history of dealings

8    that you can document to the Trustee?

9           MS. KESSLER:   I have it documented and with me.

10          THE COURT:     Okay.  Give copies to the Trustee.

11          MS. KESSLER:   I also found that any of the items

12   that she sold in her store or had for sale were marked at a

13   very high reserve which is customary for auctioneer houses.

14   They are not really in the business of selling retail.  So

15   they put it at a very high price as your auctioneer stated

16   that her prices are seven times as high.  The intent is to

17   merely house it and have people viewing and then when they

18   go to auction, they can make a low bid and fight, because

19   they feel the value is one of substantial value basically

20   especially decorators who are using these goods.

21          Let me just look at my notes.  I also find that

22   it is interesting that the auctioneer had stated that there

23   is about $100,000 worth of property.  When I spoke with

24   Felicia the other day, she said there is about $600,000

25   worth of consigned property.  It's basically my opinion that

1    this auction is mainly intended to pay a few creditors and

2    does not look at the value and assets of all of the people

3    who are also creditors who are the owners of these goods.

4         And I think it is disproportionate and unfair to

5    sell everyone's merchandise to pay the salaries or the LIPA

6    bills of a few people when it clearly can be shown that

7    these people have rights and ownership to this property.

8         I also don't feel I have never been told of a

9    Chapter 11.  Felicia, I think it was in July that I saw her.

10   She still had my emerald ring in her hand.  She did offer to

11   give it back.  I don't believe it was her intent to defraud

12   people, but she did not tell me that she was in Chapter 11.

13   So, after she said she could barely keep her doors open, is

14   when I said I'll just take my goods back.

15        There was a third bracelet which she had given me

16   $2,000 for, but she had told me that she was giving it to me

17   towards the diamond and emerald lot.  So it was confusing --

18   the whole transaction was confusing to conclude.  At this

19   point --

20        THE COURT:    This is just supposed to be

21   argument.  You are just testifying, and --

22        MS. KESSLER:    Okay.  I'm just --

23        THE COURT:    She gave you a $2,000 bracelet?

24        MS. KESSLER:    No, she gave me a $2,000 check

25   after the bounced check and the stock check and said that

1    was paying towards the diamond and the emerald.

2                    THE COURT:    And did that check clear or not?

3            MS. KESSLER:    Yes, that check cleared.  It

4    turns out now -- what is today?  Tuesday or Wednesday.  Well

5    I spoke to her on Monday the 29th, it turns out now that she

6    sold the diamond bracelet on auction which would be

7    consistent with the $2,000 payment, and that's why she

8    didn't tell me about the Chapter 11 because she said at that

9    time, I wasn't a creditor.

10                   But I have been requesting the goods for over a

11   year, and I have documentation of that.  She just kept

12   saying it is in the City.  A lot of people have purported to

13   be the owners of this property.  There is a lot of gray

14   issues so I don't really know when in lies the truth.  I

15   just know what the told me the other day, and what she has

16   told me in the past, which I have stated.

17                   THE COURT:    Okay.  Thank you.

18           MS. KESSLER:    I just want to make one more

19   comment that I believe the letter from the Trustee.  It was

20   unusual.  I had never received a Bankruptcy Notice that

21   basically told me why they were telling me I had no rights

22   to my goods.  I think it intended to scare people away from

23   coming to court, but that's just my personal opinion.

24                   THE COURT:    Obviously, you weren't scared

25   away.

1          MS. KESSLER:   Well, no.  I just want to give you

2     the value on the emerald ring that Felicia stated that she

3     sold August 1st for $2,040.00.  That was $2,400 sale less

4     15% commission.  She has also devised that she would like to

5     tell the court and know how to handle the merchandise that

6     is at this other party's possession: the 1.33 carat diamond

7     after it is sold.  The deal was 30% off Rappaport, which is

8     $3,800 a carat.  After her commission, my total due is

9     $3,0070.20.

10          THE COURT:     Okay.  Next.

11          MS. KESSLER:     Thank you.

12          MR. BATES:     Good afternoon, your Honor.  My

13     name is William F. Bates.  I am here for the Estate of

14     Esther O'Keefe.

15          THE COURT:     That's a probate estate?

16          MR. BATES:   Yes, sir.  Suffolk County.

17          THE COURT:     Is the probate estate still open.

18     Is it still pending in Suffolk County?

19          MR. BATES:   Yes, it is still open and pending

20     in Suffolk County.  There has been some litigation over the

21     sale of some real estate, and that's why it hasn't been

22     closed.

23          THE COURT:     Okay.  So what does the Estate

24     claim?

25          MR. BATES:     In my opinion, we are here to

1          balance the rights of different parties towards the property

2          that is there on the premises at Morgansen's on Route 27 in

3          Southampton.  I think that's why Section 9-102 20 is there

4          to do.  This defines what is a consignment and what is not.

5                    I think we have three categories.  We have sale,

6          bailment, and in the middle we have consignment.  It seems

7          to me that the purpose of 9102 20 is to take certain of

8          these transactions which could be described as consignments

9          and to classify some of the as sales and some of them as

10         bailments.

11                   Now a sale it would seem to be if there were a

12         sale, the property is there on the premises that the

13         landlord, a lender, LIPA, has a right -- a reasonable right

14         to rely on the presence of that property in granting some

15         kind of credit.  However, under certain circumstances those

16         parties would not be justifiably able to rely upon the

17         presence of that property on the premises.

18                   An auctioneer would be one such situation.

19         Clearly, everyone knows that an auctioneer is selling

20         property of others.  As a matter of fact under the General

21         Business Law an auctioneer is required to maintain records.

22         But even if the parties selling, in this case Morgansen's,

23         is not an auctioneer, there is an additional category in

24         9102 (a) iii which says if I may be liberal in my

25         paraphrasing, a party like an auctioneer that somebody else

1    who is also holding a lot of property of somebody else; and

2    in that case, it would seem to me that the landlord, LIPA,

3    an ordinary creditor, anyone who can look at the sign in the

4    front of the premises, anyone who can read the telephone

5    book, anyone who looks at any of the advertising would know

6    that a good deal of the property on that premises did not

7    belong to Morgansen's and therefore could not reasonably be

8    relied on in order to back up any kind of debt or

9    obligation.

10   Therefore, I think what that section does is it

11   draws a line and helps us draw a line between somebody like

12   LIPA or the landlord and somebody like the rest of us.  We

13   know it is our property; and those people who grant credit

14   to Morgansen's should know it too.

15   Therefore, the Bankruptcy Trustee is completely

16   unjustified in classifying what is here as a consignment as

17   a sale.  There is no buyer.  There is not even a transfer of

18   title.  I think it is 2-1026 which says the essence of a

19   sale is a transfer of title.  It's clear there is no

20   transfer of title here.

21   Morgansen's is an agent.  There is never any

22   claim that there was a transfer of title.  What we are doing

23   here in my mind is trying to classify an ambiguous

24   transaction, the consignment, and we have two ways to go.

25   We can either classify it as a sale in which case it seems

1    to be to be the general creditor is entitled to rely upon

2    the property that is there as a result of that transaction.

3         But the whole purpose of that -- we should be

4    going the other way.  We should be looking at this as

5    strictly as a bailment.  And that is what that purpose of

6    9102 20 (a) a is all about.  You look at the type of person

7    that Morgansen's is, and then you decide which way to go.

8    The Bankruptcy Trustee only sees one way and that is to go

9    in the direction of a sale.

10        He should be going in the direction of a

11   bailment.  If he goes in the direction of a bailment, we

12   should have our property.

13        Now the problem of a sale --

14        THE COURT:    It doesn't look like any bailment

15   that I recognize.  We have a whole series of transactions

16   under the UCC for warehouse receipts and bills of lading and

17   specialized commercial devices.  But the bailment that I

18   thought we had in mind was when I park my garage in a garage

19   and expect at the end of the concert to be able to come

20   back, open the door, and drive my car back home.  And for

21   that, I paid a fee.

22        I bring my car to the garage for repairs.  He

23   makes the repairs.  If I don't pay, he has a garage man's

24   lien; but if I pay -- if all I am doing is delivering it for

25   servicing or repair, it is still a bailment.  There is no

1    contemplation while I'm off playing golf in the Hamptons,

2    he's then going to turn around and sell it.

3         Then I have the entrusting situations, where it

4    is really a warning to those people who put their goods with

5    someone who sells goods of that kind.

6         So we have a common law of bailment.  You'd have

7    to demonstrate to me that under the common law of the State

8    of New York, under any applicable non-UCC statutes, that

9    this kind of transaction which you are denominating as a

10   consignment is to be treated as a bailment.

11        There are not just two categories.  There may be

12   multiple categories.  And the question is which one does it

13   fall under, and it is not a question of balancing or rights.

14   The only persons who have balanced rights have in the

15   Congress and the State of New York, and then I have to

16   harmonize these diversion statutes.  I am not hear to make

17   determinations based upon some intuitive sense of the

18   equities.

19        I have to first apply the law.  Once I understand

20   it, and once I determine it's applicable to these facts.

21   And this is not a Court to which you can made a general plea

22   in equity that we have been wronged or we are not being

23   wronged by the Trustee.  And based upon your argument what

24   constitutes natural justice, I should adopt that argument.

25        I may be wholly sympathetic with the frustration

1      of everyone of you here.  This is a Court that deals with
2      nothing but fraud on a daily basis.  This is the premier
3      commercial court on fraud.  I deal with stock brokers who
4      file for Chapter 7 after their brokerages were closed down
5      by the securities regulators and the customers come in here
6      and assert millions of dollars of claims for having been
7      defrauded by their brokers.  I hold about six of those
8      trials a year.

9             Then I have the Trustee's actions based upon
10     fraudulent transfers when the husband decides in the face of
11     having guaranteed business debts and having creditors being
12     to howl, he decides to transfer the property that he and
13     wife held as tenants by entirety to his wife, and he has the
14     bravado to call it estate planning.  We make short work of
15     those.

16            I deal with fraud against credit card companies.
17     I deal with fraud by one partner against another.

18            But I am not free to form the remedy.  The
19     remedies are given to me by Congress or by the State of New
20     York or by the Common Law.  And when there is a conflict
21     between state law and bankruptcy law under the supremacy
22     clause of the United States Constitution, the bankruptcy
23     provision prevails.

24            So I don't want you to misperceive what my
25     concerns here are.  The Trustee is trying to establish a

1          position.  He's given notice.  Some of you may think it

2          wasn't enough notice.  I tried to suggest to you that

3          perhaps you ought to collaborate.  We have people here whose

4          goods have been sold.  We have persons here whose goods may

5          have been redelivered to a third party without their

6          authorization.  There may be a myriad of facts.

7          But we don't have to talk for the moment about

8          goods that aren't on the premises in the Hamptons.  That's

9          all we are talking about.  And I tried to suggest to you the

10         Trustee is always available to make some kind of practical

11         accommodation.  And maybe because we have been pursuing

12         these fascinating arguments, and we are not coming to any

13         immediate conclusion, some of you think maybe well I'm just

14         going to have to continue to assert my claim.  I'm going to

15         take the position that the Trustee can sell it without

16         either my consent or the determination of the Court, and we

17         will reserve all of our rights to appeal.

18         And we are now going to spend more money in legal

19         fees than the items are worth.  But people do things for

20         their own reasons.  You are not going to teach the Trustee a

21         lesson.  The Trustee is not Ms. Brunesco.  The Trustee is

22         not the corporation.  The Trustee acts here as a

23         representative of creditors.

24         And while you might be a creditor, it is not in

25         your providence to tell me that LIPA should have gone to the

1      store and read the signs.  And that because they are on

2      notice, therefore, their rights are subordinate to yours.

3      That might be what you consider to be an equitable argument,

4      but it is not one that I can recognize.

5           So, if we have to have a hearing on what

6      creditors knew or what they generally knew, that's a matter

7      of proof.  It's not a matter of argument, and it is not a

8      matter of an appeal to the courts sense of rightness or

9      fairness or what conscience dictates.

10          And I am sorry that you find -- some of you in

11     the audience find this frustrating.  As if there is a magic

12     answer to all of this, and if I deserve to sit here wearing

13     this dress, that I ought to be able to answer it in 20

14     seconds flat.  It's not that easy.

15          And I am not doing this because I like to explore

16     these nice issues.  There are many issues I find far more

17     fascinating than consignments, bailments, and alike.

18          I would much rather have a hearing on someone who

19     is a complete con artist, but I am not indifferent to your

20     claims.  Some of your have substantial value here that you

21     are trying to recover, and we want to try to deal with it on

22     an expedited basis.  So if you want to submit a Memorandum

23     of Law, you can join with other counsel to do it within a

24     ten day period, if you don't think I have had an opportunity

25     to study your views based upon the case law.   The Trustee

1    simply asked for an expedited hearing.  Just because I grant

2    the hearing doesn't mean that I am going to make the

3    decision today and I am still asking for information, and no

4    one seems to want to talk about it.

5            Is there a better way of disposing of this

6    property with your rights preserved and we're simply going

7    to liquidate these items and reduce them to cash.  So far,

8    some of you have told me I live in Amagansett, and the

9    season is over.  Others of you have told me what's the

10   hurry, and you are not dealing with the cost benefit of a

11   sustained occupancy charge.

12           So if you have some practical ideas and I thought

13   Mr. Faver was going to come back and give me the instant

14   comprehensive solution, and when we get to his turn, maybe

15   he's going to be able to do this.

16           I don't know how many of you have had a chance to

17   talk to him and whether you think his idea is a good one.

18   But if you unhappy with the state of the pleadings, and you

19   want to file pleadings within ten days, whether you are pro

20   se, you are going to go out and get a lawyer.  You are going

21   to collaborate in hiring the same lawyer or for lawyers who

22   already appeared, you want to file a memorandum.  You'll

23   have it.  You have ten days from today.

24           Anything further?

25           MR. BATES:  Your Honor, again, I didn't receive

1    notice until Last Wednesday when I got a fax.  Should we be

2    discussing with the Bankruptcy Trustee about having another

3    day to open the premises out there so that we can identify

4    what is yours.

5            THE COURT:    That is something you should

6    discuss with him.  Look, he's here in the courthouse

7    conducting meetings with creditors on a regular basis.  He

8    is appearing before seven different judges.  He also has a

9    private law practice.  You have to work out something that

10   is mutually agreeable.  I don't think the Trustee himself is

11   going to go out there.  The question is whether an employee

12   of Mr. Maltz is going out there under some conditions

13   supervised by the Trustee.  That's a practical matter.  You

14   can do that today in the courthouse.  I am not precluding

15   that.  I don't think the Trustee is opposed to it.  But we

16   are not coming back everyday of the week to meet everyone's

17   convenience and religious practices.

18            If there are another two days that are possible,

19   whether it's evening, night, morning, we'll work that out.

20   We are not trying to hide anything here.

21            Next.  Sir.

22            MR. PAPE:    Phil Pape representing myself.  I

23   would like to give you a copy of Morgansen's consignment

24   agreement.

25            THE COURT:    You should give one to the

1    Trustee.  I'll accept a copy.  I need you to tell me Mr.

2    Pape what is that you claim to be your property that you

3    believe has not already been sold.

4            MR. PAPE:   I consigned for auction about nine

5    items, and I was able to go to the viewing on Wednesday.

6    Just by happenstance, I had been driving by there, and saw

7    that the door was open.  I do not, in fact, receive

8    notification.  Of my nine items, I couldn't fine two of

9    them.

10           THE COURT:    You found seven, but not nine.

11           MR. PAPE:   That's correct.  The other two may be

12   there, but I didn't see them.

13           THE COURT:    The items you found that you

14   identified as your own --

15           MR. PAPE:   I'm sorry.

16           THE COURT:    The items that you identified, how

17   would you describe those?

18           MR. PAPE:   They are described as a pair of

19   marble end tables, an iron marble top console, mirror, and

20   Victorian rocker, pair of marble top consoles, Hallstand

21   mirror, small pine table.

22           THE COURT:    You're going too fast.  Marble

23   something or other --

24           MR. PAPE:   I can submit a copy of this to you.

25           THE COURT:    So you have a report.

1           MR. PAPE:    Yes.

2           THE COURT:     And you have given that to the

3      Trustee or to Mr. Maltz?

4           MR. PAPE:    No, I have not.

5           MR. ACKERMAN:     Please, because if you didn't

6      get the notice, that means you are not my list.

7           MR. PAPE:    Well, I would like to address the

8      notification process which I'm sure Mr. Ackerman has all of

9      our best interests at heart, but the notification process

10     really has not been terrific.  I happened to gone by

11     Morgansen's to see what was happening with my stuff, and I

12     saw a notice on the door.  That was a few weeks ago.  I

13     called the number on the door.  I spoke then with a

14     gentleman who gave me Mr. Ackerman's name.  I spoke with Mr.

15     Ackerman, and I didn't receive anything -- any information.

16          I called back again.  Then I finally did receive

17     his I guess you would call that a brief.  I have not

18     received a list of other creditors, and I think, your Honor,

19     you made a very good suggestion that perhaps the consignors

20     ought to get together and form a committee and try to get

21     more in lock step with this Trustee because it seems as if

22     the consignors are taking an adversarial position against

23     the trustee.  The Trustee is trying to help us, and it

24     doesn't seem that the two parties are together at this

25     point.  Perhaps if we had a better understanding, maybe

1      through the 341 Hearing or meeting that was supposed to take

2      place on August 9th, we could get a better understanding of

3      exactly --

4                    THE COURT:      Not August 9th.

5                    MR. PAPE:    I'm sorry, October 9th.  We could get

6      a better understanding as to where this thing is going and

7      what we might be able to derive out of it.

8                    THE COURT:      Mr. Pape, I think that makes

9      sense.  Look as far as the list of "consignors", Mr.

10     Ackerman, I assume, will file that list.  It's probably

11     available in the courthouse.  This isn't electronic filing

12     is it?

13                   MR. ACKERMAN:      Yes.  I have prepared an

14     application and proposed order to change the matrix of the

15     court to set forth everybody that I know about.

16                   THE COURT:      But if you are not an attorney and

17     you're "owner of this property", you can't get access to

18     that list, can you?

19                   MR. ACKERMAN:      I am also going to ask in there

20     that the court establish a new bar date for people who

21     didn't get notice previously, and that I be authorized to

22     send out a Proof of Claim form with notice of the bar date.

23                   THE COURT:      But to the extent that Mr. Pape

24     would like to coordinate his activities with other persons

25     who he believes are similarly situated to him in the

1   language of the law, there will be a publically available

2   listing of this schedule.  I don't think it is the

3   responsibility of Mr. Ackerman to send out the same list to

4   everyone on the list.  That's not the function of the

5   Trustee, but if a few of you want the list, I suspect he

6   will make that accommodation.  It may be appropriate to do

7   this at the October 9 hearing, but I have the distinct sense

8   that unless the Trustee has reserved the whole day.

9           MR. ACKERMAN:   It's 2:30, Judge.  I don't even

10  know if she is going to show, and I will say this.  I am not

11  going to reveal my strategy on the record to Ms. Brunesco if

12  --

13          THE COURT:    I understand that.  But the

14  primary purpose of this is to give creditors an opportunity

15  to ask questions of the debt.  Correct?  It is not just your

16  party.  It's their party.  That's why it is called a meeting

17  of creditors; not the meeting of Trustees.

18          Mr. Ackerman, I am going to suggest that you talk

19  to Ms. Cavanaugh.  We have facilities here.  I don't know if

20  we ever used the ceremonial courtroom on the first or second

21  floor for these.  I have another courtroom next door which

22  you can open up and if you want to schedule this on an

23  adjourned date and let everyone have it; and if you need to

24  resort to process to bring Ms. Brunesco here, then you can

25  do that.  I assume there have been circumstances in which

1    you were a Trustee in a converted case because the debtor

2    already enjoyed the benefit of the 11, have an ability to

3    bring her in.  And if you need an order from me, and you can

4    show that as extra authority, I would be happy to enter the

5    order, and we can let the US Marshal chase her down wherever

6    she may be.

7        Then the creditors can come and ask their

8    specific questions.  I don't want to turn this into a lynch

9    mob.  We'll have court security officers there, but it may

10   be more sensible in trying to pack the people into the fifth

11   floor meeting room when you have a half an hour to deal with

12   this case at most.

13       MS. CAVANAGH:   Your Honor, we can work that out

14   because we can make of our larger meeting rooms available,

15   but if we see there is that much creditor activity, we'll

16   coordinate that with one of the deputies in the Clerk's

17   Office.  But I do want to point out.

18       THE COURT:     Identify yourself.

19       MS. CAVANAGH:   Yes.  Terese Cavanagh, Assistant

20   US Trustee.

21       THE COURT:     You know about Mother Nature.

22   Don't mess with Mother Nature.

23       MS. CAVANAGH:   Just for your information, my

24   position is with the Department of Justice.  Office of the

25   United States Trustee, oversees bankruptcy cases and

1    Trustee for gross negligence or willful conversion.  If he

2    is acting in his capacity as the Trustee and acting with the

3    body of law, he has qualified immunity.

4            MR. PAPE:   Certainly, wouldn't we have a

5    potential claim against the Estate?

6            THE COURT:    Yes, but that is not suing the

7    Trustee.

8            MR. PAPE:   Then I misspoke.  Then I would say we

9    would have a potential claim against the estate.

10           THE COURT:    You may have an actual claim

11   against the estate.  You will have an opportunity to file a

12   Proof of Claim.  The Trustee will have an opportunity to

13   review it.  Often times, he doesn't file objections to the

14   Proofs of Claim because his primary concern is to maximize

15   the money and get the distribution to creditors.  But there

16   are a number of parties and interests who have the right to

17   object to a claim.  And then you have to try to document

18   this claim to the fullest extent you can.  It's not just a

19   one page piece of paper.  It requires substantiation.

20           MR. PAPE:   If I could just repeat.  I agree

21   with that, and I do agree that that we can have a lynch mob.

22   I think that we should form a committee.  I think that we

23   should have our own representation.  I think a number of

24   people in this room that are consignors are already

25   beginning to form that group.

1             THE COURT:    Let me ask Ms. Cavanagh, because

2      with respect to official committees of equity security

3      holders or of unsecured creditors, it is not the

4      responsibility of the Court to form the committee or to

5      determine its membership.  It's the charge of the US Trustee

6      which would come under Ms. Cavanagh's jurisdiction.

7             Have you ever appointed a creditor's committee.

8             MS. CAVANAGH:    In Chapter 7, no, your Honor, and

9      I would be concerned in this instance because we have mixed

10     constituencies that they may or may not fall into a category

11     that would be appropriate for a committee.  It does not mean

12     that a committee cannot be formed on their own independently

13     and retain counsel.

14            THE COURT:    All right.

15            MR. PAPE:    There appears to be quite a bit of

16     dissension here today, and most of it revolves around the

17     requested sale of merchandise or goods that are being held

18     at the Morgansen's facility in Southampton.  My request, and

19     I think it is consistent with a number of people in this

20     room that the sale be held off, that it is premature and

21     maybe ultimately going to happen.  I'm sure it will.  But at

22     this time, I really haven't seen myself enough information

23     to be able to agree with it.  We don't know what the values

24     are of the merchandise that are contained within the

25     building.  We don't have a clear understanding as to the

1      outstanding secured debt.  We don't have an understanding as

2      to what people, meaning the consignors, believe their

3      merchandise is in fact worth.  There seems to be a lot of

4      unanswered questions; yet we are forging ahead with this

5      sale.

6              Someone has mentioned of the fact that these

7      goods are there piled up all over the place.  There is no

8      room for an auction sale.  I think we need an opportunity to

9      come up with some solutions.  I think a lot of people have

10      put forth the obvious problems, and I think through the

11      formation of this committee, and by postponing this, not

12      allowing this sale to go on as scheduled, perhaps we can

13      come back to the Court with some suggestions and a meeting

14      of the minds that might make sense for both secured and

15      unsecured creditors as well as consignors and the Trustee's

16      office.

17              THE COURT:     And what is your occupation, Mr.

18      Pape?

19              MR. PAPE:   Builder.

20              THE COURT:   Yes?

21              MR. PAPE:   I'm a builder.

22              THE COURT:   You are providing affordable housing

23      on the East End?

24              MR. PAPE:   Not at this time.

25              THE COURT:     Are your sales down?

1          MR. PAPE:   Not at this time.

2          THE COURT:     Because we were trying to figure

3     out whether the East End was still alive.  We kept on

4     getting all kinds of conflicting reports.  The weather was

5     horrible, but it didn't seem to me that there was such a

6     high vacancy rate for summer rentals.  That was one of the

7     questions.  Did it fill up this summer with rentals and the

8     developers are opening new tracks?

9          MR. PAPE:   Sales were okay, but rentals were a

10    little off.

11         THE COURT:     They were?

12         MR. PAPE:   Yes.

13         THE COURT:     Are you a member of the Chamber of

14    Commerce or something of that sort?

15         MR. PAPE:    No.

16         THE COURT:     When you compare it to five years

17    ago, where the streets empty or was it fairly crowded?

18         MR. PAPE:    It was still crowded.

19         THE COURT:     And we didn't have any instances

20    this summer where people were being backed into?  I'm glad

21    we had a happy summer.  And did you see Steven Spielberg and

22    his family?

23         MR. PAPE:    No, I didn't.

24         THE COURT:     They didn't come out this summer?

25         MR. PAPE:   I didn't see them.  They may have

1    come out.

2              THE COURT:     Is Martha Stewart around in

3    Amagansett?  I bet Mr. Davidow has her tracks.  It's a good

4    thing that her problems with the authorities didn't adverse

5    the effect of prices in Amagansett.

6              MR. PAPE:  If I could just say one last thing.

7    In respect to Morgansen's being an auctioneer, I just have

8    this consignment agreement and the word auctioneer is all

9    over it.  I think it is so clear.  It is plain as day at

10   least in my opinion and I would just like the Court to take

11   a copy of this, if possible.

12             THE COURT:     Well, if it is clearly an auction

13   agreement, and it just happens to be improperly entitled

14   consignment agreement, then the Trustee would have to made a

15   determination; ultimately I will have to make a

16   determination just what kind of agreement it is.  And I

17   agree with you.  If it is an auction agreement and that's

18   the primary tenor direction or thrust of it, then

19   notwithstanding how it has been labeled, we may make have to

20   conclude that it's an auction agreement.  But that's the

21   question of reviewing the agreement, making sense of it to

22   the extent that it is ambiguous, having a hearing to produce

23   the evidence.

24             MR. PAPE:   I can only say that my intention was

25   that I was consigning my goods to auction.

1          THE COURT:    The problem is when you are doing

2     that, you are mixing what should be very separate kinds of

3     terms.  But if we have some kind of third speeches of

4     agreement, I would have to decide what category it fits

5     into, and then I'll take into consideration the relevant

6     public policies both under the Code and the UCC, because it

7     may not be either a straight out plain vanilla auction

8     agreement.  It may not be a straight plain vanilla

9     consignment agreement.  And then you will be able to argue

10    what is the interpretation of that agreement as that

11    reflects the intention of the parties.

12          MR. PAPE:    Thank you.

13          THE COURT:    Anybody else?   Mr. Faver, do you

14    have --

15          Yes, Ms. Kessler?

16          MS. KESSLER:   I have a question.  I just need to

17    know how I should file based on the information I have been

18    given because it is conflicting.  I am a little confused.

19          THE COURT:    You can go down to the Clerk's

20    Office, ask them for a Proof of Claim form.  You can go

21    through it, and you should be able to fill it out as best

22    you can.  It is supposed to be in plain English.  It is

23    supposed to be available for non-lawyers.

24          MS. KESSLER:   No, but I'm saying since I was

25    told it was sold, got a check, told the buyers refused it,

1    received money, got the stock payment, then I received

2    payment, what did it go to.  Now I'm told this one is at a

3    third party.  This one now disappeared.  Did I sell it.  She

4    never mentioned it before.  So, I don't know to file this.

5            THE COURT:    I can't give you advice on how to

6    file it, but I can tell you that it is primarily a notice

7    form supported by the relevant documents.

8            MS. KESSLER:    Does the Trustee tell me who the

9    third party is from Felicia?

10           THE COURT:    You simply assert your claim

11   against the estate based upon the best information you have.

12   You support it with whatever documentation you have.  It is

13   not a lawsuit.  The allowance and disallowance of claims is

14   supposed to be done as uncontested matters or contested

15   matters.  We are not supposed to turn these into separate

16   lawsuits.  So you don't have to file the equivalent of a six

17   count complaint.  You can put it in the narrative term as an

18   attachment with your exhibits.  But there is a form that you

19   have to file and you can get that in the Clerk's Office on

20   the second floor.  They will give you the form.  They can't

21   tell you how to fill it out.  You can go to the library on

22   the 11th and 10th floors.  You can ask to speak with Astride

23   Stalis who is the Circuit Court Assistant Librarian, and she

24   has a number of books that we have helped her collect for

25   pro se litigants, credits and alike.

1    MS. KESSLER:   My question was more towards the

2    estate, the perfecting information of what the owner has

3    told me.  Can I get the name of the parties that she gave it

4    to so I can assert my claim.

5         THE COURT:   I am simply talking about your

6    ability to assert a written proof of claim, and I'm telling

7    you those forms are downstairs.  There are books upstairs in

8    the library open to the public that are guides to bankruptcy

9    proceedings. they are guides to people how to fill out

10   claims.  What it means to be a debtor.  What it means to be

11   a secured creditor, and you just go upstairs and tell her

12   what your concerns are, and she'll point you in the

13   direction, and you may find some of the answers in that

14   book.

15        And that goes for all of you.  This is a public

16   courtroom.

17        MR. FAVER:   Judge, to more thoroughly answer

18   your question from earlier.  I develop senior housing 55 and

19   older.

20        THE COURT:   What's that?

21        MR. FAVER:   I develop senior housing 55 and

22   older, active adult communities.

23        THE COURT:   It's the only kind I know.

24        MR. FAVER:   In terms of affordable housing, only

25   when --

1          THE COURT:    How come I turn around and all my

2    neighbors seem to be much younger than 55.  Is that because

3    they have second wives.  Is that it?

4          MR. FAVER:    Those are perhaps more difficult

5    questions that we have been presented here today, Judge.

6          THE COURT:    All I can find in new construction

7    are leisure communities, adult communities, assisted living

8    communities, and developments of housing that are in excess

9    of 6,000 sq. ft.

10         MR. FAVER:    Are those for seniors as well?

11         THE COURT:    I don't see any affordable housing

12   being built on Long Island for lower middle or middle class

13   citizens who want to work out here and live out here because

14   the average cost of a private residence in this part of

15   Suffolk County is well in excess of $300,000.  So I don't

16   see any housing being built that meets the needs of people

17   who are earning a gross income of $60,000 to $80,000 a year.

18   So I am hearing that the sons and daughters who went to the

19   local high schools can't afford to come back to the

20   community, join their parents other than to move in.

21         MR. FAVER:    I understand there is actually some

22   good developers doing some great affordable tax credit

23   housing out here to help address that issue.

24         THE COURT:    I saw some up the street that was

25   church affiliated on Carleton Avenue, but I haven't seen

1          very much.  We thought by moving out here, we would

2          stimulate economic development, and we would make a major

3          impact.  I haven't seen any major impact with us being here,

4          and I have been here for over three years.

5                    MR. FAVER:  It's a shame.  Hopefully, it will be

6          forthcoming, but the way those tax credit programs are

7          structured, there should be some really nice affordable

8          housing given the demographics and specifically the incomes

9          of the --

10                   THE COURT:    So what should I be paying for

11         rent for a two bedroom, one bath?

12                   MR. FAVER:    I am not familiar with the market

13         out here, Judge.

14                   THE COURT:    I know I couldn't afford your

15         market.

16                   MR. FAVER:    No, actually I am in Upstate New

17         York so it is a less expensive market, substantially, and

18         affordable housing there is.

19                   THE COURT:    So what's your proposal.

20                   MR. FAVER:    Well before I left the practice of

21         law, Judge, I actually was a lawyer with the Department of

22         Justice in Washington in the Civil Division, and it is a

23         shame that my former colleague wasn't here earlier for the

24         lively discussion we had about the legal issues.  Because I

25         think they are interesting.  I think we do have a great

1     legal issue here; and of course, it gets resolved in favor

2     of those people who are objecting.  In my reading of that is

3     consistent with a number of commentators and alike and in my

4     papers.

5              THE COURT:     You must be from Washington.  You

6     talk like a politician.  What's your proposal?

7              MR. FAVER:     Well, of course, we are not here

8     just to resolve disputes which require the resolution by

9     academic legal opinions but hopefully a practical resolution

10    that solves it for everybody with some degree of finality.

11    And if we can somehow carve out --

12             THE COURT:     How long did it take you to try

13    your cases?

14             MR. FAVER:   I'm sorry Judge.

15             THE COURT:     How long did it take you to try

16    your cases?  Your opening arguments must have gone for four

17    days.  Cut to the chase, Mr. Faver.

18             MR. FAVER:    If you can somehow carve out the

19    very few objectors.  We are talking about 600-700 items and

20    everyone has conceded that not all of those items would sell

21    in the sale anyhow.  There is going to be leftover items.

22    We can't be possibly talking about a whole lot of items,

23    Judge.  From those few objectors who are here, if they can

24    be carved out.  I think the one important thing is we are

25    entitled as far as I can tell to return of our goods if we

1    prevail on this legal argument; an issue which we discussed

2    earlier today.  And if that is the case, then the better

3    approach would be not fund from the potential proceeds from

4    the sale, but the goods themselves in escrow so to say, and

5    being it is such a small portion when you consider the

6    objectors of the overall number of --

7         THE COURT:    Mr. Faver, you are all in the same

8    boat, and Mr. Pape didn't discover it until he drove by

9    recently, what the Trustee I think is suggesting implicitly

10   that he doesn't want to wave the flag around is that he

11   wants to make sure that all of the consignments if they are

12   consignments have been reviewed, that everyone be given

13   adequate notice to the sense that he can dredge that up, and

14   I don't think he's going to let you people be at the top of

15   the line, because your rights aren't any better than any

16   other's rights.  And Mr. Pape never got notice and the

17   Trustee wasn't aware of his interest, it would be unfair to

18   persons in his shoes who didn't have the fortune of driving

19   by to be put in the position in which their rights can't be

20   articulated.  So the people who were sturdy enough to come

21   here today on short notice get preferential treatment.  That

22   is not just fair.

23        MR. FAVER:    Well, if I understand your view,

24   Judge correctly, then clearly

25        THE COURT:    I don't have a view.  I am just

1          raising a question, Mr. Faver.

2                    MR. FAVER:   The question that you raised

3          clearly would then go to the suggestion and notion that this

4          whole sale be halted until proper notice is given to all of

5          the consignors and which we know there are 300.

6                    THE COURT:   Yes, but I'm going to let Mr.

7          Maltz testify today briefly, and you will have a chance to

8          ask him questions.  I need to hear from him about the

9          seasonality of this sale because the extent to say that no

10         demonstration has been made, the only reason no

11         demonstration has been made is that Mr. Ackerman has been

12         dealing with these legal theories and hasn't had an

13         opportunity to put a witness of the stand to testify in

14         support of his proposal.  So if you don't have a better

15         device other than let's not go forward with the sale, then

16         we'll call Mr. Maltz to the stand and whoever else Mr.

17         Ackerman is intending to call.  We'll hear those proofs, and

18         you will have a chance to examine him.  Okay?

19                   MR. FAVER:   Let me make sure I understand

20         exactly what it is you're saying, Judge.  With the sole

21         question that Mr. Maltz would testify toward is the

22         proprietary of fairness of the sale at this given time?

23                   THE COURT:   Let Mr. Ackerman put on his

24         proofs.  He is the one who brought him here.

25                   MR. FAVER:   So in other words, he is not going

1    to put on his proof then as to this issue on consignment,

2    whether they be factual or legal.  That is going to be put

3    off to another time.  Correct?

4         THE COURT:    He's not here to determine that

5    legal issue.  Correct.  So why don't you just wait and let

6    Mr. Ackerman ask the questions before you start putting

7    limits on them.  I am not making any decisions now.  I have

8    to hear some testimony and one of the issues is whether it

9    is in the best interests of the creditors of the estate, and

10   some of you may be creditors, whether you like it or not,

11   and I want Mr. Maltz, if he is going to be the one

12   testifying to demonstrate to the Court in open court, why

13   this sale should be held on an expedited basis, what the

14   carrying costs are.  He already began to represent that it

15   wasn't under oath, the costs of moving this to Plainview or

16   some other location.

17        So I have to make a determination based upon

18   certain facts.  The only way I can do that is to have a

19   witness testified and it may be the case that he convinces

20   me that it should be a sale of the character that he

21   decides, and then I have to determine given all of the other

22   considerations, whether it has to be held, even though there

23   may be costs associated with it.

24        So we can take advantage of the October 9

25   hearing.  I am not trying -- Listen, and I'm telling you for

1       the last time.  I am not trying to jam anybody here.  That's

2       not the purpose of this hearing, and it is not the intention

3       of the Trustee.  He just wanted this brought to the

4       attention of the Court with as much notice as he could

5       provide so that we can begin to address these issues.

6               MR. FAVER:   I guess what I'm confused about,

7       Judge, is why is it as the first attorney after the break

8       suggested, we can't simply carve out the items that are in

9       dispute that may potentially prohibit --

10              THE COURT:    Because I have already answered

11      it.  I am not going to prefer some of you who are here today

12      to the detriment of all others who are similarly situated.

13      I am not going to let the people like Mr. Pape --

14              MR. FAVER:   If they received notice and they

15      waived their right to appear or to otherwise object --

16              THE COURT:    I'm not making any determinations

17      of waiver.  I haven't heard the Trustee make an argument for

18      waiver.  This is the first time I've considered it.  It is a

19      new issue for me.  We are dealing with a very large number

20      of persons.  We are dealing with some fairly small values in

21      terms of --

22              MR. FAVER:   Which is why in my motion I

23      suggested the idea of a committee, a designation of a

24      committee.

25              THE COURT:    Okay.  I understand that, but I

1       may not have the authority to appoint a committee.

2       Sometimes I just let --

3                   MR. FAVER:    I guess -- I'm sorry Judge.

4                   THE COURT:    Let me finish and you're done.

5       Sometimes I let people form their own organizations because

6       they have a superior way of dealing with this, and my

7       authority under the Bankruptcy Code is limited as is Ms.

8       Cavanagh's.  This is a very unorthodox situation, okay,

9       because some of you are trying to assert what your legal

10      interests are.

11                  MR. FAVER:    And it may require an unorthodox

12      solution perhaps given the circumstances.

13                  THE COURT:    I'm not pulling the inventory from

14      sale today.  Mr. Maltz.  Thank you Mr. Faver.

15                  Whereupon,

16                          DAVID MALTZ,

17      having been first duly sworn, was examined and testified as

18      follows:

19                  CLERK:    State your name for the record?

20                  THE WITNESS:    David R. Maltz.

21                          DIRECT EXAMINATION

22      BY MR. ACKERMAN

23          Q    Mr. Maltz, what is your occupation?

24          A    I am a licensed auctioneer.

25          Q    And do you work for a specific company?

1          A     David R. Maltz & Co., Inc.

2          Q     Where is that located?

3          A     In Plainview, Long Island.

4          Q     Have you been engaged as an auctioneer in any

5     bankruptcy sales before?

6          A     Many.

7          Q     Would you give an estimation?

8          A     The number of bankruptcy sales I have been

9     retained in?

10         Q     As auctioneer.

11         A     As auctioneer, probably in excess of 1,000.  I

12    have been doing this for 24, 25 years.

13         Q     And I believe you were working for other

14    auctioneers before you opened your own practice?

15         A     Yes.

16         Q     So you were engaged in auction sales prior to the

17    time you opened your own practice?

18         A     That is correct.

19         Q     And how often have you been engaged in being an

20    auctioneer for antiques, jewelry, et cetera?

21         A     On a regular basis for the past 25 years.  My

22    practice primarily is debt related type sales.  I work for

23    lending institutions, government agencies, bankruptcy

24    trustees, and a like.  So we get a wide variety of range of

25    merchandise to sell which gives us a very large database

1    from selling the contents of homes to homes to factories to

2    many jewelry stores, antique stores, retail type stores of

3    every type.

4        Q    Now I consulted you about Morgansen's.  Did you

5    have an occasion to visit the premises?

6        A    Yes, I have.

7        Q    And you secured the premises, I believe?

8        A    Under your direction, that is correct.

9        Q    Now, you've reviewed all of the items in the

10   premises?

11       A    All of the items would probably not be an

12   accurate statement.  I walked through the store on several

13   occasions.  We have not spent a considerable time that will

14   be necessary, labor, in order to lot and catalog waiting for

15   a determination from the Court because there really is no

16   sense in spending estate money until we know what exactly we

17   are doing with these items.  It could be a duplication of

18   work if that does wind up having to be moved or if items are

19   given back to people.

20       Q    One of the questions that has come up today is

21   whether we should hold the sale in the Hamptons or whether

22   we should move it elsewhere to maximize value, et cetera.

23   First, what is your opinion, as to the cost of moving these

24   items?

25       A    Well, besides the costs associated with moving

1      the items, we would have to find a mover who would be

2      willing to move it and not get paid until after we have an

3      auction and there was some sort of estate to pay him.  It is

4      not as if we can go out and get three estimates and choose

5      the lowest price of an insured, bonded mover that we are

6      comfortable with because most movers want to get paid

7      immediately upon the completion of the job.  This will be a

8      substantial job because of the packing and wrapping that is

9      necessary in order to secure and preserve these assets and

10     make sure there isn't any breakage.  A lot of these items

11     are very fragile.  We have chandeliers.  We have art work.

12     We have all sorts of china.

13             I have not spoken to movers, but in my years of

14     having things moved and stored, I would say that you are

15     looking at a minimum of $15,000 to probably $25,000 to move

16     and store these assets for a 30 to 60 day period.  In

17     addition, the labor from my end would be substantially more.

18

19             Right now everything is laid out in the store and

20     is displayed the way we would probably display it to sell.

21     Yes, we would have to move some things around and make some

22     room, but it is not going to be as time consuming or labor

23     intense as unwrapping everything after it has been moved by

24     a mover and placed in a pile.  Then my people would have to

25     go in and unwrap everything and re-set it up for sale.

1          I mean the way it is set up in the store now, it

2   looks the best it will ever look.  So you are going to have

3   the additional labor to move it, the additional labor to set

4   it up if it is moved, plus the costs associated with moving

5   it.

6          Everyone is concerned that the season is over.

7   People travel from all over for auctions.  When we run

8   auctions, we have people come from all over the country,

9   depending upon the item that is being sold.

10          If there is a bankruptcy sale of a large quantity

11   of antique type of goods, people will come from Manhattan

12   out there.  It is not that difficult for someone to get in

13   their car and drive two hours and be there.  The sale will

14   be well advertised, well publicized.

15          Can it be moved?  It certainly can.  I can move

16   it to my warehouse as I stated earlier.  It is much more

17   convenient for me and my people if I do that.  We don't have

18   to drive 45 minutes or an hour to go out there, but I don't

19   think it is in the best interests of the estate.  I think it

20   can be done from there.  It may have to be done in two sales

21   rather than one sale.  There is basically one area upstairs

22   in the back room that is just loaded floor to ceiling with

23   items, but those items looking the room don't appear to be

24   that valuable anyway.  It is primarily chairs and wood type

25   of things that she probably just purchased at an auction

1    someplace else.  We did find some receipts for items that
2    she purchased.
3            I would suggest that we do it there.  The fall
4    season, there is still plenty of traffic out there.  I do
5    not live out there, but I do travel out there several times
6    a year.  I think if we have signs on the property.  We
7    advertise it locally.  We advertise it to -- I have a list
8    of her customers.  I have my list of customers.
9            As I stated before, I have no problem
10   anticipating over 100 people showing up at this auction
11   sale.
12           THE COURT:    How large is your database on
13   customers for antiques, jewelry, and art work.
14           THE WITNESS:    I would say several hundred at
15   minimum.
16           THE COURT:    And this is in the greater
17   metropolitan New York area?
18           THE WITNESS:    This is people in the greater
19   metropolitan area or they could be from out of state if they
20   attended other sales, Judge.  Basically, the list is
21   created from people who have attended prior sales.
22           THE COURT:    Okay, but what you are talking
23   about?
24           THE WITNESS:    The tri-state area.
25           THE COURT:    So we might draw persons from that

1    unmentionable jurisdiction from across the river, New

2    Jersey, right?

3           THE WITNESS:    We may get some very nice folks

4    from Connecticut also.

5           THE COURT:    Okay.  So you would advertise in

6    Westchester County?

7           THE WITNESS:    Primarily we would advertise in

8    The New York Times.  We would a lot of direct mailing.  We

9    would advertise in local papers depending upon what time

10   constraints we had and the way the publications fell out.

11   There are some antique publications.

12          THE COURT:    But when you start talking about

13   labor costs to lot and tag and to inventory, even at the

14   present location, then you talk about advertisement beyond

15   your database that is supposed to attract people from the

16   tri-state area, when it is at least 100 miles from the East

17   River to the Hamptons, the question is what are your costs

18   going to be aside from -- Let's assume you're talking about

19   moving.  Your labor costs to set up this sale is going to be

20   what if you do it on two separate occasions?

21          THE WITNESS:    The labor to set it up or the

22   labor to set it up, run an auction, and handle deliveries?

23          THE COURT:    From start to finish in place

24   where it is.

25          THE WITNESS:    I would estimate that it would

1    probably be in the neighborhood of $4,000 to $5,000.

2              THE COURT:    Okay, and the advertising costs?

3              THE WITNESS:    Probably similar.  Normally I

4    prepare an advertising budget and send it to the Trustee

5    with publications and get their approval.

6              THE COURT:    So, we're talking about $10,000 in

7    transaction costs for sales.  Now if you say this isn't

8    seasonal, why isn't the argument in then let's hold it in

9    November, let's hold it before the snows fall, if there are

10   any snows?

11             THE WITNESS:    Because there are many more

12   people traveling out there this time of year.  They're still

13   apple picking, pumpkin picking.  There still is a lot of

14   traffic out there.

15             THE COURT:    Okay, but people travel to pick

16   pumpkins and apples.  Those are the kind of people who draw

17   into art sales?

18             THE WITNESS:    You draw everyone, Judge to

19   auction sales.  I'll take anyone who wants to come in.  If

20   they want to buy something that is $100 or $100,000.  They

21   are all customers.  They are all buyers.

22             THE COURT:    Look, if I'm out on a Sunday drive

23   or a Saturday drive, and I'm picking pumpkins, and I have

24   three kids in the car eating ice cream and cookies, trying

25   to keep them from tearing each other's hair out, when I go

1    out on the North Fork, you're not a North Fork kind of guy.

2    These people aren't either.  But this is pie place Bryn Myr.

3    Okay that's on the North Folk.  You go there and the line

4    snakes around.  You can buy pumpkins and gourds and things

5    of that sort and buy 27 different varieties of apple pie

6    that are really expensive, but they draw a big crowd.  I am

7    not imagining any of those people taking the next car for

8    the chocolate cream pie that has to be in the refrigerator

9    and going out attending an auction sale.

10              THE WITNESS:    Either am I, Judge.  I am not

11   assuming that they are going to pass buy and see my auction

12   sign and stop in.  We are going to have a sign stating the

13   sale when it is going to take place.

14              THE COURT:    You can make a deal where you have

15   these pies for sale there.

16              THE WITNESS:    You'll get more people in that

17   way.  That can be a satellite location.

18              THE COURT:    You can run a sub-franchise.

19              THE WITNESS:    The Trustee won't even have to

20   know.

21              THE COURT:    You can probably serve apple cider

22   too.  Are you aware of any other public events either town

23   parades or Oktoberfests or anything of that sort that are

24   likely to draw people based upon pre-existing advertisements

25   and notices.  That there are some weekends that are

1      especially designated to draw substantial crowds supported

2      by the Chamber of Commerce, other tourist bureaus and local

3      businesses, where there is a tradition of people going out

4      to this area for community activities.

5           THE WITNESS:    People will come out there for

6      the sole purpose of this auction.  That's why they'll come.

7           THE COURT:    So, you're saying that you are not

8      going to depend on walk-in traffic.

9           THE WITNESS:    I am going to depend upon drive-

10     by traffic for two or three weeks prior to the auction sale

11     for them to see the signs that we have posted on the

12     premises.  It is basically on the only road to get out

13     there.  So anyone who lives there or passes there, will see

14     these signs.

15          THE COURT:    Okay, but you're not hitting a

16     tourist trade.

17          THE WITNESS:    No, I'm not.

18          THE COURT:    And why can't this be held in

19     November so you will have more time and may be make some

20     legal determinations in the interim?

21          THE WITNESS:    If it had to be held in

22     November, it could be held in November.  There are still

23     people out there.  When I spoke -- actually when my office

24     spoke to Felicia, we were concerned initially about the time

25     of year also to get the sale done.  She told us that between

1    September 15th and the end of October was her busiest

2    season, after the people that rented their houses out for

3    the summer returned.  That was her real customer.  Now,

4    again, I'm taking it from the principal of the debtor whose

5    word really doesn't mean much, but she had no reason to

6    really lie about that.

7              THE COURT:    But the point is if you can

8    attract people and the weather conditions still permit

9    travel out there, may be people go out to that part of the

10   world to buy turkeys.  I don't know what goes on out there.

11   I try to stay away from that area.

12             THE WITNESS:    Judge, if you asking me if there

13   is a difference between the last week in October and the

14   first week in November, I would say there isn't.  Once we

15   get closer to Thanksgiving, I think it would get a little

16   more difficult.

17             THE COURT:    What happens if we shoot for the

18   weekend of the 15th of November, if that's a weekend day?

19        Q    Well do we have rent accruing on the premises?

20             THE COURT:    There are some accrual costs.

21   There is no doubt about that.

22        A    We have you in our costs.  We have utilities

23   costs.  We have the alarm company costs.  We have the risks

24   of theft and loss.

25             MR. ACKERMAN:    You were aware that I was having

1      difficulties procuring insurance and it went on for weeks

2      and weeks.

3              THE COURT:    You can collaborate with the

4      members here.  They'll form a posse who will lead and

5      protect the property.  They'll stand on guard in rotation.

6      Look, one of the concerns is that we are rushing into this.

7      I am not indifferent to the holding costs.  I am not

8      indifferent to the sales expenses, but maybe somebody can

9      represent to the Court what the per monthly costs are in

10     maintaining the premises in their present condition.  What

11     is his burn rate as we say for administrative overhead?

12             MR. ACKERMAN:  The one -- I believe --

13             THE COURT:    How much are you paying for rent a

14     month?

15             MR. ACKERMAN:  I believe the rental, Judge, is

16     $6,000 or $6,500.

17             THE COURT:    That's the most money that it will

18     ever make.

19             MR. ACKERMAN:  And the landlord already got one

20     eviction, et cetera.  The insurance --

21             THE COURT:    We also know that he had no

22     tenant.  He just wanted to make sure that before the

23     opening of the next season, he would be able to rent it and

24     he recognizes that if this case dragged on to the end of the

25     summer, he was going to get had.

1          MR. ACKERMAN:   He's saying -- one of the things

2     he was saying to me, Mr. Milieus who represents the landlord

3     was saying to me that if the sale doesn't start going

4     through, he is going to start making motions to let it stay,

5     et cetera, et cetera.

6          Another cost is of Phoenix New York, which is my

7     insurance broker.  They've told me that the deposit that

8     must be made for the insurance is $3,280.52.

9          THE COURT:    That's a month?

10         MR. ACKERMAN:   I said will I get it back if I

11    can do a sale in two weeks, and they said no, but you'll get

12    charged a lot more if you hold off.

13         THE COURT:    What I am trying to do is

14    determine what your holding costs are.

15         MR. ACKERMAN:   I don't know how much more they

16    are going to charge, Judge.

17         THE COURT:    What's the period of coverage?

18    When does the policy lapse?

19         MR. ACKERMAN:   The policy just went into

20    existence today or yesterday.

21         THE COURT:    Okay so you have 30 days out of

22    the policy?

23         MR. ACKERMAN:   Yes.  We found out on September

24    8th that Ms. Brunesco had not paid and therefore the old

25    policy had been cancelled for non-payment.  I was calling

1       Vince Caruso who is the person used by Trustees as a broker
2       to get insurance.  We went through so much nonsense.  There
3       were three or four questionnaires.  I was calling on a
4       daily, sometimes three times a day basis.
5                    THE COURT:    Mr. Ackerman, I have no doubt that
6       you have all kinds of aggravation.  I'm simply trying to
7       find out what the number is.
8                    MR. ACKERMAN:   She wouldn't tell me how much
9       more.  All she would say to me is that this will not be
10      refunded no matter what.
11                   THE COURT:    Okay, so you can't now ascertain
12      what your costs are to hold this for more than 30 days?
13                   MR. ACKERMAN:   Other than the extra rentals
14      Judge, I don't know.
15                   THE COURT:    What about the utilities?
16                   MR. ACKERMAN:   How much are the utilities?
17                   THE WITNESS:    You have to consider heat also
18      if we start going into November.
19                   THE COURT:    I understand that, Mr. Maltz.  I'm
20      just trying to get a number.  I'm trying to determine
21      whether the holding costs is $10,000 to $15,000 a month and
22      whether in light of these considerations, that's a cost
23      unfortunately that has to be borne by the estate.
24      Ultimately it comes out of the creditor's pockets.  Some of
25      these people thing they are going to prevail and convince me

1    that they can remove their goods.  I don't know what they

2    are going to convince me to do, but if they lose that fight

3    and they become creditors, then it is in their interest to

4    reduce the administrative expenses.  Because every dollar

5    that gets paid above the line is one less dollar for them to

6    have distributed.  We don't even know the magnitude of the

7    claims.  If there are substantial claims for conversion,

8    then people will have bonafide claims for goods that were

9    sold on an order of the Court.  They are going to have to

10   share those proceeds with other persons who have been

11   subject to conversion.  So Ms. Kessler may be here in two or

12   three different categories.  So, she might find that it's in

13   her interest to keep the cost down.  If she has a claim for

14   conversion, and the Trustee can't recover the goods from

15   whoever holds them, she is going to be in a very different

16   position than some of the other people who have spoken here

17   today who have goods that they believe are on the premises.

18   And your position may change from time to time as the

19   information gets better.  Is it a fair estimate to say your

20   holding costs after October 1st are going to run about

21   $15,000 a month.

22           MR. ACKERMAN:   I would estimate at a minimum,

23   Judge.

24           THE COURT:   What else is there on top of it?

25   There's utilities.

1     MR. ACKERMAN:    There's heat, utilities.  I know

2     that Mr. Maltz will be charging labor costs as he will be

3     requesting reimbursement of labor costs for every time --

4     THE COURT:    His labor costs are not going to

5     increase if he is going to have a delayed sale.

6     MR. ACKERMAN:    If he has to go out and keep on

7     showing inspection, we have to inspect the premises, and

8     make sure it is safe and things of that nature.  If we

9     delay, yes.

10    THE COURT:    And then the building of this

11    character, I don't know how well it is insulated, is it

12    going to keep the temperature fairly low.  These are things

13    that are not going to freeze.

14    THE WITNESS:    We talking about keeping it

15    above freezing so the pipes don't freeze.  I would be more

16    concern, Judge, about the risk of loss than anything else.

17    The store is secure, but if somebody want to gets in, you

18    are going to get in.  Yes, it is alarmed.  And we did

19    contact the Southampton Police Department and make them

20    aware of that.

21    THE COURT:    Yes, but I assume that since these

22    people may be residents of Southampton, they are going to

23    make sure that the police drive by on a fairly regular

24    basis.  These are armed citizenry, right?  They probably

25    have better access to the Southampton Police than you do.

1          MR. ACKERMAN:   Actually Judge --

2          THE COURT:    They may be well known by the

3     police because of their active contributions to the police

4     benevolent society not because they have been locked up for

5     drunk driving or for spousal abuse.  In fact they may even

6     be schoolteachers.  I'm sure Mr. Davidow knows everybody in

7     town.  How may police do you know Mr. Davidow by first name?

8          MR. DAVIDOW:   I don't know any.

9          THE COURT:    You don't know any.

10         MR. DAVIDOW:   I've only lived there for nine

11    years.  Before that, I lived in Patchogue.

12         THE COURT:    You aren't a native by any

13    stretch.  You have to be there 300 years before it starts to

14    count.

15         MR. DAVIDOW:   Probably more.

16         THE COURT:    Mr. Davidow, it satisfies you that

17    I have your interests at heart.

18         My daughter-in-law traces her ancestry to the

19    Clarks.  They first settled in Southampton in about 1650,

20    and one of the succeeding generations was a signatory to the

21    Declaration of Independence.  So my grandson, odd that it

22    is, when his grandfather's name is Bernstein, has a right to

23    participate in DAR activities.

24         There's no end to perspective is there?  So, we

25    need to cut to the chase.  Any further questions of Mr.

1    Maltz?

2              MR. ACKERMAN:    None that I can think of at this

3    point.

4              THE COURT:    Anyone want to ask Mr. Maltz

5    questions?

6              MR. DAVIDOW:   I have a question.

7              THE COURT:    Go ahead Mr. Davidow.   Approach

8    the microphone, please.

9                        CROSS EXAMINATION

10   BY MR. DAVIDOW:

11        Q    If you are going to hold this sale, what time of

12   day are you going to have it?

13        A    What time of day?

14        Q    Yes, what time of day will it begin?

15        A    Normally the inspection would begin at 9 a.m.

16   The auction would begin at 11:00.   We would probably have a

17   viewing the day prior to the sale as well as the morning of.

18        Q    And you expect to get people from all over to

19   come to this sale?

20        A    That is correct.

21        Q    Have you ever been traveling east on Sunrise

22   Highway between 7 and 10 in the morning and get to the end

23   of the Sunrise Highway?

24        A    Unfortunately, I have.

25        Q    Can you describe that to us?

1          A     It's a parking lot.

2          Q     About three miles long?

3          A     If you say.  I would guess five.

4          Q     And you think all of these people you are going

5    to advertise to are going to come through that?

6          A     Yes.

7                THE COURT:     Do you want a midnight madness

8    sale Mr. Davidow?

9                MR. DAVIDOW:    Excuse me?

10               THE COURT:     Do you want a midnight madness

11   sale?

12               MR. DAVIDOW:    All I know is I avoid going to the

13   end of the Sunrise eastbound between 7 and 10 in the morning

14   and so does everybody else.

15               THE COURT:     So, you're telling me that you

16   believe that the sale should open at 2:00 with an

17   opportunity to inspect by noon?

18               MR. DAVIDOW:    I'm saying that it is only the

19   tourists who are willing to brave that in the morning, and

20   they are only there until Labor Day.  After that, you have

21   only workman causing the traffic jams because the workman

22   can't afford to live in the Hamptons.

23               THE COURT:     Okay.

24               MR. ACKERMAN:   Mr. Davidow, when would you say

25   it would be better?  12:00?

1          THE COURT:     I'm trying to determine whether

2     you think there are any hours of the day.

3          THE WITNESS:     Neal, the auction is going to

4     take probably 5-6 hours.  We are also dealing with losing

5     daylight in November.  By 5:00, it's pitch black outside.

6          THE COURT:     Look, this is not comments from

7     the gallery.  You want to ask Mr. Maltz a question, you will

8     be given that opportunity.

9          MS. KESSLER:    I know my time is in question.

10                      CROSS EXAMINATION

11    BY MS. KESSLER:

12         Q    Do you believe that the traffic out here is the

13    same as in Manhattan for the upscale customer that would buy

14    expensive furniture like they house in Morgansen's at the

15    moment?

16         A    I am not sure I understand your question.

17         Q    I'm saying don't you -- do you feel that the

18    traffic and the crowd that is presently out in the Hamptons

19    at this time, I am a resident of Southampton, do you feel

20    that it is equivalent to the traffic and the volume of the

21    crowd that is in Manhattan at this time?

22         A    At this time, I would say there physically more

23    buyers of that caliber in Manhattan.  But I am also fairly

24    confident that they will travel out to the auction sale.

25         Q    Have you ever been out to the Hamptons in the

1    fall?

2        A    Yes, I have.

3        Q    And have you gone to a restaurant?  How do you

4    compare the volume of people out here compared to August

5    which is our selling season?

6        A    How would I compare the volume of?

7        Q    Of people in the area who are willing to come

8    here and spend the weekend et cetera?

9        A    I think there will be a large volume of people.

10    People are going to come especially for this auction sale.

11    They are not going to come out to look at the leaves change

12    and buy a pumpkin and come to an auction.  They are coming

13    out here because there is an auction.  The people who live

14    out here will just be coming because it is the auction.

15        Q    Right.  Isn't it the main interest to get the

16    most money out of this auction and the highest bid on the

17    property?

18        A    Without a doubt.

19        Q    Okay.  So the more volume of people and the

20    longer length of time they can view it would be an issue.

21    Right?

22        A    Well it's not the volume of people.  It's the

23    type of person.  We don't want what we call tire kickers.

24    We want real buyers

25        Q    I just want to mention something that is a little

1      weird.  I don't know if you have ever done it, but I have

2      auctioned merchandise on E-Bay that I could not sell

3      nationally, and have sold internationally for huge amounts

4      more than what I could ever get in Southampton.  Did you

5      consider that option, because you can put an auction on E-

6      Bay for ten days and reach worldwide buyers internationally

7      since you have a lot of rare and unusual furniture,

8      sculptures, et cetera.

9           A    The sale is advertised on our website, and I

10     spoke with Mr. Ackerman about maybe there would be maybe a

11     half a dozen or a dozen items in the store that if they

12     don't realize what we feel the true value is, we would go to

13     other means to market them.

14           MS. KESSLER:   Okay.  Just so that you are aware

15     as a person who deals in antiques and jewelry and such, that

16     the most valuable place you can if you are going to take the

17     property of the people who have consigned their goods to

18     Morgansen's would be through E-Bay because you would have

19     ten days notice to worldwide?. That's just a think I would

20     like to mention.

21           THE WITNESS:   Okay.

22           THE COURT:    Why would you have to go to

23     Morgansen's if you could sell it by E-Bay?

24           MS. KESSLER:   Well if the bankruptcy is

25     purporting to attach these assets --

1          THE COURT:     No, Ms. Kessler, why would you --
2     if you know about the E-Bay facilities, why would you not
3     yourself resort to E-Bay and sell your items over the
4     internet rather than --
5          MS. KESSLER:    That is the way I do it now, but I
6     have been waiting for over a year to get my goods back from
7     them, and it was just a business I had gone to them in the
8     summer of 2001.  It didn't seem to work out.  So I took the
9     merchandise back.  I also live out here, and it is
10     completely dead now, and most people don't travel to the
11     Hamptons.  I used to own a shop in the Village, and I live
12     in Southampton Town, so I don't know if that's the best in
13     the interests of the estate.
14          THE COURT:     We have conflicting comments here.
15     Mr. Davidow, it's mob that you don't even want to go near
16     there.
17          MS. KESSLER:    That's not true.
18          THE COURT:     And then there is no one there.
19     And I don't know how to reconcile those values.
20          MS. KESSLER:    That's totally not true.  People
21     mostly rent in the Hamptons in the summer.  I have a home,
22     and either people rent from me from May to September 15th,
23     and they live.  They go to Paris.  They go to London.
24     Nobody is here anymore except for some people who live here.
25          THE COURT:     Thank you.  Anyone else have any

1    question of Mr. Maltz.

2              MR. ACKERMAN:   I just want to make one thing

3    clear.  When I heard the E-Bay thing, it sounded great, but

4    Ms. Cavanagh pointed out to me that they are not bonded

5    auctioneers.  There may be some bonded E-auctioneers, but

6    Mr. Maltz is bonded, and that makes a grave difference.  It

7    means that if there is a theft or conversion of the items, I

8    can sue on the bond, things like that.  You testify Mr.

9    Maltz.

10             THE WITNESS:   Also there can be return

11   problems.  I mean, payment problems, shipping problems.  The

12   goods aren't as described.

13                      RE-DIRECT EXAMINATION

14   BY MR. ACKERMAN:

15        Q    Are you required to be bonded in order to act as

16   an auctioneer in the Eastern District of New York?

17        A    Yes, that is correct.  I spoke to Ms. Cavanagh

18   about that the other day.

19             THE COURT:     Okay.  Any other points?

20             MR. FAVER:   Just real quickly Judge.

21                       CROSS EXAMINATION

22   BY MR. FAVER:

23        Q    You may have mentioned this already.  Have you

24   conducted auctions in the Hamptons?

25        A    Yes, I have.

1          Q     Approximately how many?

2          A     Probably a half a dozen.

3          Q     And when was the last one?

4          A     I sold a house in Quogue probably a year, year

5     and a half ago.  We had a retail store in Watermill, other

6     property, boat yards.

7          Q     Have you ever sold items as those that we are

8     discussing today?

9          A     Not in the Hamptons.

10          Q     When is the high season?

11          A     When is the high season for where?

12          Q     The Hamptons?

13          A     I would think anytime June, July, or August.

14          Q     So October is after the high season, correct?

15          A     Without a doubt.  I don't think that's an issue

16     here.

17          Q     Will items sell for a higher price during the

18     high season?

19          A     It's really very difficult to say.  You have two

20     people there who want that item, it could be in the dead of

21     winter, and it will bring more money than the high season.

22          Q     So the more people you have, the chances are the

23     higher the price will accrue, correct?

24          A     No, that's incorrect.  The more real buyers you

25     have, the better the chances are.

1          Q    And the higher number of people you have, the

2    chances are, the higher number of real buyers you have,

3    correct?

4          A    Not really.

5          Q    Would it be an inordinate burden -- approximately

6    how many items are there out there.

7          A    A good estimate is probably 500 items.  I could

8    be off by 100 items either way.

9          Q    500 items.  And you already testified I believe

10   of multiple sales, not simply just one auction, correct?

11         THE COURT:    He said two sales.

12        A    I said it is possible that we may elect to do two

13   sales.  I would need to discuss that with Mr. Ackerman.

14         Q    Would it be an inordinate burden than to withhold

15   say 30 to 40 auction items for the second sale?

16         THE COURT:    Mr. Faver, you were already

17   indicated that we are not going to treat these persons who

18   are here today more favorably than others who are similarly

19   situated.  So I don't know what the universe is of persons

20   who claim to have entered into consignment agreements or

21   whatever they are.

22         Q    Would it be an inordinate burden -- Well, you do

23   intend to create an inventory, correct -- to create an

24   inventory of exactly which goods are there, correct?

25         A    To trade inventory?

1      Q    To create inventory?

2      A    To create an inventory list.  That is correct.

3      Q    And that inventory will include this 500, 600

4 number of items.

5      A    I will include every single item in that store as

6 well as fixtures, safes, lighting fixtures, anything there

7 we are planning on selling.

8      Q    And Mr. Ackerman mentioned earlier that there are

9 approximately 200-300 or perhaps slightly more consigned

10 orders of people who are similarly situated you are

11 objecting, correct?

12     A    Well, I don't think -- what he found was names of

13 200 people.  We're not sure that they have anything in that

14 store.  We basically went through books and records to try

15 to recreate documentation and make up a list.  I assisted --

16 my staff assisted in helping Mr. Ackerman's people go

17 through drawers to look for consignment agreements.  Some of

18 them go back many years.  These people may have nothing

19 there at all.

20     Q    What exact documents or types of documents did

21 you review in creating his list?

22     A    I did not create the list.  Basically all I did

23 was locate paperwork that I thought Mr. Ackerman or Mr.

24 Ackerman's accountant would want to see: checkbooks,

25 customer lists, Rolodex, consignment forms, whatever

1    paperwork we thought.

2         Q    Approximately how many consignment forms did you

3    find?

4         A    I didn't count them.  I would be throwing a dart.

5         Q    So these names, these 200 to 300 names, we're not

6    even sure whether they are consignors, is that what your

7    saying?

8         A    That's what I'm saying.  Mr. Ackerman didn't say

9    that.  These are just names of people that we found on the

10   premises.

11        MR. ACKERMAN:   Judge may I address that?

12   Because this has nothing to do with Mr. Maltz.

13        THE COURT:    I agree.  It has nothing to do

14   with Mr. Maltz.

15        MR. ACKERMAN:   What we did was anyone who gave a

16   phone call, anyone, anywhere, who had anything in any books

17   and records, I would write down or I instructed Mr. Ira

18   Spiegel, who is my accountant, to write down.  My feeling

19   was I'd rather be over inclusive than under inclusive.

20   There were times Ira, Mr. Spiegel, I apologize, was saying

21   to me I can create a much more firm list.  There might be

22   people on here who are not parties in interest anymore.  I

23   said, Ira, we have to get this notice out.  Prepare the

24   list.  Be over inclusive.  I don't care.  I want all names

25   and all addresses.

1           THE COURT:     So you can't really determine

2    without going through the inordinate exercise of trying to

3    tie in every consignment agreement that you have with every

4    piece of inventory.

5           MR. ACKERMAN: No.

6           THE COURT:     It would be a very expensive

7    procedure.

8           MR. ACKERMAN:   Indeed, the people I would speak

9    to on the phone I would often times say can you make sure

10   you send by fax your name and address and the place where

11   you want notices to be sent to Mr. Spiegel.  I gave his fax

12   number, and they would say to me, I can't get my list

13   together of items, and I think Felicia Brunesco stole stuff

14   and I said you will send that to Ira later.  Right now, we

15   have to get the list.  Just get your addresses over as

16   quickly as possible.

17          MR. FAVER:   Judge, I agree with where I think

18   you were going about putting this off at least until

19   November to sort out all of these legal issues, if that was

20   possibly an idea you were entertaining.

21          THE COURT:     Mr. Faver, you know you are not

22   counterpunch with me, because I am much better at it than

23   you are.

24          MR. FAVER:   I'm not trying to whatsoever.  I'm

25   trying to understand.

1          THE COURT:   I didn't say I was going to put it

2     off to November.  I'm still trying to determine what the

3     holding costs are, what would be the most appropriate date,

4     and just because I asked a question doesn't mean I made any

5     determination.

6          MR. FAVER:   And I didn't suggest otherwise, your

7     Honor.  I got the impression that it was one possible option

8     that was being considered by the Court; and if that's the

9     case, then another possible option which I was trying to

10    sort out now is if there is going to be two sales and we can

11    just pull out the consignment agreements and find out

12    exactly the number of consignment agreements there are,

13    which I don't think is too difficult of a task, I would be

14    willing to help myself in that regard, then we can have the

15    second sale be those items that are in dispute today in the

16    Court.  I am trying to relieve the Court of having to go

17    through a rush decision which is what everyone's concern is

18    here.  I'm just trying to work with the Court and to try to

19    come up with creative ideas of resolving the procedural

20    issues as well as the merits, Judge.

21         MR. ACKERMAN:   Do you want me to address Mr.

22    Faver's.

23         THE WITNESS:    I don't know.  I don't know if

24    there was a question before you.

25         MR. FAVER:   It was a response to Mr. Ackerman.

1              THE COURT:    Okay, fine, thank you.

2              MR. GOLDBERG:   I have a question, your Honor.

3              THE COURT:    Mr. Goldberg.

4                     CROSS EXAMINATION

5    BY MR. GOLDBERG:

6         Q    Mr. Maltz, did you have access to the second

7    warehouse that was mentioned previously?

8         A    I have not.

9              THE COURT:    I don't know what you are talking

10   about.  How should he know.  What second warehouse are you

11   talking about?

12             MR. GOLDBERG:    There was a mention before by

13   the Trustee, your Honor, about a second warehouse.

14             THE COURT:    Do you have an address and a

15   location?

16             THE WITNESS:    I do not.

17             THE COURT:    Do you have an address and a

18   location Mr. Goldberg?

19             MR. GOLDBERG:   No, I do not, your Honor.

20             MR. ACKERMAN:    Judge, what has occurred is this.

21   There has been information provided to me of other

22   possibilities.  I would have to do an Order to Show Cause

23   and Attachment Order.  I do not want to say anything further

24   on the record, because this will be able to be read by the

25   very person I might be suing.

1          THE COURT:     So, you're continuing an

2     investigation based upon some leads you have gotten from

3     some of the people who have called you, and you are not

4     prepared to disclose on the record a warehouse now.

5          MR. ACKERMAN:    I don't know the address.

6          THE COURT:     All right fine.  Presumably you

7     are dealing with that on some reasonably expedited basis.

8     Okay.  Anything else?

9                         CROSS EXAMINATION

10    BY MR. PAPE:

11         Q    Mr. Maltz, how often do you sell or have you

12    conducted an auction of antiques specifically?

13         A    How many times over the last 25 years?

14         Q    Yes.

15         A    Many.

16         Q    Can you put a number on it?

17         A    30-50.

18         Q    So out of 1,000 auctions that you have had in the

19    last 25 years, about 3% of them --

20         A    I've done 1,000 bankruptcy sales.  I'm guessing.

21         Q    But a very small percentage of your overall

22    business is in antiques, I take it?

23         A    That is correct.

24         Q    Do you find that typical bankruptcy sales or an

25    auction that you hold, the people come from locally or they

1    travel from afar?

2          A    Both.  Local and they travel.  It depends on the

3    item that you are selling.

4          MR. PAPE:   I would just like to submit to the

5    Court that antiques -- I think one of the biggest problems

6    that Morgansen's had is that they were trying to fit a round

7    peg into a square hole.

8          THE COURT:    Do you want to explain that to me.

9          MR. PAPE:   Well Louis XIV gilded chair doesn't

10   seem to sell well in the Hamptons in a turn of the century

11   shingled house, and I think a lot of the merchandise that is

12   contained in the Southampton store is better suited for

13   possibly people that live in Manhattan or in other areas --

14   possible suburban areas.

15         THE COURT:    You're not going to get Sotheby's

16   to come in at this level, are you?

17         MR. ACKERMAN:   Judge, I had thought about that,

18   and I am just going through a case now called Howard Adler.

19   It's a matter of record.

20         THE COURT:    What's that?

21         MR. ACKERMAN:   It's a case before Judge

22   Signowski called Howard Adler and what happened is we

23   consigned stuff to Christy's.  It was the most horrible

24   experience.  They do sales once every nine months.  They

25   refused to show it -- they will show it whenever they feel

1    it is appropriate, and then if they don't sell it after

2    maybe three years -- I think it was two years -- and I think

3    there were two times that they would put it up for sale,

4    they give you a phone call.  Pick up your stuff by tomorrow.

5    And that is what just happened to me.  I just had to run

6    down there and pick up three paintings which we had

7    consigned to Christy's under an order of Judge Signowski.  I

8    do not want to use them.  These were things that I thought

9    about when I was considering how to go about the sale.

10           THE COURT:      I assume there are dealers who

11    deal with different kinds of objects, and there may be ways

12    of treating this.  You're tending to treat this as an

13    undifferentiated mass, and it may be possible to have

14    dispositions that use different persons.  But I agree that

15    you are not going to the large houses and get very much

16    interest on this stuff.  It doesn't pay for them to put a

17    dozen items through their catalogues.

18           But I don't know what's the largest auctioneer or

19    specialized antique dealer in this part of Long Island.  I

20    assume there are a number of competitors of Morgansen's who

21    are located -- that have much more space and maybe some of

22    these people have dealt with them in the past and maybe

23    there is someone else who might be able to assist.  But, as

24    I say, those are your judgments to make.

25           The only question is, is there is something

1        inappropriate about this sale because it is not the function

2        of the Court to make a determination whether I think there

3        is a better way of getting value or a creditor's way of

4        getting better value.  It's really something within the

5        Bankruptcy Court's purview, to at least determine that an

6        auction sale should not be authorized at all or is it merely

7        a question of timing.  I am not waiting until July and

8        August in the high season and burdening Mr. Ackerman with

9        the overhead costs to get to high season.

10              Anything further, Mr. Ackerman?

11                   RE-DIRECT EXAMINATION

12       BY MR. ACKERMAN:

13       Q    Mr. Maltz do you get phone calls from people who

14       ask to be notified of bankruptcy sales?

15       A    All the time.

16       Q    Do you have a special list for such persons?

17       A    Yes, we do.

18       Q    Do they often appear at these sales?

19       A    Yes, they do.

20       Q    And do you also get lists from the Trustees

21       themselves of people who have asked to be notified of

22       bankruptcy sales?

23       A    That is correct.  Just since we had the notice of

24       this bankruptcy posted on the door at Morgansen's, we

25       probably have received 30-40 phone calls from people who

1    want to be notified when the auction is going to take place.

2    You're a builder?

3              MR. PAPE:   Yes.

4              THE WITNESS:    I spoke to someone who is

5    building a 25,000 sq. ft. house that is going to be

6    completed in November who wants -- he can't wait to get into

7    the store with his wife, to come to the auction to see

8    what's there.  So there are people there.  There is money

9    there.

10             MR. PAPE: I think antiques are a specialized

11   area.  I lived in Englewood, New Jersey for a while, and I

12   had a home there and collected a lot of stuff.  Went to a

13   lot of auctions and bought a lot of stuff, and I have --

14             THE COURT:    Mr. Pape, where were you living?

15             MR. PAPE:   Englewood, New Jersey.

16             THE COURT:    Englewood.

17             MR. PAPE:   Yes.  I had a yard sale at one time.

18   I was very unsuccessful, and I hired a company by the name

19   of Regal Antiques, and they advertised this thing.  You

20   wouldn't believe, but I would say at least 750 people walked

21   through my house and I had an unbelievable turnout.  Now,

22   I'll tell you that I have averaged -- I had a yard sale.  I

23   advertised in the newspaper, and put signs up on the street

24   and all of that, and the showing was horrible, and I hired

25   the right people.  I'm wondering -- I would suggest, I mean

1    you are going to be involved in this, that you might want to

2    think about working with someone who specializes in

3    antiques.

4              THE WITNESS:    I work with other auctioneers

5    who specialize in antiques.  If we don't know what something

6    is, we call them in.  They make the determination as far as

7    value or where an item should be placed or sold, we do that.

8              MR. PAPE:   But 80% of the things that are going

9    to be sold are going to be sold to dealers, and getting a

10   list of dealers and finding the dealers out there, I think

11   is where it makes sense to work in conjunction.

12             THE WITNESS:    I hope you're wrong and 80% of

13   the stuff in there is sold to end users and not dealers, and

14   the dealers are standing there not being able to buy

15   anything.

16             MR. PAPE:   It's possible, but you are going to

17   find a lot of dealers are going to be interested.

18             THE WITNESS:    We're definitely going to find a

19   lot of dealers there.

20             THE COURT:    This isn't a debate.  Ask him a

21   question, he'll tell you.  I know this is a function of some

22   of you being non-lawyers.  If you have some suggestions,

23   what you believe would realize higher value, I'm sure Mr.

24   Ackerman is all ears.  So if you have some suggestions how

25   you think this could be more effectively marketed than the

1           proposal he made, let him know about it.

2                   MR. PAPE:   Your Honor, I would just like to say

3           this.  I would like to hear from someone who is certified in

4           appraising antiques and someone who specializes in that

5           business to view the items at Morgansen's and render an

6           opinion on whether or not that is in fact the proper venue

7           for this sale.  Thank you.

8                   THE COURT:    All right.  If you have a

9           suggestion, give it to Mr. Ackerman.  Okay.  Ma'am.

10                  MS. GOLDBERG:   My name is Barbara Goldberg, and

11          I would just like to address -- This is just information for

12          Mr. Ackerman.  Several months ago we stopped off at

13          Morgansen's to see if any of our property had been sold, and

14          we already found several chairs there.  We didn't see

15          anything else, and we said Felicia where are our things.

16          She said well I like to rotate my stock, and I have them in

17          a warehouse, and now I am very busy and I can't speak to you

18          anymore.  And she was with some customers so we left.

19                  When we went to the viewing at Morgansen's, I

20          believe it was last Friday, most of those things but not

21          all, were back.  And I am just wondering did she have

22          someone bring them from somewhere.  Suddenly, they were

23          back.

24                  THE COURT:    Is this a question of Mr. Maltz?

25          If you want to talk to Mr. Ackerman, you don't need to use

1      me as a conduit.  You can talk to him directly.  If you

2      think there are some things that call for an investigation,

3      talk to him.

4              MS. GOLDBERG:   Judge, I just wanted to have my

5      turn to speak, and I wanted to have this on the record.  So

6      thank you for the opportunity.

7              THE COURT:     Thank you Ms. Goldberg.  That's

8      what the purpose of this meeting on October 9th is.  But if

9      you can provide information to Mr. Ackerman, preferably in

10     writing, he will be able to follow up.

11                            CROSS EXAMINATION

12     BY MS. KESSLER:

13        Q    Would it be feasible to have two auctions since

14     you are looking to quickly catch a season and possibly sell

15     the merchandise that you have on record that Morgansen's

16     owns that they have records that they have purchased as a

17     buyer and then subsequently give the Court time to determine

18     the issues on the consigned good for the ownership and

19     whatever we are contesting today, and that way you would

20     take the benefit of the season for part of the goods.

21        A    That's really a decision for Mr. Ackerman to

22     make.

23        Q    So you don't have like a separation of goods that

24     Morgansen's owns and goods that consignor's have?

25        A    The only goods I know that belong to consignors

1    is the people who came in last Friday, and identified their

2    items, and were you there last Friday?

3         Q    I think I went on one of the days.  I don't

4    remember.

5         A    And we put a tag on those items, but the problem

6    being most of the list will say, one painting.  There are

7    100 paintings in the store.

8         Q    So, how are you determining what is the property

9    of Morgansen's that they have purchased as a buyer and what

10   is the property of consignors?

11        A    When the consignors come in with their

12   documentation.

13        Q    But you haven't notified all of the consignors

14   because you don't even know who they are.  Is the owner of

15   Morgansen's, Felicia, required to give you a list?

16        A    Mr. Ackerman has been speaking for the last five

17   hours about a list of 200-300 names that he created.

18        Q    But you don't know who has property, and who

19   doesn't, what Morgansen's owned, what other people owned, so

20   you want to go ahead an auction all of it together without

21   it.  Is that correct?

22        A    That is correct.

23             MR. DUBIN:    Your Honor.

24             THE COURT:    I'm telling you.  You're pushing

25   the point.  Go ahead.

1          MR. DUBIN:   I have been in this business for 55

2     years.

3          THE COURT:    What business?

4          MR. DUBIN:   The antique business.  I deal with

5     Christy's and Sotheby's.  I have worked with Doyle in sales

6     out there in Long Island.  I know the inventory at

7     Morgansen's.  If it sells, it will not sell to cover his

8     costs and their costs.  Nobody will get a dime.  I know this

9     business.  The only fair thing to do is to give back to the

10    consignors the things that they can actually prove belong to

11    them and garbage the rest because that is what is going to

12    happen.

13         THE COURT:    Thank you.

14         THE WITNESS:    Am I excused Judge?

15         THE COURT:    Yes, Mr. Maltese.

16         THE WITNESS:    Thank you.

17         THE COURT:    I'm going to talk to the Clerk.  I

18    am no longer taking cases for the Hamptons.

19         Mr. Ackerman, do you have any closing argument?

20         MR. ACKERMAN:    Yes, thank you Judge.  I believe

21    that consigned property is clearly property of the estate.

22    I request authorization to conduct the sales as soon as

23    possible.  I will take all of these things in mind because

24    my desire is to optimize the price.  I pride myself on

25    getting the best distribution I can for the creditors.  I

1          will take every single one of these in mind and I will

2          consult with Mr. Maltz.  Perhaps we should have someone

3          assisting.

4                    MALE VOICE:   How can you sell my property

5          without my permission.

6                    MR. ACKERMAN:   That's a matter of law.  That is

7          my closing comment.  I respectfully request that the relief

8          granted be given, your Honor.

9                    THE COURT:    I will consider it.  But I do

10         think you should discuss with Mr. Maltz a date later than

11         the one you requested.

12                    MR. FAVER:   Judge?

13                    THE COURT:    Yes.

14                    MR. FAVER:   Can I have one minute to review as

15         well?

16                    THE COURT:   I just asked him to summarize his

17         position.  You've summarized your position on several

18         occasions.  What is it that you want to say, Mr. Faver?

19                    MR. FAVER:   Just briefly, Judge.  I think that

20         when you look at the merits of the legal issues who have

21         been asked to resolve, they clearly weigh in favor as my

22         paper suggests and as the argument this morning as I laid

23         out suggests in favor of these consignors.  Article 9 rather

24         does not apply and Article 2 doesn't apply either.  It's

25         common law agency and the goods ought to be returned to us.

1     And I think the Court sees a very serious concern with the

2     timing of all of this and the rush to do it. And maybe a

3     moment should be taken to reflect to make this gets done and

4     gets done right and properly and fairly before these people,

5     my personal belongings are liquidated, and we no longer have

6     the chance of having them returned which would be the

7     appropriate remedy should we prevail in the merits of our

8     objections, Judge. Thank you.

9             MR. GOLDBERG: I have one last word, your Honor.

10    Your Honor, two things. Number one, all of the property of

11    the debtor has not been ascertained. As yet, there may be a

12    second warehouse with goods that we are not aware of.

13           THE COURT: I heard that argument Mr.

14    Goldberg.

15            MR. GOLDBERG: All of the possible consignors

16    have not been identified as yet. There may be others with

17    goods that they left with Ms. Brunesco, and therefore, I

18    believe that this sale is premature. Thank you, your Honor.

19           THE COURT: I expect to see the Memorandum of

20    Law within the next ten days, and I will make the

21    appropriate suggestion on orders. I suggest that all of you

22    if you wish to attend the meeting, it will have to be on a

23    date other than October 9th, and it will have to be at a

24    facility other than the initially scheduled hearing room,

25    but recognize that Trustee has certain priority rights to

1    ask questions, and he may have to determine that it is
2    necessary to bring Ms. Brunesco in and she may come with a
3    lawyer and plead the Fifth Amendment because that is what is
4    going to happen because you are accusing her of being a
5    thief.  And if she has any lawyer who is well-counseled, she
6    is going to take the Fifth.

7                 MR. PAPE:   May I?

8                 THE COURT:    Of course.  The evening is young
9    and it is still sunny out.

10                MR. PAPE:   Your Honor, I just want to be clear
11   on one point that I made about the creation of a committee.
12   I would hope that we would be able to form a committee and
13   determine --

14                THE COURT:    That's up to you guys.

15                MR. PAPE:   Well, appoint some counsel.  But I
16   would perhaps ask that this hearing be adjourned until we
17   can be represented by counsel on this matter, and maybe take
18   up some further arguments.  I agree and I thank you very
19   much for your patience.  We are not attorneys, many of us,
20   and I'm sure it has been exasperating for you, but --

21                THE COURT:    It's not exasperating.  It's just
22   that when I have heard the point three and four times, it
23   just doesn't make any further sense.

24                MR. PAPE:   But it might be helpful for us to be
25   represented by counsel.  They may be able to make this point

1     more consistently.

2              THE COURT:   Mr. Pape, you know, if you are a

3     builder, this must remind you of some kind of zoning hearing

4     where everyone in the neighborhood comes out and says don't

5     build in my backyard, and you haven't done the appropriate

6     environmental impact statements.  And if any of the members

7     on the zoning board dare to approve this plan, we will

8     remove you from office because we didn't move out here to be

9     crowded out by these 25,000 sq. ft. ugly homes.  You need to

10    preserve the tranquility of the neighborhood.  We hear our

11    traffic studies.  If you build seven more homes, everything

12    will be deadlocked.  And I am sure some of you have gone to

13    those hearings.  Does it play like a zoning hearing?

14             MR. ACKERMAN:   So today is the first, Judge, you

15    want papers into you by the 11th, and they would also be

16    sent to me?

17             THE COURT:    Yes.

18             MR. ACKERMAN:   They would have to be served on

19    me.

20             THE COURT:    I want a copy for my chambers.  If

21    this is electronic filing, then you are going to have to

22    resort to electronic filing, talk to the Clerk's Office, and

23    I also ask that you submit a copy to Ms. Cavanagh as the US

24    Trustee.  So a copy to me, a copy to Mr. Ackerman, and a

25    copy to Ms. Cavanagh.  If you want to share claims, you may

1    want to share names and addresses.

2              MS. CAVANAGH:   Your Honor, I think for

3    informational purposes, those who cannot electronically file

4    can file by disk to the Court.

5              THE COURT:   Okay.

6              MR. ACKERMAN:   As I said Judge, I just saw the

7    11th was a Saturday, so it should be October 13th.

8              THE COURT:   Fine.

9              MALE VOICE:   Will Mr. Ackerman be submitting any

10   sort of papers?

11             THE COURT:   I don't think so.

12             MR. ACKERMAN:   In the event that I think I would

13   like to submit them, I will make sure that anyone who serves

14   me will be also notified and they, of course, will be

15   served.

16             THE COURT:   I don't want this to turn into a

17   paper war.   The presumption will be that you'll have an

18   opportunity to make an argument on an expedited basis, but I

19   need to schedule a further hearing on this.   I can't have

20   this drag on.

21

22             CLERK:   October 14th at 10:30 a.m.

23             THE COURT:   October 14th at 10:30 a.m.   That

24   will give you an opportunity to go to the meeting of

25   creditors if it can be scheduled before that date.   October

1    14th at 10:30 a.m.  And I will review your papers by then.

2    By that time, we will have studied these papers further, and

3    we will be in a better position to try to assess all of

4    these items, because I would like to be able to make a

5    ruling on that date.

6              Matter is adjourned.  Thank you for your

7    patience.

8              MR. ACKERMAN:    Thank you judge.

9         (Whereupon, the hearing was adjourned.)

10

11

12

13

14

15

16

17

18

19

20

1

2                    C E R T I F I C A T E

3

4            I, KAREN KNIPPER, HEREBY CERTIFY THAT:

5    (A) THE FOREGOING PAGES REPRESENT AN ACCURATE AND COMPLETE

6    TRANSCRIPTION OF THE RECORD OF THE PROCEEDING BEFORE THE

7    UNITED STATES BANKRUPTCY COURT FOR THE EASTERN DISTRICT OF

8    NEW YORK, HON. STAN BERNSTEIN PRESIDING, IN THE MATTER OF

9    MORGANSEN'S, LTD., AND (B) THESE PAGES CONSTITUTE A TRUE

10   COPY OF THE TRANSCRIPT OF THE PROCEEDING.

11

12            _____

13            Karen Knipper, Transcriber

14

15

16

17

18

19

20

21

22

23

24

25